# MILO SHEFF ET AL. *v.* WILLIAM A. O'NEILL ET AL.
## (15255)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

1

Argued September 28, 1995—officially released July 9, 1996*

*Wesley W. Horton,* with whom were *John Brittain, Martha Stone, Philip D. Tegeler, Dennis D. Parker,* pro hac vice, and, on the brief, *Sandra DelValle,* pro hac vice, *Kenneth Kimerling,* pro hac vice, *Wilfred Rodriguez, Christopher A. Hansen,* pro hac vice, *Theodore M. Shaw,* pro hac vice, and *Marianne L. Engelman Lado,* pro hac vice, for the appellants (plaintiffs).

*Richard Blumenthal,* attorney general, with whom were *Gregory T. D'Auria, Carolyn K. Querijero, Bernard F. McGovern, Jr.,* and *Martha Watts Prestley,*

---

* July 9, 1996, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

assistant attorneys general, for the appellees (defendants).

*Maurice T. FitzMaurice* and *Carolyn A. Magnan* filed a brief for the city of Hartford et al. as amici curiae.

*Kathryn Emmett, Jane W. Glander* and *Elise Mayers Bouchner* filed a brief for the Capitol Region Conference of Churches et al. as amici curiae.

*David S. Golub* and *Jonathan M. Levine* filed a brief for the Connecticut Legislative Black and Puerto Rican Caucus et al. as amici curiae.

*Martin Margulies* filed a brief for the Society of American Law Teachers as amicus curiae.

*Stephen C. Willey*, pro hac vice, and *Michael P. Koskoff* filed a brief for the Connecticut Federation of School Administrators et al. as amici curiae.

PETERS, C. J. The public elementary and high school students in Hartford suffer daily from the devastating effects that racial and ethnic isolation, as well as poverty, have had on their education. Federal constitutional law provides no remedy for their plight. The principal issue in this appeal is whether, under the unique provisions of our state constitution, the state, which already plays an active role in managing public schools, must take further measures to relieve the severe handicaps that burden these children's education. The issue is as controversial as the stakes are high. We hold today that the needy schoolchildren of Hartford have waited long enough. The constitutional imperatives contained in article eighth, § 1,[1] and article first, §§ 1 and 20,[2] of our

---

[1] The constitution of Connecticut, article eighth, § 1, provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

[2] The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

state constitution entitle the plaintiffs to relief. At the same time, the constitutional imperative of separation of powers persuades us to afford the legislature, with the assistance of the executive branch, the opportunity, in the first instance, to fashion the remedy that will most appropriately respond to the constitutional violations that we have identified. The judgment of the trial court must, accordingly, be reversed.

## I

## THE HISTORY AND FACTUAL BACKGROUND OF THIS LITIGATION

In their action seeking a declaratory judgment and injunctive relief, the eighteen plaintiffs[3] filed a four count complaint in which they claimed that the defendants[4] had a constitutional obligation, under article

---

The constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[3] The eighteen plaintiffs are: Milo Sheff, an African-American child residing in Hartford; Wildalize Bermudez, a Latino child residing in Hartford; Pedro Bermudez, a Latino child residing in Hartford; Eva Bermudez, a Latino child residing in Hartford; Oskar M. Melendez, a Latino child residing in Glastonbury; Waleska Melendez, a Latino child residing in Glastonbury; Martin Hamilton, an African-American child residing in Hartford; Janelle Hughley, an African-American child residing in Hartford; Neiima Best, an African-American child residing in Hartford; Lisa Laboy, a Latino child residing in Hartford; David William Harrington, a white child residing in Hartford; Michael Joseph Harrington, a white child residing in Hartford; Rachel Leach, a white child residing in West Hartford; Joseph Leach, a white child residing in West Hartford; Erica Connolly, a white child residing in Hartford; Tasha Connolly, a white child residing in Hartford; Michael Perez, a Latino child residing in Hartford; and Dawn Perez, a Latino child residing in Hartford.

[4] The defendants are: William O'Neill or his successor as the governor of the state of Connecticut; the state board of education of the state of Connecticut; Abraham Glassman, A. Walter Esdaile, Warren J. Foley, Rita Hendel, John Mannix and Julia Rankin or their successor members of the state board of education; Gerald N. Tirozzi or his successor as the commissioner of education for the state of Connecticut; Francis L. Borges or his

eighth, § 1, and article first, §§ 1 and 20, to remedy alleged educational inequities in the Hartford public schools. The trial court denied the defendants' motions to strike the complaint and for summary judgment. After an evidentiary hearing, the court concluded, however, that the plaintiffs had failed to prove that "state action exists under the facts and circumstances of this case," and rendered judgment in favor of the defendants.

A

The plaintiffs' revised four count complaint alleges that students in the Hartford public schools are burdened by severe educational disadvantages arising out of their racial and ethnic isolation and their socioeconomic deprivation. Seeking declaratory and injunctive relief, each count of their complaint is grounded on the proposition that the defendants have failed to fulfill their state constitutional responsibility to remedy these severe educational disadvantages. Count one alleges that the defendants bear responsibility for the de facto racial and ethnic segregation between Hartford and the surrounding suburban public school districts and thus have deprived the plaintiffs of an equal opportunity to a free public education as required by article first, §§ 1 and 20, and article eighth, § 1. Count two alleges that the defendants have perpetuated the racial and ethnic segregation that exists between Hartford and the surrounding suburban public school districts, and thus have discriminated against the plaintiffs and have failed to provide them with an equal opportunity to a free public education as required by article first, §§ 1 and

successor as the treasurer of the state of Connecticut; and J. Edward Caldwell or his successor as the comptroller of the state of Connecticut.

The plaintiffs expressly disavowed at trial any claim that their constitutional rights had been violated by any acts or omissions on the part of the city of Hartford or its board of education, or on the part of the twenty-one surrounding suburban towns or their boards of education.

20, and article eighth, § 1. Count three alleges that the defendants have failed to provide the plaintiffs with an equal opportunity to a free public education as required by article first, §§ 1 and 20, and article eighth, § 1, because the defendants have maintained in Hartford a public school district that, by comparison with surrounding suburban public school districts: (1) is severely educationally disadvantaged; (2) fails to provide equal educational opportunities for Hartford schoolchildren; and (3) fails to provide a minimally adequate education for Hartford schoolchildren. Count four alleges that the defendants have failed to provide the plaintiffs with a substantially equal educational opportunity as required by Connecticut law, including General Statutes § 10-4a,[5] in violation of the plaintiffs' rights to due process under article first, §§ 8 and 10.[6]

The defendants not only denied the underlying factual and legal premises of the plaintiffs' complaint, but also raised seven special defenses. These defenses alleged that the defendants were not liable because of: (1) sovereign immunity; (2) stare decisis; (3) separation of powers; (4) the lack of a justiciable controversy; (5)

---

[5] General Statutes § 10-4a provides: "Educational interests of state identified. For purposes of sections 10-4, 10-4b and 10-220, the educational interests of the state shall include, but not be limited to, the concern of the state (1) that each child shall have for the period prescribed in the general statutes equal opportunity to receive a suitable program of educational experiences; (2) that each school district shall finance at a reasonable level at least equal to the minimum expenditure requirement pursuant to the provisions of section 10-262j an educational program designed to achieve this end; and (3) that the mandates in the general statutes pertaining to education within the jurisdiction of the State Board of Education be implemented."

[6] The constitution of Connecticut, article first, § 8, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

The constitution of Connecticut, article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

the plaintiffs' failure to join necessary parties, including the city of Hartford; (6) the absence of state action; and (7) the unavailability of court-ordered remedies.

The trial court initially denied the defendants' motions to strike and for summary judgment that were premised on these special defenses. After an evidentiary hearing, however, the court ruled in favor of the defendants on their sixth special defense. Relying heavily on principles drawn from federal constitutional law, the court determined that the plaintiffs could not prevail without establishing that state action was the "direct and sufficient cause of the conditions" alleged in their complaint, and concluded that they had failed to prove such causation. Finding no such state action, the court rendered judgment for the defendants without addressing the merits of the constitutional claims asserted by the plaintiffs.

B

Because of the importance of the novel and controversial questions of constitutional law raised in this litigation, pursuant to Practice Book § 4023 and General Statutes § 51-199 (c), we transferred to this court the plaintiffs' appeal from the judgment of the trial court. Noting that the plaintiffs' complaint had been pending since 1989, we held a special hearing, shortly after the appeal had been filed, to order supplementation of the trial record. We directed the parties to prepare a joint stipulation of all relevant undisputed facts and to assist the trial court in making findings of fact on matters upon which the parties could not agree.[7] Our resolution of this appeal has proceeded on the basis of this supple-

[7] We express herewith our sincere appreciation to all counsel for the diligence and the expedition with which they responded to this court's request. Their professionalism is to be commended.

We also express herewith our sincere appreciation to the trial court for the diligence and the expedition with which that court responded to this court's request.

mented record, which the parties and the court promptly prepared in accordance with our order.

## C

The stipulation of the parties and the trial court's findings establish the following relevant facts. Statewide, in the 1991–92 school year, children from minority groups constituted 25.7 percent of the public school population. In the Hartford public school system in that same period, 92.4 percent of the students were members of minority groups, including, predominantly, students who were either African-American or Latino.[8] Fourteen of Hartford's twenty-five elementary schools had a white student enrollment of less than 2 percent. The Hartford public school system currently enrolls the highest percentage of minority students in the state. In the future, if current conditions continue, the percentage of minority students in the Hartford public school system is likely to increase rather than decrease. Since 1980, the percentage of African-Americans in the Hartford student population has decreased, while the percentage of Latinos has increased. Although enrollment of African-American students in the twenty-one surrounding suburban towns has increased by more than 60 percent from 1980 to 1992, only seven of these school districts had a minority student enrollment in excess of 10 percent in 1992. Because of the negative consequences of racial and ethnic isolation, a more integrated public school system would likely be beneficial to all schoolchildren.

A majority of the children who constitute the public school population in Hartford come from homes that are economically disadvantaged, that are headed by a single parent and in which a language other than English is spoken. The percentage of Hartford schoolchildren

---

[8] We use the terms "African-American" and "Latino" because they are the terms that the parties used in their relevant stipulations of fact.

at the elementary level who return to the same school that they attended the previous year is the lowest such percentage in the state. Such socioeconomic factors impair a child's orientation toward and skill in learning and adversely affect a child's performance on standardized tests. The gap in the socioeconomic status between Hartford schoolchildren and schoolchildren from the surrounding twenty-one suburban towns has been increasing. The performance of Hartford schoolchildren on standardized tests falls significantly below that of schoolchildren from the twenty-one surrounding suburban towns.

Directly or indirectly, the state has always controlled public elementary and secondary education in Connecticut. The legislature directs many aspects of local school programs, including courses of study and curricula, standardized testing, bilingual education, graduation requirements and school attendance. Since 1941, as a result of a state statute; see General Statutes § 10-240;[9] the public school district boundaries in Hartford have been coterminous with the boundaries of the city of Hartford. Since at least 1909, as a result of another state statute; see General Statutes § 10-184;[10] schoolchildren

---

[9] General Statutes § 10-240 provides: "Control of schools. Each town shall through its board of education maintain the control of all the public schools within its limits and for this purpose shall be a school district and shall have all the powers and duties of school districts, except so far as such powers and duties are inconsistent with the provisions of this chapter."

[10] General Statutes § 10-184 provides: "Duties of parents. All parents and those who have the care of children shall bring them up in some lawful and honest employment and instruct them or cause them to be instructed in reading, writing, spelling, English grammar, geography, arithmetic and United States history and in citizenship, including a study of the town, state and federal governments. Each parent or other person having control of a child seven years of age and over and under sixteen years of age shall cause such child to attend a public day school regularly during the hours and terms the public school in the district wherein such child resides is in session, or while the school is in session in which provision for the instruction of such child is made according to law, unless the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools."

have been assigned.to the public school district in which they reside.

The legislature provides substantial support to communities throughout the state to finance public school operations. State financial aid is distributed so that the neediest school districts receive the most aid. Accordingly, in the 1990–91 and 1991–92 school years, overall per pupil state expenditures in Hartford exceeded the average amount spent per pupil in the twenty-one surrounding suburban towns. The state reimburses Hartford for its school renovation projects at a rate that is considerably higher than the reimbursement rate for the twenty-one surrounding suburban towns.

The state has not intentionally segregated racial and ethnic minorities in the Hartford public school system. Except for a brief period in 1868, no students in Connecticut have intentionally been assigned to a public school or to a public school district on the basis of race or ethnicity.[11] There has never been any other manifestation of de jure segregation either at the state or the local level. In addition to various civil rights initiatives undertaken by the legislature from 1905 to 1961 to combat racial discrimination, the state board of education was reorganized, during the 1980s, to concentrate on the needs of urban schoolchildren and to promote diversity in the public schools. Since 1970, the state has supported and encouraged voluntary plans for increasing interdistrict diversity.

The state has nonetheless played a significant role in the present concentration of racial and ethnic minorities in the Hartford public school system. Although

---

[11] In 1868, Hartford enacted a town ordinance that assigned African-American students to a specially designated public school. In response to the town ordinance, the General Assembly enacted legislation that provided for open enrollment in all of the state's public schools without regard to race. Public Acts, May Sess., 1868, c. CVIII; see General Statutes § 10-15c.

intended to improve the quality of education and not racially or ethnically motivated, the districting statute that the legislature enacted in 1909, now codified at § 10-240,[12] is the *single most important factor* contributing to the present concentration of racial and ethnic minorities in the Hartford public school system. The districting statute and the resultant school district boundaries have remained virtually unchanged since 1909. The districting statute is of critical importance because it establishes town boundaries as the dividing line between all school districts in the state.

Nonetheless, according to the findings of the trial court, poverty, and not race or ethnicity, is the principal causal factor in the lower educational achievement of Hartford students. The court also found that the Hartford public school system provides its students with a minimally adequate education under article first, §§ 1 and 20, and article eighth, § 1, because, regardless of the comparative levels of achievement between Hartford students and students from the twenty-one suburban towns, the education provided to Hartford students gives them a chance to lead successful lives. It further found that the Hartford public school system provides its students with an equal educational opportunity because they receive resources, educational programs and curricula similar to those received by students in other communities in the state. It then found that school district lines would have to be redrawn in order to remedy effectively the severe racial, ethnic and socioeconomic isolation that exists in the Hartford public school system. In addition to these findings addressed to the plaintiffs' specific legal claims, the court also found that any form of mandatory intervention would have to rely on coercive measures that would not assure educationally desirable outcomes.

[12] See footnote 9.

## D

The plaintiffs' appeal challenges the validity of many of the trial court's findings of fact and all of its conclusions of law.[13] The defendants ask us to affirm the judgment of the trial court, by reversing its conclusion that the plaintiffs' complaint is justiciable or by upholding its conclusion that the complaint is barred by an absence of the requisite state action. If we reject these affirmative defenses, the defendants argue that the plaintiffs have failed to establish their claims of law in light of the findings of the trial court. We are unpersuaded by the defendants' affirmative defenses and, on the merits, we reverse the judgment of the trial court.

## II

## THE AFFIRMATIVE DEFENSES

The defendants renew two affirmative defenses that they raised at trial.[14] They argue that the text of article eighth, § 1, deprives the trial court of jurisdiction to consider whether the plaintiffs are entitled to relief by way of an order to the legislature to provide a remedy for their impaired educational opportunities. They also argue that, even if the trial court had jurisdiction, the plaintiffs cannot recover because they have not alleged that their educational impairment results from intentional state misconduct. We are not persuaded by either of these affirmative defenses.

---

[13] The plaintiffs have failed to brief and thus have abandoned the fourth count of their complaint that alleges that the defendants have failed to provide the plaintiffs with a substantially equal educational opportunity in violation of article first, §§ 8 and 10. See *In re Bruce R.*, 234 Conn. 194, 215–16, 662 A.2d 107 (1995); *State* v. *Mejia*, 233 Conn. 215, 223 n.13, 658 A.2d 571 (1995).

[14] The defendants have failed to pursue their defenses based on sovereign immunity, stare decisis and the plaintiffs' failure to join necessary parties. We thus deem these claims abandoned and decline to address them.

## A

The defendants maintain that the trial court should have dismissed the plaintiffs' complaint because the plaintiffs' claims are nonjusticiable. Granting the plaintiffs the relief they seek would, according to the defendants, require this court to respond to a political question that our constitution has expressly and exclusively entrusted to the legislature. We disagree.

Existing precedents describe the uneasy line that distinguishes between cases that are justiciable and cases that are not. Because of the doctrine of separation of powers, courts do not have jurisdiction to decide cases that involve matters that textually have been reserved to the legislature, such as the implementation of a constitutional spending cap; *Nielsen* v. *State*, 236 Conn. 1, 9–10, 670 A.2d 1288 (1996); or the appointment of additional judges. *Pellegrino* v. *O'Neill*, 193 Conn. 670, 683, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984); see also *Nielsen* v. *Kezer*, 232 Conn. 65, 74, 652 A.2d 1013 (1995). In the absence of such a textual reservation, however, it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803); *Pratt* v. *Allen*, 13 Conn. 119, 132 (1839); see *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 2557 (1985); *Horton* v. *Meskill*, 172 Conn. 615, 625, 649–50, 376 A.2d 359 (1977) (*Horton I*); *Preveslin* v. *Derby & Ansonia Developing Co.*, 112 Conn. 129, 145, 151 A. 518 (1930). "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate inter-

preter of the Constitution." *Baker* v. *Carr*, 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); see *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 552, 663 A.2d 317 (1995); *Nielsen* v. *Kezer*, supra, 74–75; see also L. Henkin, "Is There a 'Political Question' Doctrine?," 85 Yale L.J. 597, 599–600 (1976); M. Redish, "Judicial Review and the 'Political Question,' " 79 Nw. U.L. Rev. 1031, 1051–60 (1984–85).

In the context of judicial enforcement of the right to a substantially equal educational opportunity arising under article eighth, § 1, and article first, §§ 1 and 20, justiciability is not a matter of first impression for this court. In *Horton I*, supra, 172 Conn. 615, and *Horton* v. *Meskill*, 195 Conn. 24, 486 A.2d 1099 (1985) (*Horton III*),[15] we reviewed, in plenary fashion,[16] the actions taken by the legislature to fulfill its constitutional obligation to public elementary and secondary schoolchildren. Judicial authority to render these decisions was expressly reaffirmed in *Nielsen* v. *State*, supra, 236 Conn. 9–10, and in *Pellegrino* v. *O'Neill*, supra, 193 Conn. 683.

The defendants do not challenge the continued validity of *Horton I* and *Horton III*, but argue that their claim of nonjusticiability differs. That argument is unavailing. The plaintiff schoolchildren in the present case invoke the same constitutional provisions to challenge the constitutionality of state action that the plaintiff school-

---

[15] In *Horton* v. *Meskill*, 187 Conn. 187, 445 A.2d 579 (1982) (*Horton II*), we addressed the ability of municipalities to intervene in the litigation arising out of our decision in *Horton I*.

[16] The defendants in *Horton I* originally asserted defenses based on justiciability, sovereign immunity and standing. The trial court ruled against the defendants on the issues of justiciability and standing, but did not address the issue of sovereign immunity. *Horton* v. *Meskill*, 31 Conn. Sup. 377, 389, 332 A.2d 113 (1974). In their appeal to this court, the defendants in *Horton I* did not challenge the trial court's ruling.

The defendants in this case have not challenged the standing of the plaintiffs to bring this action.

children invoked in *Horton I* and *Horton III*. The text of article eighth, § 1, has not changed. Furthermore, although prudential cautions may shed light on the proper definition of constitutional rights and remedies; see *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 184–85, 610 A.2d 153 (1992); such cautions do not deprive a court of jurisdiction.

In light of these precedents, we are persuaded that the phrase "appropriate legislation" in article eighth, § 1, does not deprive the courts of the authority to determine what is "appropriate."[17] Just as the legislature has a constitutional duty to fulfill its affirmative obligation to the children who attend the state's public elementary and secondary schools, so the judiciary has a constitutional duty to review whether the legislature has fulfilled its obligation.[18] Considerations of justiciability must be balanced against the principle that every presumption is to be indulged in favor of subject matter jurisdiction. See, e.g., *Federal Deposit Ins. Corp.* v. *Hillcrest Associates*, 233 Conn. 153, 163, 659 A.2d 138

[17] *Simmons* v. *Budds*, 165 Conn. 507, 338 A.2d 479 (1973), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974), on which the defendants rely, is not to the contrary. Although, in that case, we rejected a claim that the defendants, various University of Connecticut officials, had violated the constitutional mandate of article eighth, § 2, that the university "shall be dedicated to excellence in higher education," we did so on the merits. We did not hold that the claim was nonjusticiable.

[18] Courts in other jurisdictions overwhelmingly have reached the same conclusion. See, e.g., *Rose* v. *Council for Better Education, Inc.*, 790 S.W.2d 186, 209 (Ky. 1989); *McDuffy* v. *Secretary of Executive Office of Education*, 415 Mass. 545, 610–11, 615 N.E.2d 516 (1993); *Robinson* v. *Cahill*, 69 N.J. 133, 145–47, 351 A.2d 713, cert. denied sub nom. *Klein* v. *Robinson*, 423 U.S. 913, 96 S. Ct. 217, 46 L. Ed. 2d 141 (1975); *Board of Education* v. *Nyquist*, 57 N.Y.2d 27, 39, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), appeal dismissed, 459 U.S. 1139, 103 S. Ct. 775, 74 L. Ed. 2d 986 (1983); *Board of Education* v. *Walter*, 58 Ohio St. 2d 368, 383–86, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 665, 62 L. Ed. 2d 644 (1980); *Washakie County School District No. 1* v. *Herschler*, 606 P.2d 310, 317–18 (Wyo.), cert. denied sub nom. *Hot Springs County School District No. 1* v. *Washakie County School District No. 1*, 449 U.S. 824, 101 S. Ct. 86, 66 L. Ed. 2d 28 (1980).

(1995); *Simms* v. *Warden,* 230 Conn. 608, 614, 646 A.2d 126 (1994); *State* v. *Metz,* 230 Conn. 400, 410, 645 A.2d 965 (1994); *Tolly* v. *Dept. of Human Resources,* 225 Conn. 13, 29, 621 A.2d 719 (1993); see also *United States Dept. of Commerce* v. *Montana,* 503 U.S. 442, 459, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992). In this case, our precedents compel the conclusion that the balance must be struck in favor of the justiciability of the plaintiffs' complaint.

### B

The defendants maintain that even if the plaintiffs' claims are justiciable, the plaintiffs are not entitled to judicial relief because the educational disparities of which they complain do not result from the requisite state action. The plaintiffs claim that the state bears responsibility to correct the constitutional violations alleged in their complaint because of the state's failure to "take corrective measures to [e]nsure that its Hartford public schoolchildren receive an equal educational opportunity."[19] That failure is actionable, according to the plaintiffs, because of the state's knowledge of the racial and ethnic isolation in the Hartford schools, combined with the state's extensive involvement in the operations of Connecticut's public schools and the impact of state statutes mandating school attendance within statutorily defined school districts. General Statutes §§ 10-184 and 10-240.[20] The defendants maintain, to the contrary, that the state's constitutional duty to provide for the elementary and secondary education of Connecticut schoolchildren is triggered only by state action that is alleged to be intentional state misconduct. The trial court relied on the absence of such intentional state

---

[19] The plaintiffs also claim that the trial court improperly failed to find that the state actively contributed to the allegedly unconstitutional conditions that exist in the Hartford public school system. We find no merit to this claim.

[20] See footnotes 9 and 10.

action in denying relief to the plaintiffs. We disagree with the trial court's decision.

The defendants' argument, derived largely from principles of federal constitutional law, founders on the fact that article eighth, § 1, and article first, §§ 1 and 20, impose on the legislature an *affirmative* constitutional obligation to provide schoolchildren throughout the state with a substantially equal educational opportunity. *Horton I*, supra, 172 Conn. 648–49. It follows that, if the legislature fails, for whatever reason, to take action to remedy substantial inequalities in the educational opportunities that such children are being afforded, its actions and its omissions constitute state action.

The affirmative constitutional obligation that we recognized in *Horton I* and *Horton III*, and reaffirmed recently in *Moore* v. *Ganim*, 233 Conn. 557, 595–96, 660 A.2d 742 (1995), was not premised on a showing that the legislature had played an active role in *creating* the inequalities that the constitution requires it to redress. In *Horton I*, we determined that the state's educational financing scheme was unconstitutional even though it was facially nondiscriminatory and even though the disparities resulting therefrom had not been created intentionally by the legislature. These constitutionally unacceptable disparities developed, instead, "from the circumstance that over the years there [had] arisen a great disparity in the ability of local communities to finance local education," and from the legislature's failure to consider "the financial capability of [each] municipality . . . ." *Horton I*, supra, 172 Conn. 648. In declaring this statutory scheme unconstitutional in *Horton I*, and in requiring further remedial action in *Horton III*, supra, 195 Conn. 38, 43–44, we necessarily determined that the state's failure adequately to address school funding inequalities constituted the state action that is the constitutional prerequisite for affording judicial relief.

The claims now before us likewise implicate the legislature's affirmative constitutional obligation to provide a substantially equal educational opportunity to all of the state's schoolchildren. The plaintiffs document the existence of an extensive statutory system developed in response to the legislature's plenary authority over state public elementary and secondary schools.[21] As a general matter, the plaintiffs challenge the failure of the legislature to address continuing unconstitutional inequities resulting, de facto, from that scheme. In addition, and more specifically, they point to two statutes that directly impact on their claims of constitutional deprivation. State law sets the borders of school districts to coincide with town boundaries; General Statutes § 10-240;[22] and requires all children to attend public school within the district in which they reside. General Statutes § 10-184.[23] The trial court expressly found that the enforcement of these statutes constitutes the "single most important factor" creating the present racial and

[21] In fulfillment of its constitutional mandate to provide for the education of the state's youth, the legislature has developed a detailed and comprehensive educational system. For example, the state identifies the educational interests that must be implemented by the local school boards; General Statutes §§ 10-4a and 10-4b; sets the minimum length of the school year; General Statutes § 10-15; sets the minimum length of the school day; General Statutes § 10-16; generally prescribes particular courses of study; General Statutes §§ 10-16b, 10-18 and 10-19; requires bilingual education under some circumstances; General Statutes § 10-17a; regulates special education programs; General Statutes §§ 10-76b and 10-76d; regulates teacher certification; General Statutes § 10-145b; requires attendance in the school district in which a student resides; General Statutes § 10-184; prescribes requirements for high school graduation; General Statutes § 10-221a; and regulates the suspension and expulsion of students. General Statutes §§ 10-233c and 10-233d. Although the legislature has delegated the day-to-day functioning of the state's public elementary and secondary schools to towns; General Statutes §§ 10-220 (defining duties of boards of education), 10-240 (providing town control of public schools within town boundaries) and 10-241 (defining powers of school districts); the legislature retains and exercises broad statutory authority in discharging its responsibility to meet the demands of the Connecticut constitution.

[22] See footnote 9.

[23] See footnote 10.

ethnic imbalance in the Hartford public school system.[24]
The failure adequately to address the racial and ethnic
disparities that exist among the state's public school
districts is not different in kind from the legislature's
failure adequately to address the "great disparity in the
ability of local communities to finance local education"
that made the statutory scheme at issue in *Horton I*,
supra, 172 Conn. 648, unconstitutional in its appli-
cation.[25]

The defendants maintain, however, that the logic of
this inference is undermined by certain other prece-
dents of this court. The defendants rely particularly on
*Savage* v. *Aronson*, 214 Conn. 256, 571 A.2d 696 (1990),
in which we concluded that the state's failure to provide
emergency housing to recipients of federal welfare ben-
efits did not constitute state action. Although we recog-
nized that the absence of emergency housing might

---

[24] The significance of this finding is not diminished by the trial court's
finding that "social and demographic forces generated by the collective
exercise of personal geographic preferences over which the state had no
control" had contributed to the imbalance. Multiple factors may have signifi-
cant impacts on the creation or perpetuation of a condition.

[25] Courts in other jurisdictions have reached the same conclusion without
directly addressing the state action question. Faced with state constitutional
provisions that set forth an affirmative obligation to provide public educa-
tion, these courts have determined that legislative inaction with respect to
the constitutional obligation may give rise to liability. "The General Assembly
must not only establish the system [of common schools], but it must monitor
it on a continuing basis so that it will always be maintained in a constitutional
manner." *Rose* v. *Council for Better Education, Inc.*, 790 S.W.2d 186, 211
(Ky. 1989); see, e.g., *McDuffy* v. *Secretary of Executive Office of Education*,
415 Mass. 545, 606, 615 N.E.2d 516 (1993) ("[T]he Commonwealth has a
duty to provide an education for *all* its children, rich and poor, in every city
and town . . . . While it is clearly within the power of the Commonwealth to
delegate some of the implementation of the duty to local governments, such
power does not include a right to abdicate the obligation imposed . . . by
the Constitution. [Emphasis in original.]"); *Seattle School District No. 1* v.
*State*, 90 Wash. 2d 476, 523, 585 P.2d 71 (1978) ("[T]he fact that the Legislature
possesses an ultimate obligation to act is not to say that it may act or not
act as it chooses. The duty to act as well as the duty to do so within the
parameters of [the constitution] is constitutionally required.").

have a deleterious impact on the opportunity of children to attend school, we held that this secondary effect was not a sufficient basis for imposing constitutional liability upon the state. See id., 286–87. *Savage*, however, sheds no light on the state action requirement in this case because, as we explained in *Savage*; see id., 284–86; the state has no affirmative constitutional obligation to provide emergency housing, while it does have an affirmative constitutional obligation with respect to public elementary and secondary education.

The defendants also invoke two cases in which this court declined to find state action because the pertinent actors were *private parties* rather than the *state itself*. In *Lockwood* v. *Killian*, 172 Conn. 496, 504–505, 375 A.2d 998 (1977), we concluded that private discrimination by the testator of a scholarship fund who had restricted its beneficiaries on the basis of religion did not constitute state action. In *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 64–66, 469 A.2d 1201 (1984), we concluded that the governmental regulation and public use of a private shopping mall did not transform the mall owners' refusal to allow political speech within the mall into state action. Although this aspect of the state action doctrine arguably is related to the question before us; see *Lebron* v. *National R.R. Passenger Corp.*, 513 U.S. 374, 378–79, 115 S. Ct. 961, 130 L. Ed. 2d 902 (1995); it cannot be controlling in a case in which action or inaction by the state is directly implicated.

In addition to these state cases, the defendants urge us to follow federal precedents that concededly require, as a matter of federal constitutional law, that claimants seeking judicial relief for educational disparities pursuant to the equal protection clause of the fourteenth amendment to the United States constitution must prove intentional governmental discrimination against a suspect class. See, e.g., *Freeman* v. *Pitts*, 503 U.S. 467, 494, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992) ("[o]nce

the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors"); *Pasadena City Board of Education* v. *Spangler*, 427 U.S. 424, 434, 96 S. Ct. 2697, 49 L. Ed. 2d 599 (1976) (United States constitution is not violated in absence of segregative efforts by state); *Milliken* v. *Bradley*, 418 U.S. 717, 746–47, 747 n.22, 94 S. Ct. 3112, 41 L. Ed. 2d 1069 (1974) ("[t]he suggestion . . . that schools which have a majority of [African-American] students are not 'desegregated' . . . however neutrally the district lines have been drawn and administered, finds no support in our prior cases"); cf. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); *Washington* v. *Davis*, 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). According to the defendants, because the plaintiffs raise claims of unconstitutional disparities in educational opportunities on the basis of severe racial and ethnic imbalances among school districts, the plaintiffs, too, must prove intentional state action.[26]

For two reasons, we are not persuaded that we should adopt these precedents as a matter of state constitutional law. First and foremost, the federal cases start from the premise that there is no right to education under the United States constitution. *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 35, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). Our Connecticut constitution, by contrast, contains a fundamental right to education and a corresponding affirmative state obligation to implement and maintain that right. See *Moore* v. *Ganim*, supra, 233 Conn. 595–96; *Broadley* v. *Board of*

---

[26] The federal precedents are unclear as to whether they require a showing of discriminatory intent to prove state action, or whether state action and discriminatory intent are independent requirements for proving a violation of the federal equal protection clause.

*Education,* 229 Conn. 1, 6, 639 A.2d 502 (1994); *Horton I,* supra, 172 Conn. 645. Second, the federal cases are guided by principles of federalism as "a foremost consideration in interpreting any of the pertinent constitutional provisions under which [a court] examines state action." (Internal quotation marks omitted.) *San Antonio Independent School District* v. *Rodriguez,* supra, 44; see generally L. Tribe, American Constitutional Law (2d Ed. 1988) § 18-2, p. 1691. As the United States Supreme Court noted, "it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State." *San Antonio Independent School District* v. *Rodriguez,* supra, 44. Principles of federalism, however, do not restrict *our* constitutional authority to enforce the constitutional mandates contained in article eighth, § 1, and article first, §§ 1 and 20.

Federal constitutional law, furthermore, has not invariably required intentional state action as a requisite foundation for constitutional remedies. In cases involving the fundamental right to vote, the United States Supreme Court has held state action to be implicated by the legislature's failure to take the proper steps to implement its affirmative constitutional duty. See *Reynolds* v. *Sims,* 377 U.S. 533, 561–63, 568, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); see also *Board of Estimate* v. *Morris,* 489 U.S. 688, 692–93, 109 S. Ct. 1433, 103 L. Ed. 2d 717 (1989); *Tashjian* v. *Republican Party of Connecticut,* 479 U.S. 208, 227, 107 S. Ct. 544, 93 L. Ed. 2d 514 (1986); *Abate* v. *Mundt,* 403 U.S. 182, 185–86, 91 S. Ct. 1904, 29 L. Ed. 2d 399 (1971); *Moore* v. *Ogilvie,* 394 U.S. 814, 818, 89 S. Ct. 1493, 23 L. Ed. 2d 1 (1969); *United States* v. *Classic,* 313 U.S. 299, 318–19, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941).[27] We can perceive no

---

[27] The United States Supreme Court has never retreated from its holding in *Reynolds.* See *Shaw* v. *Reno,* 509 U.S. 630, 639–40, 113 S. Ct. 2816, 125

principled distinction between judicial intervention to require legislative action to protect the fundamental right to vote and judicial intervention to require legislative action to protect the fundamental right to a substantially equal educational opportunity.

In summary, under our law, which imposes an affirmative constitutional obligation on the legislature to provide a substantially equal educational opportunity for all public schoolchildren, the state action doctrine is not a defense to the plaintiffs' claims of constitutional deprivation. The state had ample notice of ongoing trends toward racial and ethnic isolation in its public schools, and indeed undertook a number of laudable remedial efforts[28] that unfortunately have not achieved their desired end. The fact that the legislature did not affirmatively create or intend to create the conditions that have led to the racial and ethnic isolation in the Hartford public school system does not, in and of itself,

L. Ed. 2d 511 (1993) (citing *Reynolds* affirmatively); *Burson* v. *Freeman*, 504 U.S. 191, 199, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (same); *Board of Estimate* v. *Morris*, supra, 489 U.S. 692–94 (extending principle set forth in *Reynolds* to elections of members of board of estimate). The court recently has addressed two other evils that violate the fourteenth amendment to the United States constitution and threaten the right to vote: the dilution of the voting potential of minorities; see *Mobile* v. *Bolden*, 446 U.S. 55, 66, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980); and the separation of voters into districts by race. See *Miller* v. *Johnson*, 515 U.S. 900, 905, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995); *Shaw* v. *Reno*, supra, 641–42. In these cases, the court has required a showing of some form of intent in order to establish a constitutional claim. See *Shaw* v. *Reno*, supra, 644–45, 649 (requiring proof that classification was motivated by racial purpose, although showing can be inferential if district lines are "unexplainable on grounds other than race"); *Mobile* v. *Bolden*, supra, 67–68 (requiring intent to discriminate).

[28] See General Statutes § 10-226a et seq. (requiring public schools within districts to be racially balanced); General Statutes § 10-264a et seq. (promoting educational diversity through voluntary development and implementation of interdistrict educational programs). In addition, the state has provided financial support and technical assistance to voluntary interdistrict transfer programs, has provided technical assistance to intradistrict magnet schools and has authorized special bond funding for the construction and renovation of interdistrict magnet schools.

relieve the defendants of their affirmative obligation to provide the plaintiffs with a more effective remedy for their constitutional grievances.

## III

## THE PLAINTIFFS' CONSTITUTIONAL CLAIMS

We turn now to the merits of the plaintiffs' claims. No statute, no common law precedent, no federal constitutional principle provides this state's schoolchildren with a right to a public education that is not burdened by de facto racial and ethnic segregation. The plaintiffs make no such claim. The issue that they raise is whether they have stated a case for relief under our state constitution, which was amended in 1965 to provide both a right to a free public elementary and secondary education; Conn. Const., art. VIII, § 1; and a right to protection from segregation. Conn. Const., art. I, § 20. This issue raises questions that are difficult; the answers that we give are controversial. We are, however, persuaded that a fair reading of the text and the history of these amendments demonstrates a deep and abiding constitutional commitment to a public school system that, in fact and in law, provides Connecticut schoolchildren with a substantially equal educational opportunity. A significant component of that substantially equal educational opportunity is access to a public school education that is not substantially impaired by racial and ethnic isolation.

Our analysis of this issue has three parts. First, what are the constituent elements of the affirmative constitutional mandate to provide all public schoolchildren with a substantially equal educational opportunity in the context of alleged racial, ethnic and socioeconomic disparities? Second, does the plaintiffs' complaint encompass these elements? Third, have the plaintiffs proven their claim?

A

Since *Horton I*, it is common ground that the state has an affirmative constitutional obligation to provide all public schoolchildren with a substantially equal educational opportunity. *Horton I*, supra, 172 Conn. 648–49; see also *Benjamin* v. *Bailey*, 234 Conn. 455, 461–62, 662 A.2d 1226 (1995); *New Haven* v. *State Board of Education*, 228 Conn. 699, 707–708, 638 A.2d 589 (1994); *Horton III*, supra, 195 Conn. 34–35. Any infringement of that right must be strictly scrutinized. *Horton I*, supra, 646.

The issue presented by this case is whether the state has fully satisfied its affirmative constitutional obligation to provide a substantially equal educational opportunity if the state demonstrates that it has substantially equalized school funding and resources. The defendants urge us to adopt such a limited construction of our constitution. The plaintiffs, to the contrary, urge us to adopt a broader formulation. They argue that the combination of "racial segregation, the concentration of poor children in the schools, and disparities in educational resources . . . deprive [Hartford schoolchildren] of substantially equal educational opportunities." We agree with the plaintiffs in part. We need not decide, in this case, the extent to which substantial socioeconomic disparities or disparities in educational resources would themselves be sufficient to require the state to intervene in order to equalize educational opportunities. For the purposes of the present litigation, we decide only that the scope of the constitutional obligation expressly imposed on the state by article eighth, § 1, is informed by the constitutional prohibition against segregation contained in article first, § 20. Reading these constitutional provisions conjointly, we conclude that the existence of extreme racial and ethnic isolation in the public school system deprives schoolchildren of a substantially equal educational opportu-

nity and requires the state to take further remedial measures.

Two factors persuade us that it is appropriate to undertake a conjoint reading of these provisions of our state constitution. One is the special nature of the affirmative constitutional right embodied in article eighth, § 1. The other is the explicit prohibition of segregation contained in article first, § 20.

The affirmative constitutional obligation of the state to provide a substantially equal educational opportunity, which is embodied in article eighth, § 1, differs in kind from most constitutional obligations. Organic documents only rarely contain provisions that explicitly require the state to act rather than to refrain from acting. See *Moore* v. *Ganim*, supra, 233 Conn. 557. As we observed, however, in *Horton I*, supra, 172 Conn. 645, "educational equalization cases are 'in significant aspects sui generis' and not subject to analysis by accepted conventional tests or the application of mechanical standards. The wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is relative rather than absolute." See also *Horton III*, supra, 195 Conn. 35. Nothing in the description of the relevant legal landscape in any of our cases suggests that the constitutional right that we articulated in *Horton I* was limited to school financing.

For Connecticut schoolchildren, the scope of the state's constitutional obligation to provide a substantially equal educational opportunity is informed and amplified by the highly unusual[29] provision in article

---

[29] The only other constitutions that explicitly prohibit segregation are those of Hawaii and New Jersey.

The constitution of Hawaii, article first, § 9, provides: "No citizen shall be denied enlistment in any military organization of this State nor be segregated therein because of race, religious principles or ancestry." No court has undertaken to interpret this provision.

first, § 20, that prohibits segregation not only indirectly, by forbidding discrimination, but directly, by the use of the term "segregation." The section provides in relevant part: "No person shall be denied the equal protection of the law *nor be subjected to segregation* or discrimination . . . because of . . . race [or] . . . ancestry . . . ." (Emphasis added.)

The express inclusion of the term "segregation" in article first, § 20, has independent constitutional significance. The addition of this term to the text of our equal protection clause distinguishes this case from others in which we have found a substantial equivalence between our equal protection clause and that contained in the United States constitution.[30] *Broadley* v. *Board of Education*, supra, 229 Conn. 8 n.15; *Franklin* v. *Berger*, 211 Conn. 591, 594 n.5, 560 A.2d 444 (1989); *Keogh*

---

The constitution of New Jersey, article first, paragraph 5, provides: "No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin." No court has confronted the issue of whether this provision *requires* the state to prevent de facto segregation within its public school system. The Supreme Court of New Jersey has held that the state commissioner of education and local boards of education have broad statutory authority, especially in light of the constitutional provision against segregation in schools, to *prevent* the implementation of local decisions that would increase racial imbalance. See, e.g., *Jenkins* v. *Township of Morris School District*, 58 N.J. 483, 506–508, 279 A.2d 619 (1971) (holding that commissioner may prevent withdrawal of town's children from particular high school and enrollment in different high school if that change would result in increase in racial imbalance in those schools); *Booker* v. *Board of Education*, 45 N.J. 161, 178, 212 A.2d 1 (1965) (holding that commissioner, in reviewing local desegregation plan, must determine if plan takes sufficient and proper steps toward desegregation); *Morean* v. *Board of Education*, 42 N.J. 237, 242–44, 200 A.2d 97 (1964) (supporting decision of town board of education to allocate children among different schools in manner designed to prevent exacerbation of racial imbalance after board decided to close one junior high school).

[30] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

v. *Bridgeport,* 187 Conn. 53, 66, 444 A.2d 225 (1982). Fundamental principles of constitutional interpretation require that "[e]ffect must be given to every part of and each word in our constitution . . . ." *Cahill* v. *Leopold,* 141 Conn. 1, 21, 103 A.2d 818 (1954); *State* v. *Gethers,* 197 Conn. 369, 386, 497 A.2d 408 (1985); *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). In other cases, we have held that, insofar as article first, § 20, differs textually from its federal counterpart, its judicial construction must reflect such a textual distinction. See *AFSCME, Council 4, Local 681, AFL-CIO* v. *West Haven,* 234 Conn. 217, 221 n.6, 661 A.2d 587 (1995) (per curiam); *Daly* v. *DelPonte,* 225 Conn. 499, 513, 624 A.2d 876 (1993).

The issue before us, therefore, is what specific meaning to attach to the protection against segregation contained in article first, § 20, in a case in which that protection is invoked as part of the plaintiff schoolchildren's fundamental affirmative right to a substantially equal educational opportunity under article eighth, § 1. In concrete terms, this issue devolves into the question of whether the state has a constitutional duty to remedy the educational impairment that results from segregation in the Hartford public schools, even though the conditions of segregation that contribute to such impairment neither were caused nor are perpetuated by invidious intentional conduct on the part of the state.

Linguistically, the term "segregation" in article first, § 20, which denotes "separation,"[31] is neutral about seg-

---

[31] "Segregation" refers to the "act or process of separation"; Black's Law Dictionary (6th Ed. 1990); or to "the separation or isolation of a race, class, or ethnic group by . . . divided educational facilities, or by other discriminatory means . . . ." Webster's Third New International Dictionary (1961); see Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

regative intent. The section prohibits segregation that occurs *"because of* religion, race, color, ancestry, national origin, sex or physical or mental disability"; (emphasis added); without specifying the manner in which such a causal relationship must be established.

Whatever this language may portend in other contexts, we are persuaded that, in the context of public education, in which the state has an affirmative obligation to monitor and to equalize educational opportunity, the state's awareness of existing and increasing severe racial and ethnic isolation imposes upon the state the responsibility to remedy "segregation . . . because of race [or] . . . ancestry . . . ."[32] We therefore hold

[32] Neither *Broadley* v. *Board of Education,* supra, 229 Conn. 1, nor *Savage* v. *Aronson,* supra, 214 Conn. 256, is inconsistent with our constitutional analysis in this case. Neither case dealt with the particular combination of constitutional provisions on which the present plaintiffs rely.

In *Broadley,* we concluded that the state's special education statutes; General Statutes § 10-76a et seq.; had not established a constitutional right to an individualized educational program for gifted children. We held that "when neither the legislature nor the framers of our constitution have vested in gifted children any right to an individualized education program, we cannot conclude that the plaintiff's right to a free public education under article eighth, § 1, of the Connecticut constitution includes a right to a special education program." *Broadley* v. *Board of Education,* supra, 229 Conn. 8. Gifted children are not expressly recognized as a cognizable constitutional class within article first, § 20.

In *Savage* v. *Aronson,* supra, 214 Conn. 287, we concluded that the constitutional right to a substantially equal educational opportunity does not include "any [guarantee] that children are entitled to receive their education at any particular school or that the state must provide [emergency] housing accommodations for them and their families close to the schools they are presently attending." In the absence of a claim of racial or ethnic isolation, the housing disparities that underlay this claim are not expressly encompassed by article first, § 20.

The only decision of our sister states to which the parties draw our attention neither supports nor weakens our analysis. In *NAACP* v. *Dearborn,* 173 Mich. App. 602, 615–16, 434 N.W.2d 444 (1988), appeal denied, 433 Mich. 906, 447 N.W.2d 751 (1989), the Michigan Court of Appeals determined that the plaintiffs need not show a discriminatory intent or purpose in order to prove a violation of the prohibition against racial discrimination embodied in that state's constitution. In *Dearborn,* the Michigan court interpreted an equal protection provision that, without containing an express antisegrega-

that, textually, article eighth, § 1, as informed by article first, § 20, requires the legislature to take affirmative responsibility to remedy segregation in our public schools, regardless of whether that segregation has occurred de jure or de facto.

The history of the promulgation of article eighth, § 1, and article first, § 20, supports our conclusion that these constitutional provisions include protection from de facto segregation, at least in public schools. That history includes not only the contemporaneous addition, in 1965, of these two provisions to our constitution, but also the strong commitment to ending discrimination and segregation that is evident in the remarks of the delegates to the 1965 constitutional convention.

First, it is undisputed that the duty to provide a public education contained in article eighth, § 1, and the prohibition against segregation contained in article first, § 20, were proposed to and adopted by the voters of this state in response to the constitutional convention of 1965. When the convention delegates debated the desirability of both amendments to our state constitution, they recognized and endorsed the landmark decision in *Brown* v. *Board of Education,* 347 U.S. 483, 495, 74 S. Ct. 686, 98 L. Ed. 873 (1954), declaring the unconstitutionality of "separate but equal" public school education. See 2 Proceedings of the Connecticut Constitutional Convention of 1965, p. 691, remarks of Chase G. Woodhouse.[33] The primary motivation for the addition of article eighth, § 1, to the constitution in 1965 appears to have been the realization that Connecticut

tion clause, imposed an affirmative obligation on the state to prevent discrimination.

[33] Woodhouse stated: "[W]e have to realize that today the philosophy of segregation is something that is in the minds of all of us. It would be regrettable if it should be in any way suggested that this Constitution did not unequivocally oppose the philosophy and the practice of segregation." 2 Proceedings, supra, p. 691.

was the only state in the nation that did not provide any express right to public elementary and secondary education in its constitution. See 3 Proceedings, supra, pp. 1039–40, remarks of Simon J. Bernstein.[34] The delegates' expectation that the proposed amendments to the constitution would secure interrelated constitutional rights was underscored by Bernstein's remark that article first, § 20, was intended to be applied in the context of the "rights of freedom in education." 2 Proceedings, supra, p. 694.

Second, it is significant that the debate over the amendment of article first, § 20, manifested the intention of the convention delegates to extend broad protection to all persons from all forms of racial and ethnic discrimination and segregation. The debate over the express inclusion of the term "segregation" focused not on whether including such a term might reach too far, but rather on whether it might invite too narrow a construction of the prohibition against discrimination. It was for this reason that the rules committee felt that language regarding segregation was unnecessary. 2 Proceedings, supra, p. 692, remarks of Chief Justice Raymond E. Baldwin. The convention delegates' decision nonetheless to retain the term "segregation"[35] was

[34] In support of the amendment, Bernstein stated: "In July I submitted a resolution No. 109 which pertained to the subject of education, actually it was the only resolution I did introduce and the statement of purpose of that resolution of mine was that our system of free public education have a tradition acceptance on a par with our bill of rights and it should have the same Constitutional sanctity. It was because our Constitution had no reference to our school system that I submitted my resolution and of course others were aware of the same omission in our Constitution and other similar resolutions were submitted. I became aware of this in the decade of the fifties when I served on a board of education . . . . [W]e have [had] good public schools so that this again is not anything revolutionary, it is something which we have, it is which is [in] practically all Constitutions in the States of our nation and Connecticut with its great tradition certainly ought to honor this principle." 3 Proceedings, supra, p. 1039.

[35] The provision when introduced on the convention floor stated: "No person shall be denied the equal protection of the law, nor the enjoyment

premised on the acknowledged importance of unequivocal opposition to all that is encompassed by this invidious philosophy and practice. See 2 Proceedings, supra, pp. 690–92, remarks of Chase G. Woodhouse and James J. Kennelly.[36] In effect, the convention delegates inserted into article first, § 20, constitutional language that was intended to prohibit not only discrimination, but also segregation on the basis of race or ethnicity.[37]

Finally, the convention delegates' manifest intent that article first, § 20, by prohibiting segregation, should pro-

---

of his civil or political rights, nor be discriminated against in the exercise thereof because of religion, race, color, ancestry or national origin." Rules Committee Substitute for Constitutional Convention Resolution No. 168, File No. 7.

The amendments proposed by Woodhouse and others during the proceedings of the constitutional convention changed the provision to state, as it does today: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise of and the enjoyment of his civil or political rights . . . ." 2 Proceedings, supra, p. 690.

[36] Woodhouse stated: "It would seem that this language as offered in the amendment is sufficiently general so that it would not be interpreted as an exclusion or limit [on] rights. I think we all realize that rights of individuals in this country have developed and have changed from time to time, and we certainly would not want to have in our Constitution any language that would in the future perhaps limit new rights. On the other hand we have to realize that today the philosophy of segregation is something that is in the minds of all of us. It would be regrettable if it should be in any way suggested that this Constitution did not unequivocally oppose the philosophy and the practice of segregation." 2 Proceedings, supra, p. 691. These sentiments were echoed by Kennelly, who stated: "It is further a broad statement of principle that is all inclusive and would provide a complete umbrella for the total protection against discrimination and . . . segregation, which is sound symbolic language." 2 Proceedings, supra, p. 692.

Mary B. Griswold remarked on the same issue that "it was very important to have the word segregation in our new amended bill of rights" and Meade H. Alcorn remarked that "the amendment offered this morning is a worthy addition to" the provision. 2 Proceedings, supra, pp. 693–94.

[37] We note that at the time of the constitutional convention of 1965, it was jurisprudentially unclear whether the principles enunciated in *Brown* v. *Board of Education*, supra, 347 U.S. 483, would be limited to de jure segregation in the public schools. See *Booker* v. *Board of Education*, 45 N.J. 161, 168–70, 212 A.2d 1 (1965); see also *Jenkins* v. *Township of Morris School District*, 58 N.J. 483, 497–98, 279 A.2d 619 (1971) (comparing lower

vide "total protection against discrimination"; 2 Proceedings, supra, p. 692, remarks of James J. Kennelly; supports our conclusion that they intended to encompass de facto segregation in the circumstances presented by the present case. If significant racial and ethnic isolation continues to occur within the public schools, for which the legislature has an affirmative constitutional obligation to provide a substantially equal educational opportunity, no special showing of an invidious segregative intent is required.

It would be illogical not to prohibit all such segregation in light of the legislature's otherwise comprehensive assumption of responsibility for the education of Connecticut schoolchildren. The legislature has created the current school districts, has required students to attend school and has determined which students will attend a particular school district. General Statutes §§ 10-184 and 10-240. The state cannot now avoid its responsibilities by invoking constitutional restraints articulated for different purposes under different constitutional provisions.

Sound principles of public policy support our conclusion that the legislature's affirmative constitutional responsibility for the education of all public schoolchildren encompasses responsibility for segregation to which the legislature has contributed, even unintentionally. The parties agree, as the trial court expressly found, that racial and ethnic segregation is harmful, and that integration would likely have positive benefits for all children and for society as a whole. Further, as the trial court also expressly found, the racial and ethnic isolation of children in the Hartford schools is likely to worsen in the future.

Racial and ethnic segregation has a pervasive and invidious impact on schools, whether the segregation

federal court cases decided between 1966 and 1971 with United States Supreme Court cases decided in 1971).

results from intentional conduct or from unorchestrated demographic factors. "[S]chools are an important socializing institution, imparting those shared values through which social order and stability are maintained." *Plyler* v. *Doe*, 457 U.S. 202, 222 n.20, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982). Schools bear central responsibility for "inculcating [the] fundamental values necessary to the maintenance of a democratic political system . . . ." *Ambach* v. *Norwick*, 441 U.S. 68, 77, 99 S. Ct. 1589, 60 L. Ed. 2d 49 (1979). When children attend racially and ethnically isolated schools, these "shared values" are jeopardized: "If children of different races and economic and social groups have no opportunity to know each other and to live together in school, they cannot be expected to gain the understanding and mutual respect necessary for the cohesion of our society." (Internal quotation marks omitted.) *Jenkins* v. *Township of Morris School District*, 58 N.J. 483, 498, 279 A.2d 619 (1971). "[T]he elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black and white." *Lee* v. *Nyquist*, 318 F. Sup. 710, 714 (W.D.N.Y. 1970), aff'd without opinion, 402 U.S. 935, 91 S. Ct. 1618, 29 L. Ed. 2d 105 (1971). Our state constitution, as amended in 1965, imposes on the state an affirmative obligation to respond to such segregation.

B

Having concluded that the provisions of article eighth, § 1, as informed by article first, § 20, permit a state constitutional challenge to substantial disparities in educational opportunities resulting from racially and ethnically segregated public schools, we turn now to an examination of the plaintiffs' pleadings to determine whether they fairly can be read to encompass such a challenge. Because the remedies sought by the plaintiffs in their complaint are not differentially tied to the vari-

ous substantive claims that they have alleged, the plaintiffs can succeed if any of their claims falls within the constitutional right as we have defined it. We are persuaded that the plaintiffs' pleadings cross this threshold.

In the first count of their complaint, the plaintiffs relied on article first, §§ 1 and 20, and article eighth, § 1, for what they have characterized as a per se claim that they have suffered from unconstitutional segregation.[38] In the second count, the plaintiffs alleged that disparities in the racial and ethnic composition of Hartford public schools as compared with schools in the surrounding school districts violated their constitutional rights under the same constitutional provisions.[39] These two counts can reasonably be construed to state a constitutional claim of school segregation as we have defined it. Both counts allege a deprivation of the plaintiffs' right to a substantially equal educational opportunity expressly predicated upon the severe racial and ethnic isolation that exists in the Hartford public school system. The constitutional implications raised by these allegations were fully argued before the trial court, and were fully briefed by the parties before this court. Under

---

[38] The first count of the plaintiffs' complaint claims: "Separate educational systems for minority and non-minority students are inherently unequal.

"Because of the de facto racial and ethnic segregation between Hartford and the suburban districts, the defendants have failed to provide the plaintiffs with an equal opportunity to a free public education as required by [a]rticle [f]irst, §§ 1 and 20, and [a]rticle [e]ighth, § 1, of the Connecticut [c]onstitution, to the grave injury of the plaintiffs."

[39] The second count of the plaintiffs' complaint claims: "Separate educational systems for minority and non-minority students in fact provide to all students, and have provided to plaintiffs, unequal educational opportunities.

"Because of the racial and ethnic segregation that exists between Hartford and the suburban districts, perpetuated by the defendants and resulting in serious harm to the plaintiffs, the defendants have discriminated against the plaintiffs and have failed to provide them with an equal opportunity to a free public education as required by [a]rticle [f]irst, §§ 1 and 20, and [a]rticle [e]ighth, § 1[,] of the Connecticut [c]onstitution."

these circumstances, we conclude that the plaintiffs' pleadings, with respect to counts one and two, state a claim for the deprivation of a substantially equal educational opportunity. We would be remiss in the exercise of our constitutional obligation to provide "remedy by due course of law . . . without . . . delay"; Conn. Const., art. I, § 10; if we were to deprive the plaintiffs of a remedy solely because, as a pleading matter, their claims were stated in two counts rather than combined in one.[40]

In the third count of the plaintiffs' complaint, they invoked article first, §§ 1 and 20, and article eighth, § 1, for a different purpose. They alleged that the defendants have failed to provide schoolchildren in the Hartford public school system with the educational resources necessary to obtain a minimally adequate education. As pleaded in their complaint and as argued before the trial court, this claim was not expressly predicated upon the severe racial and ethnic isolation that exists in the Hartford public school system. Moreover, at oral argument, the plaintiffs conceded that they had never claimed, either at trial or in their appellate brief, that the opportunity to participate in a racially and ethnically diverse education is a constitutionally required component of a minimally adequate education. Accordingly, we conclude that the third count of the plaintiffs' complaint does not implicate the constitutional right to a substantially equal educational opportunity as defined in part III A. Because, however, the plaintiffs' remedial claims do not depend upon the validity of the third

---

[40] Contrary to the suggestion of the dissent, this is not a case in which further briefing was required. Unlike the cases on which the dissent relies, the constitutional provisions that are crucial to our holding have been at center stage in this case since its inception. It cannot come as a surprise to anyone that this litigation is grounded on the interrelationship between article first, §§ 1 and 20, and article eighth, § 1.

count of their complaint, we need not reach the merits of this claim.[41]

## C

The final issue before us is whether, in light of the findings of the trial court, some of which the plaintiffs deem erroneous, the plaintiffs have proven a violation of their fundamental right, under the state constitution, to a substantially equal educational opportunity that is free from substantial racial and ethnic isolation. We conclude that they have done so.

"[I]n Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized." *Horton I,* supra, 172 Conn. 646; *Horton III,* supra, 195 Conn. 35. Proper evaluation of the plaintiffs' claims is best pursued in accordance with the methodology that we adopted and applied in *Horton III,* supra, 38–39. This methodology requires us to balance the legislature's affirmative constitutional obligation to provide all of the state's schoolchildren with a substantially equal educational opportunity against the legislature's recognized significant discretion in matters of public elementary and secondary education.

The analysis that we adopted in *Horton III* to scrutinize legislation that allegedly infringes upon the fundamental right to education requires a three-step process:

---

[41] The plaintiffs have abandoned the claim contained in the fourth and last count of their complaint. See footnote 13.

Significantly, the plaintiffs have never claimed, either at trial or in this court, that the state has deprived them of a substantially equal educational opportunity by reason of the funding that the state provides to supplement the Hartford property tax. Specifically, the plaintiffs have never argued that the funding provided by the state does not sufficiently balance any deficiency in the funding provided through the local property tax. See *Horton I,* supra, 172 Conn. 633. The parties stipulated that the state formula for distributing state aid to local school districts "provide[s] the most state aid to the neediest school districts."

"First, the plaintiffs must make a prima facie showing that the disparities . . . are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education. If they make that showing, the burden then shifts to the state to justify these disparities as incident to the advancement of a legitimate state policy. If the state's justification is acceptable, the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional." Id., 38; see also id., 45, 45 n.25. Applying the parties' stipulated facts and the trial court's factual findings to this analytical framework, we are persuaded that the current school assignment scheme, principally embodied in §§ 10-184 and 10-240, violates the plaintiffs' fundamental right to a substantially equal educational opportunity.

The plaintiffs have shown, and the defendants do not contest, that the disparities in the racial and ethnic composition of public schools in Hartford and the surrounding communities are more than de minimis. While children from minority groups constituted 25.7 percent of the statewide public school population in the 1991–92 school year, 92.4 percent of the children in the Hartford public school system were members of minority groups, including, predominantly, students who were either African-American or Latino. The percentage of minority students enrolled in Hartford's public schools has since increased. In the 1994–95 school year, 94.5 percent of the children in the Hartford public school system were members of minority groups.[42] Moreover, the Hartford public school system currently enrolls the highest percentage of minority students in the state, and this per-

---

[42] We take judicial notice; see *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 873 n.14, 675 A.2d 441 (1996); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 655 n.8, 674 A.2d 821 (1996); of the statistics compiled by the Hartford board of education pursuant to General Statutes § 10-220 (c). Hartford School District Strategic School District Profile (1994–95).

centage is likely to become even higher in the future, if current conditions continue. These disparities jeopardize the plaintiffs' fundamental right to education.

The defendants stress that the trial court also made extensive findings about the significant role that adverse socioeconomic conditions play in the difficulties encountered by Hartford schoolchildren. Although the findings of the trial court are supported by credible evidence, they do not undermine the plaintiffs' claim. It is well established, under prevailing principles governing the law of equal protection, that poverty is not a suspect classification. *Moscone* v. *Manson*, 185 Conn. 124, 130, 440 A.2d 848 (1981); see *Harris* v. *McRae*, 448 U.S. 297, 323, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980). The plaintiffs have not brought an equal protection claim challenging these principles.

The trial court's findings simply demonstrate that Hartford's schoolchildren labor under a dual burden: their poverty *and* their racial and ethnic isolation. These findings regarding the causal relationship between the poverty suffered by Hartford schoolchildren and their poor academic performance cannot be read in isolation. They do not diminish the significance of the stipulations and undisputed findings that the Hartford public school system suffers from severe and increasing racial and ethnic isolation, that such isolation is harmful to students of all races, and that the districting statute codified at § 10-240 is the single most important factor contributing to the concentration of racial and ethnic minorities in the Hartford public school system. The fact that, as pleaded, the plaintiffs' complaint does not provide them a constitutional remedy for one of their afflictions, namely, their poverty, is not a ground for depriving them of a remedy for the other.

The uncontested evidence of the severe racial and ethnic isolation of Hartford's schoolchildren demon-

strates that the state has failed to fulfill its affirmative constitutional obligation to provide all of the state's schoolchildren with a substantially equal educational opportunity. Much like the substantially unequal access to fiscal resources that we found constitutionally unacceptable in *Horton I*, the disparity in access to an unsegregated educational environment in this case arises out of state action and inaction that, prima facie, violates the plaintiffs' constitutional rights, although that segregation has occurred de facto rather than de jure. Thus, because the plaintiffs have made the requisite prima facie showing that their fundamental right to a substantially equal educational opportunity has been jeopardized, the burden of justification shifts to the state.

We next consider whether the defendants have met their burden of demonstrating that the disparities in the plaintiffs' educational opportunities are "incident to the advancement of a legitimate state policy." *Horton III*, supra, 195 Conn. 38. The defendants emphasize the uncontested fact that, although the state has created and maintained the public elementary and secondary school system, including the districting and the attendance statutes; General Statutes §§ 10-184 and 10-240; the state bears no de jure responsibility for the racial and ethnic isolation that the plaintiffs have encountered.

The statutes enacted by the legislature and the educational strategies adopted by the state demonstrate that the state has acted to further policies that are both legitimate and facially neutral with respect to racial and ethnic isolation. The General Assembly has enacted no legislation that was intended to cause either de jure or de facto segregation. It enacted the districting statute, not to impose or to foster racial or ethnic isolation, but to improve educational quality for all Connecticut schoolchildren by increasing state involvement in all aspects of public elementary and secondary education.

Moreover, the districting scheme presently furthers the legitimate nonracial interests of permitting considerable local control and accountability in educational matters. Furthermore, in recognition of its moral obligation to address the adverse consequences of racial and ethnic discrimination, the state reorganized the board of education, during the 1980s, to concentrate on the needs of urban schoolchildren and to promote diversity in the public schools. Under General Statutes § 10-226a et seq., which the legislature enacted to remedy racial imbalances *within* public school districts, all schools within a district must maintain, within specified tolerances, a student population that reflects the student population in the district as a whole. In addition, the state has supported and encouraged voluntary plans for increasing interdistrict diversity. It has provided financial support to interdistrict magnet programs and has enacted legislation to promote *voluntary* interdistrict solutions to racial and ethnic isolation. See General Statutes § 10-264a et seq. In all these respects, the state has furthered agendas that are legitimate. Accordingly, the defendants have sustained their initial burden of justifying the legitimacy of the state's actions.

In light of the defendants' affirmative showing, we now consider the third part of the *Horton III* test. Once the state's justification for its official actions has been shown to be acceptable, "the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional." *Horton III*, supra, 195 Conn. 38. In the context of the present claims, the state must demonstrate that, in light of its recognized discretion in matters of public elementary and secondary education, and taking into account the measures that it has taken to remedy racial and ethnic disparities in the public schools, the disparities are not so significant as to rise to the level of a constitutional deprivation. In our assessment of whether the state has

met its burden, we again emphasize that, much like the substantially unequal fiscal resources that we found constitutionally unacceptable in *Horton I* and *Horton III*, the disparity in access to an unsegregated educational environment in this case arises out of discrimination that is de facto rather than de jure.

We conclude that the defendants have failed to satisfy their difficult burden. Despite the initiatives undertaken by the defendants to alleviate the severe racial and ethnic disparities among school districts, and despite the fact that the defendants did not intend to create or maintain these disparities, the disparities that continue to burden the education of the plaintiffs infringe upon their fundamental state constitutional right to a substantially equal educational opportunity.

Our conclusion finds uncontested factual support in the stipulations of the parties, which provide dramatic documentation of the wide disparities in the racial and ethnic composition of the student populations in the public schools in Hartford and those in the twenty-one surrounding communities. Although we have discussed these statistics previously in this opinion, they bear repeating. The percentage of minorities who attend Hartford public schools is significantly higher than the percentage of minorities who attend schools in the surrounding school districts. In the 1991–92 school year, over 92 percent of the students in the Hartford public school system were members of minority groups. In stark contrast, in that same period, only seven of the twenty-one surrounding suburban towns had a student minority enrollment above 10 percent. We rely also on the findings made by the trial court, which have not been contested by any of the parties, that despite efforts by the state to alleviate the severe racial and ethnic isolation that exists in the Hartford public school system, "[s]tudents in the Hartford schools are racially isolated *and are likely to become more isolated in the*

*future*"[43] and that "[t]*he single most important factor that contribute[s] to the present concentration of racial and ethnic minorities in Hartford* [is] *the town-school district system* [codified at § 10-240] which has existed since 1909, when the legislature consolidated most of the school districts in the state so that thereafter town boundaries became the dividing lines between all school districts in the state." (Emphasis added.) This record compels the conclusion that the present state regulation of public elementary and secondary education "emasculate[s] the goal of substantial equality." (Internal quotation marks omitted.) *Horton III*, supra, 195 Conn. 38. We conclude, therefore, that the school districting scheme, as codified at §§ 10-184 and 10-240 and as enforced with regard to these plaintiffs, is unconstitutional.

It is crucial for a democratic society to provide all of its schoolchildren with fair access to an unsegregated education. As the United States Supreme Court has eloquently observed, a sound education "is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown* v. *Board of Education*, supra, 347 U.S. 493. "The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance. . . . We have recognized the public schools as a most vital civic institution for the preservation of a demo-

---

[43] This finding has proven to be accurate. As we have noted previously, in the 1994–95 school year, the percentage of minority students enrolled in the Hartford public school system increased to nearly 95 percent.

cratic system of government . . . and as the primary vehicle for transmitting the values on which our society rests. . . . And these historic perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists. . . . [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." (Citations omitted; internal quotation marks omitted.) *Plyler* v. *Doe*, supra, 457 U.S. 221.

Although the constitutional basis for the plaintiffs' claims is the deprivation that they themselves are suffering, that deprivation potentially has an impact on "the entire state and its economy—not only on its social and cultural fabric, but on its material well-being, on its jobs, industry, and business. Economists and business leaders say that our state's economic well-being is dependent on more skilled workers, technically proficient workers, literate and well-educated citizens. And they point to the urban poor as an integral part of our future economic strength. . . . So it is not just that their future depends on the State, the state's future depends on them." *Abbott* v. *Burke*, 119 N.J. 287, 392, 575 A.2d 359 (1990). Finding a way to cross the racial and ethnic divide has never been more important than it is today.

## IV

## REMEDIES

Our decision to reverse the judgment of the trial court, and to direct that judgment be rendered on behalf of the plaintiffs on the merits of their constitutional

claims in the first and second counts of their complaint, requires us to consider what relief may properly be afforded to the plaintiffs. We recognize that the fashioning of appropriate declaratory or injunctive relief requires careful consideration in order to weigh the benefits and costs of various remedial measures.

In their appeal to this court, the plaintiffs have not focused their attention on the remedial consequences of a substantive decision in their behalf. Their prayer for relief asks us to reverse the judgment of the trial court and to remand the case with direction to render a declaratory judgment and "for further equitable relief not inconsistent with [our] decision." The defendants urge this court not to assume direct control of the educational system in Connecticut and to eschew "acting as a super-legislature and glorified [b]oard of [e]ducation."

Because the parties have not had the opportunity to present evidence directed to the remedial consequences that follow from our decision on the merits of the plaintiffs' complaint, we could remand this case to the trial court for further proceedings to address remedies. Alternatively, if no further evidentiary inquiries would be required, we could invite further briefing in this court and attempt to resolve the issues ourselves.

We have decided not to follow either of these avenues but to employ the methodology used in *Horton I*. In that case, the trial court, after having found for the plaintiffs, limited its judgment by granting only declaratory relief but retained jurisdiction to grant consequential relief, if needed, at some future time. *Horton I*, supra, 172 Conn. 650. In light of the complexities of developing a legislative program that would respond to the constitutional deprivation that the plaintiffs had established, we concluded, in *Horton I*, that further judicial intervention should be stayed "to afford the

General Assembly an opportunity to take appropriate legislative action." Id., 653. Prudence and sensitivity to the constitutional authority of coordinate branches of government counsel the same caution in this case.

In staying our hand, we do not wish to be misunderstood about the urgency of finding an appropriate remedy for the plight of Hartford's public schoolchildren. Every passing day denies these children their constitutional right to a substantially equal educational opportunity. Every passing day shortchanges these children in their ability to learn to contribute to their own well-being and to that of this state and nation. We direct the legislature and the executive branch to put the search for appropriate remedial measures at the top of their respective agendas. We are confident that with energy and good will, appropriate remedies can be found and implemented in time to make a difference before another generation of children suffers the consequences of a segregated public school education.

The defendants counsel us, however, to stay our hand entirely. They claim that no judicial mandate can properly take into account the daunting, if not intractable, difficulties of crafting a remedial solution to the problem of de facto racial and ethnic segregation in the public schools of Hartford. When a similar question was raised about judicial authority to mandate the reform of state electoral systems, the claim was given short shrift by the United States Supreme Court. The court stated, in *Reynolds* v. *Sims*, supra, 377 U.S. 566: "We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and

mathematical quagmires. *Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us."* (Emphasis added.) Our oath, our office and the constitutional rights of the schoolchildren of Hartford, require no less of us in this case.

The judgment is reversed and the case is remanded with direction to render a declaratory judgment for the plaintiffs; the Superior Court is directed to retain jurisdiction in accordance with this opinion.

In this opinion BERDON, NORCOTT and KATZ, Js., concurred.

BERDON, J., concurring. I join the Chief Justice in her well reasoned majority opinion that concludes that the racial and ethnic segregation that exists in our public school system deprives schoolchildren of their state constitutional right to a "substantially equal educational opportunity."[1] More specifically, I agree "that, textually,

---

[1] I also agree that this case is justiciable and one which requires judicial intervention to assure that the state constitutional rights of schoolchildren are protected. In this case, as in *Nielsen* v. *State*, 236 Conn. 1, 13–14, 670 A.2d 1288 (1996) (*Berdon, J.*, concurring), and *Horton* v. *Meskill*, 172 Conn. 615, 650–51, 376 A.2d 359 (1977), "the constitution directs the legislature to act in order to implement the respective constitutional provisions." *Nielsen* v. *State*, supra, 13–14. As this court recognized in *Horton*, we have jurisdiction to compel the legislature to act in those situations in which it fails to carry out its constitutional mandate. "We have a constitutional obligation to keep the doors of this court open in order to enforce our laws. . . . We cannot excuse the legislature's default by merely labeling it a political question and thereby rendering the issue nonjusticiable. Nor is it appropriate for us to conclude that the only remedy available to the people is at the polling booth by 'kicking the rascals out.' Our democracy depends in part on the willingness of the courts to enforce uniformly our constitutional law. We cannot be selective and choose to enforce some provisions, while turning our backs on others. Indeed, as Chief Justice Peters wrote in dissent, '[w]hatever the reasons may be, legislative inaction does not, to my mind, relieve this court of its independent duty to vindicate the constitutional rights of those who appear before us.' *Pellegrino* v. *O'Neill*, 193 Conn. 670, 695, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984)." *Nielsen* v. *State*, supra, 16 (*Berdon, J.*, concurring).

article eighth, § 1, [of the Connecticut constitution] as informed by article first, § 20, requires the legislature to take affirmative responsibility to remedy segregation in our public schools, regardless of whether that segregation has occurred de jure or de facto." I write separately because, in my view and as the record reflects, a racially and ethnically segregated educational environment also deprives schoolchildren of an adequate education as required by the state constitution.[2]

Furthermore, I agree that the state's failure to act and to remedy the inequalities and inadequacies of public education constitutes state action. *Horton* v. *Meskill*, supra, 172 Conn. 648–49; see *Moore* v. *Ganim*, 233 Conn. 557, 595–96, 660 A.2d 742 (1995). The state did not deliberately establish a segregated school system. The state, however, chose to discharge its constitutional obligation of providing public education by establishing school districts according to town boundaries; General Statutes § 10-240; and by requiring schoolchildren to attend the public schools located within the district wherein they reside. General Statutes § 10-184. Moreover, the state is aware that such a statutory scheme is producing segregated school systems. Indeed, the trial court found that "[t]he single most important factor that contributed to the present concentration of racial and ethnic minorities in Hartford was the town-school district system which has existed since 1909 . . . ." Even in the face of federalism, legislative inaction amounts to state action. *Reynolds* v. *Sims*, 377 U.S. 533, 570, 84 S. Ct. 1362, 12 L. Ed. 2d 506, reh. denied, 379 U.S. 870, 85 S. Ct. 12, 13 L. Ed. 2d 76 (1964) ("[l]egislative inaction coupled with the unavailability of any political or judicial remedy, had resulted, with the passage of years, in the perpetuated scheme becoming little more than an irrational anachronism").

[2] It is correct that at oral argument, as the Chief Justice notes, the plaintiffs acknowledged that their argument before the trial court did not focus on the claim that racial and ethnic segregation deprives schoolchildren of a constitutionally mandated adequate education. Paragraph three of the third count of the complaint, however, expressly alleges: "[T]he State of Connecticut, by tolerating school districts sharply separated along racial, ethnic, and economic lines, has deprived the plaintiffs and other Hartford children of their rights to an equal educational opportunity, *and to a minimally adequate education*." (Emphasis added.) Further, in that portion of the third count of the complaint captioned "Legal Claims," the plaintiffs claim that the Hartford school district maintained by the state "fails to provide a majority of Hartford schoolchildren with *a minimally adequate education* . . . ." (Emphasis added.)

Although the trial court found that the schoolchildren are receiving a minimally adequate education, I would conclude, on the basis of the entire record in this case, that that conclusion was clearly erroneous. The trial

In *Brown* v. *Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954), the Supreme Court of the United States noted that "education is perhaps the most important function of state and local governments. . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him [or her] for later professional training, and in helping him [or her] to adjust normally to his [or her] environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied [an equal educational opportunity]." Twenty-three years later, Justice Bogdanski, in his concurrence in *Horton* v. *Meskill*, 172 Conn. 615, 654–55, 376 A.2d 359 (1977), reaffirmed that thought: "[T]he right of our children to an education is a matter of right not only because our state constitution declares it as such, but because education is the very essence and foundation of a civilized culture: it is the cohesive element that binds the fabric of society together. In a real sense, it is as necessary to a civilized society as food and shelter are to an individual. It is our fundamental legacy to the youth of our state to enable them to acquire knowledge and possess the ability to reason: for it is the ability to reason that separates [men and women] from all other forms of life."

court specifically found, and as I hereinafter set forth in this concurrence: "Education in its fullest sense for both white and minority school children involves interracial and multiethnic exposure to each other and interaction between them, because racial and ethnic isolation has negative effects on both groups." Furthermore, any finding that the children of Hartford are receiving an adequate academic education is belied by their test scores. But equally important, as I have indicated in this concurrence, education is more than what can be measured by mastery test results in reading, writing and arithmetic.

Whether viewed as a separate constitutional ground for requiring the state to remedy the present segregated educational system or as the product of the current segregation that deprives Hartford's schoolchildren of an equal educational opportunity, the impact of racial and ethnic segregation on the quality of education is an important factor to consider in deciding this case.

Unlike the federal constitution, the constitution of Connecticut, article eighth, § 1, provides that *education is a fundamental right* of every child regardless of his or her race or ethnicity. Id., 648–49 ("in Connecticut, elementary and secondary education is a fundamental right, [and] pupils in the public schools are entitled to the equal enjoyment of that right"). Accordingly, it logically follows that the education guaranteed in the state constitution must be, at the very least, within the context of its contemporary meaning, an adequate education. Even Justice Loiselle, in his dissent in *Horton* v. *Meskill*, supra, 172 Conn. 658–59, conceded that the provision of an adequate education was constitutionally required and, in discussing the need to interpret that requirement in a reasonable manner, stated "[a] town may not herd children in an open field to hear lectures by illiterates." Indeed, long before the *formal* incorporation of this right into our present constitution, this court recognized the state's "duty to provide for the *proper* education of the young." (Emphasis added.) *State ex rel. Huntington* v. *Huntington School District*, 82 Conn. 563, 566, 74 A. 882 (1909); see also *Bissell* v. *Davison*, 65 Conn. 183, 191, 32 A. 348 (1894).[3]

The state has established the boundaries of school districts coextensively with town lines, thereby placing in certain school districts, such as Hartford, overwhelming percentages of minority students. Indeed, the trial court found that "[s]tudents in the Hartford schools are racially isolated and are likely to become more isolated in the future." In the 1987–88 academic year, 90.5 per-

---

[3] "It is a duty not imposed by constitutional provision, but has always been assumed by the State; not only because the education of youth is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the State itself. In the performance of this duty, the State maintains and supports at great expense, and with an ever watchful solicitude, public schools throughout its territory, and secures to its youth the privilege of attendance therein." *Bissell* v. *Davison*, supra, 65 Conn. 191.

cent of Hartford's schoolchildren were of minority races or ethnicities. Yet, Hartford, like many of Connecticut's urban centers, is encircled by school districts whose student populations include only a small percentage of minority children.[4] The trial court's forecast that racial and ethnic isolation would increase has unfortunately proven to be accurate. Figures recently released for the 1994–95 academic year, reveal that 93.4 percent of Hartford's students are from minority racial or ethnic groups.[5]

This segregation can have a devastating impact on a minority student's education. The United States Supreme Court recognized that segregation "generates a feeling of inferiority [within the students] as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. . . . Segregation of white and [African-American] children in public schools has a detrimental effect upon [the African-American] children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the [African-American]. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of

[4] As stipulated, statistics compiled for the 1987–88 academic year reveal that, with the exception of Bloomfield and Windsor, in which 69 percent and 30 percent of their student bodies respectively were minority, Hartford's neighboring school districts educated a nominal number of minority students: 3.8 percent of Avon's student population was minority; 7.7 percent of Farmington's student population was minority; 5.4 percent of Glastonbury's student population was minority; 6.4 percent of Newington's student population was minority; 3.3 percent of Wethersfield's student population was minority; and 15.7 percent of West Hartford's student population was minority.

[5] With respect to the more current statistics for the 1994–95 academic year, I, like the majority, take judicial notice of the "Strategic School District Profile," designed by the Connecticut state department of education for the Hartford public schools.

[African-American] children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." (Internal quotation marks omitted.) *Brown* v. *Board of Education,* supra, 347 U.S. 494.

In order to provide an adequate or "proper" education, our children must be educated in a nonsegregated environment. The trial court found, "[e]ducation in its fullest sense for both white and minority school children involves interracial and multiethnic exposure to each other and interaction between them, because racial and ethnic isolation [have] negative effects on both groups." Indeed, a study commissioned by the state department of education in 1989, concluded that "desegregation has had some positive effect on the reading skills of black youngsters. . . . [T]here is some evidence that desegregation may help to break what can be thought of as a generational cycle of segregation and racial isolation." J. Schofield, "Review of Research on School Desegregation's Impact on Elementary and Secondary School Students," Commissioned by the Connecticut Department of Education (1989) p. 35. The study further concluded that "there are indications that desegregated schooling can provide students with valuable behavioral experience which prepares them to function in a pluralistic society. . . . [T]here is some evidence that school desegregation may have long-term positive consequences on adult social relationships, housing patterns, and the like." Id., p. 36.

The poor academic achievement of Hartford's students is insightful into the devastating effects of racial isolation on the students' education. For example, in 1991–92, 94 percent of the sixth graders in Hartford's public schools failed to meet the state's goal for mathematics; 80 percent failed to achieve the state's goal for reading; and 97 percent failed to obtain the state's goal for writing. Equally disturbing is the knowledge that,

in that same year, 62 percent of Hartford's sixth graders failed to achieve even the state's remedial standards for reading.

Scholastic achievement scores, are but one effect of segregation on education. Children of every race and ethnic background suffer when an educational system is administered on a segregated basis. Education entails not only the teaching of reading, writing and arithmetic, but today, in our multicultural world, it also includes the development of social understanding and racial tolerance. If the mission of education is to prepare our children to survive and succeed in today's world, then they must be taught how to live together as one people. Anything less will surely result in a segregated society with one racial and ethnic community pitted against another. Instead of fostering social division, we must build an integrated society, commencing with educating our children in a nonsegregated environment.

Accordingly, I conclude that, in addition to the state's failure to provide Hartford schoolchildren with a "substantially equal educational opportunity," these children are also being deprived of an adequate education because of their racial and ethnic isolation. It matters little with respect to the quality of the education that the segregation was unintentional. The fact that segregation exists as a result of the school districting statute requires the state to take remedial action to eliminate the constitutional violation of not providing these schoolchildren with an adequate education.[6]

Time is precious, especially when we are confronted with a constitutional violation that impacts the lives of our children and the future of our society. Every day that goes by is one more day that the schoolchildren who reside in Hartford and other urban centers in Connecticut are deprived of an adequate education. The

---

[6] See footnote 1.

plaintiff Milo Sheff was ten years old and in fourth grade when this litigation commenced more than seven years ago. We cannot recover what has been lost for him and others, but for those children who are presently enrolled in our public schools and for those who will enter in the future, we must eliminate the current segregation that exists.

I agree, however, with the Chief Justice that the executive and legislative branches of the state government should be given an opportunity[7] to remedy what is now

---

[7] The following findings of the trial court make it clear that the decision of the court today was foreshadowed:

"On January 6, 1993, the eleventh day of the trial, Governor [Lowell P.] Weicker, [Jr.] in his message to the legislature . . . noted the positive aspects of Connecticut's educational system, such as the fact that the state had the highest teacher salaries and the best teacher-student ratio in the nation as well as one of the highest rankings among the states in per pupil spending.

"He also acknowledged that the racial and economic isolation in the state's school system was 'indisputable' and whether it had come about 'through the chance of historical boundaries or economic forces beyond the control of the state or whether it came about through private decisions or in spite of the best educational efforts of the state, what matters is that it is here and must be dealt with.' . . .

"He then proceeded to outline legislative proposals for six educational regions, the development by each region of a five year plan proposed by local and regional representative groups to reduce racial isolation, and 'to provide all students with a quality, integrated learning experience,' and emphasized the fact that '[l]ocal decisions and local involvement will guide the process.' . . .

"On June 28, 1993, [No. 93-263 of the 1993 Public Acts] (now codified as General Statutes §§ 10-264a to 10-264b) entitled 'An Act Improving Educational Quality and Diversity' was signed by the governor. The Act provided a timetable beginning on January 15, 1994, for the convening of local and regional 'forums' for the purpose of developing regional 'education and community improvement plans' which were to be voted on by each of eleven regions in the state.

"Thereafter, the plaintiffs, at the direction of the trial court, amended the complaint to state that Governor Weicker, 'in response to this law suit . . . called on the legislature to address "[t]he racial and economic isolation in Connecticut's school system," and the related educational inequities in Connecticut's schools.'

"Paragraph 66b [of the plaintiffs' complaint] stated that '[a]s in the past, the legislature failed to act effectively in response to the Governor's call

a terrible wrong. *Nielsen* v. *State*, 236 Conn. 1, 17, 670 A.2d 1288 (1996) (*Berdon, J.*, concurring). Nevertheless, in the words of United States Supreme Court Chief Justice Warren, the state must act "with all deliberate speed." *Brown* v. *Board of Education*, 349 U.S. 294, 301, 75 S. Ct. 753, 99 L. Ed. 1083 (1955).

I join in the majority opinion.[8]

BORDEN, J., with whom CALLAHAN and PALMER, Js., join, dissenting. The majority has reached a result driven conclusion based on a theory of constitutional liability that was never presented to the trial court or to this court, is ungrounded in the text and history of Connecticut's constitutional provisions regarding the rights to public education and equal protection of the laws and is wholly at odds with the factual record in this case. The majority's conclusion, moreover, is contrary to the teaching of *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977) (*Horton I*), this court's principal precedent interpreting those provisions. In its zeal to reach a result that, it envisions, will eliminate racial and ethnic concentration in the public school districts of this state, the majority has "[renounced] this Court's historical commitment to a conception of the judiciary as a source of impersonal and reasoned judgments

for school desegregation initiatives [and instead], a voluntary desegregation planning bill was passed, P.A. 93-263, which contains no racial or poverty concentration goals, no guaranteed funding, no provisions for educational enhancements for city schools, and no mandates for local compliance.' "

[8] I would not, however, reach the conclusion, which the Chief Justice does in the majority opinion, that poverty under our state constitution is not a suspect classification entitled to heightened judicial review. Although a reference to the state constitution was made in *Moscone* v. *Manson*, 185 Conn. 124, 130, 440 A.2d 848 (1981), wherein this court recognized that federal law did not provide heightened review concerning classifications predicated on poverty, no independent analysis was undertaken with respect to the state constitution. Because, as the majority recognizes, Hartford schoolchildren labor under a dual burden of *both* poverty and racial and ethnic segregation, the question of whether poverty constitutes a suspect classification under the state constitution need not be reached.

. . . ." (Internal quotation marks omitted.) *Payne* v.
*Tennessee*, 501 U.S. 808, 844, 111 S. Ct. 2597, 115 L. Ed.
2d 720 (1991) (Marshall and Blackmun, Js., dissenting).
In essence, "[p]ower, not reason, is the new currency
of this Court's [state constitutional] decisionmaking."
Id. I therefore dissent.[1]

More specifically, in reaching a result that is unprece-
dented in American jurisprudence the majority has cre-
ated a constitutional theory of equal educational
opportunity that: (1) in the long history of this case,
has never been presented to the trial court or to this
court, and is, therefore, a theory to which the defend-
ants have never had an opportunity to respond; (2)
misapplies our precedent on the meaning of an equal
educational opportunity as expressed in *Horton I*, and
is contrary to the voluminous factual findings of the
trial court; (3) distorts the meaning of the term "segrega-
tion" in our state constitution; and (4) misrepresents
the record regarding the question of a remedy for the
constitutional violation that the majority has found.

In addition, the majority sends to the legislature and
the executive branch a mandate to fashion a remedy
for de facto racial and ethnic concentration in our public
schools, a task that those branches of government will
inevitably find to be extraordinarily difficult or perhaps
even impossible, because the majority articulates no
principle upon which to structure such a remedy. The
necessary implication of the majority's reasoning is that
virtually every school district in the state is now either

---

[1] I recognize the seriousness of these criticisms of the majority opinion,
and it pains me to express them. I do so only because, in my view, the
adjudicative process by which the majority's decision has been reached is
so seriously flawed, because the opinion departs so radically from how this
case was tried in the trial court and was briefed and argued on appeal,
and because the resulting analysis so completely disregards the previously
established principles governing the issues in the case, that I can come to
no other conclusions.

unconstitutional or constitutionally suspect. Without explicitly saying so, the majority has effectively struck down, not just for the greater Hartford area but for the entire state, the municipality based school system that has been in effect in this state since 1909.

It is significant, moreover, that the majority does not respond to the major substantive flaws in its analysis that this dissent identifies. Nor does it take issue with what I identify as the necessary implications of its decision.

I

INTRODUCTION

Before analyzing the majority's reasoning and the constitutional claims that the plaintiffs did present in this case, I state the extent of my agreement with the majority. First, I agree that the case is justiciable, and that there is state action. Moreover, and most importantly, I agree with the majority on the desirability—as a matter of public and educational policy—of eliminating from our public schools the type of racial and ethnic concentration demonstrated by this record.

I also agree that racial and ethnic isolation in our public schools is harmful—both to those races and ethnic groups that are so isolated and to the other races and ethnic groups from whom they are isolated. I also agree with the majority's statement, based upon the trial court's finding, that the racial and ethnic isolation of Hartford's schoolchildren is likely to worsen in the future. I agree, furthermore, that racial and ethnic integration of our public schools would be beneficial for all children and society in general. These points of agreement rest on the notions that, as the majority recognizes, schools are important socializing institutions that bear a central responsibility for imparting our shared democratic values to our children, and that

the opportunity for children of different races, ethnic backgrounds, economic levels and social groups to get to know each other in school is important if they are to understand and respect each other. Finally, I agree with the majority that the health of the economy of our state requires an educated workforce, which includes "the urban poor as an integral part of our future economic strength." *Abbott* v. *Burke*, 119 N.J. 287, 392, 575 A.2d 359 (1990). Thus, I agree with the majority on the importance in our state—indeed, in our nation—of finding a way to cross the racial divide.[2]

---

[2] The trial court specifically found that education "in its fullest sense" for all schoolchildren involves interracial and multiethnic exposure to each other and interaction between them, because racial and ethnic isolation has negative effects on both groups. Our state constitution, however, guarantees students a substantially equal educational opportunity; *Horton I*, supra, 172 Conn. 615; not education "in its fullest sense," and neither the plaintiffs nor the majority claim otherwise. Moreover, as the trial court found and as the defendants note in their brief in this court, "the state has had and continues to have as a long-standing goal the reduction of racial and ethnic concentrations of students, and has implemented . . . numerous programs and initiatives . . . precisely to encourage this result. The defendants have always believed that all of our citizens benefit from integrated schools in an integrated society." This long-standing state commitment to, and effort to achieve, the racial and ethnic integration of our schools is demonstrated by a host of statutory, funding and administrative programs and policies, and is not disputed by the plaintiffs or the majority.

The trial court specifically found, for instance, that Connecticut is one of only three states that has voluntarily adopted legislation designed to promote integration of the schools, and is one of only seven states that expend funds on programs to integrate the schools without a court order. In 1969, the state enacted No. 773 of the 1969 Public Acts entitled "An Act Concerning Racial Imbalance in the Public Schools," now codified at General Statutes § 10-226a et seq., which requires school districts to maintain student populations that reflect the racial makeup of the student population in the district. The state department of education has consistently and vigorously enforced this legislation.

On an interdistrict basis, the state has, for more than twenty-five years, helped to fund Project Concern, one of the nation's first voluntary interdistrict programs designed to promote the integration of the schools. In addition, the state supplies technical assistance and funds for constructing interdistrict magnet schools, and has established the Interdistrict Cooperative Grant Program, which encourages the interdistrict placement of students. General Statutes § 10-74d. In 1993, the state enacted No. 93-263 of

The majority, however, has transformed a laudable educational philosophy into a constitutional mandate. That philosophy is that racially and ethnically integrated schools are socially and educationally preferable to racially and ethnically concentrated schools, because they confer certain significant social benefits on their students that such concentrated schools cannot, and they avoid certain significant social burdens that such concentrated schools are likely to impose. That belief, however, is utterly without basis as a constitutional claim of deprivation of an equal educational opportunity. Neither the record in this case, the text or history of the Connecticut constitution, nor our case law supports such a claim. A similar example of judicial overreaching

the 1993 Public Acts entitled "An Act Improving Educational Quality and Diversity," now codified at General Statutes § 10-264a et seq. This act establishes regional advisory boards to plan for increased interdistrict diversity and provides grants to fund such plans.

Furthermore, since 1979, the state's educational funding formula has been weighted in favor of districts with high concentrations of poor students, and since 1989 the formula has provided additional funds for remedial educational programs. The purpose and effect of the formula is to provide the most state aid to the neediest school districts. Indeed, in the 1991–92 school year, the state provided $4915 per pupil in educational aid to Hartford, representing more than two and one-half times the average per pupil aid provided to the twenty-one suburban towns with which the Hartford school district is compared in this case. In addition, the state provides funds, calculated according to the financial need of the recipient school districts, for school construction, student transportation and special education.

Moreover, the department of education has established a Priority School District Program, which targets the eight largest cities in the state, including Hartford, for improvement of student achievement and enhancement of educational opportunities. In 1992, the department established an Office of Urban and Priority School Districts, the purpose of which is " 'to concentrate the resources of the department on the problems of the cities, and more specifically to improve the achievement of students in the three largest urban districts,' " including Hartford.

I do not, by recounting these state policies and programs, suggest that the state is doing everything possible to solve the terribly difficult problem of racial and ethnic concentration in our public schools. There undoubtedly is more that can and should be done. I recount these steps only to underscore that the goal of achieving integrated schools is shared by the state, which neither the plaintiffs nor the majority dispute.

comes to mind. Ninety-one years ago the United States Supreme Court, in *Lochner* v. *New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), declared unconstitutional, as violative of the liberty of contract perceived to be implicit in the due process clause of the fourteenth amendment to the United States constitution, New York's labor law imposing a daily limit of ten hours of work in the bakery industry. Justice Holmes dissented, stating that "[t]he Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics," and that "a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of laissez faire." Id., 75. This decision ushered into our constitutional jurisprudence what came to be known as the "*Lochner* era," during which the Supreme Court undertook to strike down legislation that did not comport with the particular economic theories held by a majority of the justices. See *Dolan* v. *Tigard*, 512 U.S. 374, 409, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994) (Stevens, J., dissenting) (identifying the "superlegislative power the Court exercised during the *Lochner* era"); 2 R. Rotunda & J. Nowak, Treatise on Constitutional Law (2d Ed. 1992) § 15.4, pp. 403–404 ("independent review of legislation during [*Lochner*] era resulted in unprincipled control of social and economic legislation"); L. Tribe, American Constitutional Law (2d Ed. 1988) § 8-2.

The majority opinion in this case does much the same. Just as the justices of the United States Supreme Court "*Lochner*ized" the federal due process clause by reading laissez faire economic theory into it, the majority of this court has "*Lochner*ized" our education and equal protection clauses by reading into them an educational theory that mandates racially and ethnically integrated schools. There is no more basis today in our constitution for judicial intervention to impose such a manda-

tory educational theory than there was in the *Lochner* era for the judiciary to impose laissez faire economics.

Thus, the majority has used this court's power to interpret the constitution in order to mandate a vast and unprecedented social experiment, using the state's schools and schoolchildren as test data, and thereby to construct what the majority perceives to be the necessary bridge over the racial divide.[3] The majority has done so, however, without the bricks and mortar necessary to that construction—the facts, and sound constitutional principles. Indeed, had the factual findings by the trial court been those unsuccessfully sought by the plaintiffs, this case would have been very different on

---

[3] I am puzzled by the majority's facile and unexplained reference to the "racial *and ethnic* divide." (Emphasis added.) I am certainly aware of the history of racial discrimination in this nation, although it must be said that, in this state, such discrimination has never been state sponsored or maintained, and that our state has a long tradition of legal hostility to private racial discrimination. I am also aware of the current, and past, pattern of difficulties between whites and blacks; no one who lives, works, reads and watches television could be unaware of that pattern in the nation at large and in this state as well. This pattern of difficulties is what I understand the term "racial divide" to mean.

I am unaware, however, of an "ethnic divide," at least in our state, that is analogous or similar to the racial divide between whites and blacks. I am unaware of any similar history of ethnic discrimination in this state—private or public—or of any pattern of difficulties between any particular ethnic groups. The majority assumes, apparently, although it does not appear in this record, that there is such a pattern, amounting to a divide, between Hispanics and—what? other ethnic groups? "whites" of other ethnic groups? African-Americans? Asian-Americans?

It is true that, historically, various ethnic groups have, at various times, either sought to assimilate themselves into our state's culture, or to add to that culture in a different way, namely, by eschewing assimilation and maintaining their ethnic language and customs, or by a combination of both. I have not thought, however, that this process constituted an "ethnic divide" that required a constitutional cure.

Thus, the majority apparently is aware of a social phenomenon that escapes both this record and me. The reference to "ethnic divide" may sound politically correct—although I doubt even that, in today's climate that celebrates cultural diversity rather than ethnic assimilation—but its meaning is a mystery to me.

appeal. For example, had the trial court found, as the plaintiffs claimed, that racial and ethnic concentration, rather than poverty, results in different educational outcomes and achievements, and that the measurements of those outcomes and achievements are valid for interdistrict purposes, the plaintiffs' constitutional claim of a deprivation of an equal educational opportunity, as they presented it, would have been powerful and might have legitimately prevailed.

As this record overwhelmingly demonstrates, however, the trial court found the facts, not in accordance with the plaintiffs' version of the evidence on that claim, but in accordance with the defendants' version of the evidence. The trial court found that it is poverty, not racial or ethnic concentration, that accounts for the differences in educational outcomes and achievements between the children of the Hartford schools and those of the surrounding districts. The trial court also found, contrary to the plaintiffs' factual claims but in accordance with the defendants' factual claims, that the measurements regarding those differences, although valid for certain intradistrict purposes, are not valid for measuring educational differences between different school districts.

Thus, there are no facts in the record to support what the majority asserts, in an opinion long on rhetoric and short on reasoning, are the "devastating effects that racial and ethnic isolation . . . have had on [the plaintiffs'] education." Indeed, the facts found by the trial court contradict that assertion.[4] Under the facts found by the trial court, all of the adverse effects on the educa-

---

[4] Similarly, equally bereft of factual support in this record, and equally contradicted by the factual findings of the trial court, are the majority's references to "the severe handicaps that burden these children's education" as a result of their racial and ethnic isolation; "the educational impairment that results from segregation in the Hartford public schools"; and the "pervasive and invidious impact on schools" resulting from that isolation.

tion of the plaintiffs result, not from their racial or ethnic isolation—either in whole or in part—but from their poverty. The majority, nonetheless, compensates for these factual shortcomings and for the trial court's factual findings that are squarely contrary to the result the majority seeks to achieve, by ignoring those discomforting facts, and constructing a hitherto unknown constitutional theory—hitherto unknown in the long history of this litigation, and hitherto unknown in our even longer state constitutional history—that disregards all facts but those that are undisputed.

Thus, the majority opinion is, like the characters in Pirandello's play, a result in search of a rationale.[5] This case was litigated in the trial court for six years. The trial court heard evidence for eleven weeks. After a remand by this court to the trial court for the purpose of supplementing the factual record, the parties stipulated to 256 facts that are undisputed. Moreover, pursuant to our remand, the parties presented to the trial court for resolution a total of 676 disputed issues of fact—551 by the plaintiffs and 125 by the defendants. With respect to these disputed issues of fact, the parties had presented extensive and conflicting evidence during the eleven weeks of trial. As a result, the trial court made 161 factual findings, in addition to the 256 stipulated facts. Those 417 factual findings constitute the factual basis for the constitutional claims advanced by the plaintiffs in the trial court and renewed on appeal.

Those findings, however, particularly the 161 facts found by the trial court that had been disputed, are critically and fundamentally adverse to the plaintiffs' constitutional claims, as those claims were presented both to the trial court and to this court. Precisely because of that critical and fundamental factual adversity, however, the majority has, in an exercise of judicial

---

[5] L. Pirandello, Six Characters in Search of an Author (1922).

revisionism, recast the plaintiffs' constitutional claims so that the trial court's critical factual findings have become irrelevant. Moreover, the assertion of the majority to the contrary notwithstanding, it cannot be tenably maintained that the constitutional theory created by the majority was ever presented to the trial court or to this court. The defendants, therefore, have never had the opportunity to respond to that theory.

There is no question, therefore, that everyone involved in this case shares the same goal: the elimination of racial and ethnic isolation in the public schools of this state.[6] Every desirable or wise policy, even every noble goal, however, is not necessarily embodied in the constitution. The debate, therefore, is over whether that goal is constitutionally mandated under the facts of this case. The majority, by an act of judicial will, without fidelity to the facts of the case or the claims of the parties, has imposed a constitutional mandate and has usurped a policy function that legitimately belongs to the legislature.

## II

## THE PLAINTIFFS' CLAIMS AS DISCLOSED BY THE RECORD IN THIS CASE

The majority opinion[7] conceals the constitutional claims presented by the plaintiffs and responded to by

[6] Although this case involves only the school districts of the greater Hartford area, no one can pretend that the constitutional violation found by the majority does not also directly apply to the school districts of the greater New Haven and Bridgeport areas, and perhaps other urban school districts as well. Furthermore, although the majority does not address them, the necessary implications of the majority opinion must also apply to *every* school district in the state, as I discuss later in this dissent.

[7] Because I agree with the majority that the plaintiffs' claims are justiciable and that there is state action, I do not address part II of the majority opinion. My discussion, therefore, is confined to part III of the majority opinion, which addresses the merits of the constitutional claim of a deprivation of equal educational opportunity, and part IV, which addresses the issue of a remedy for the deprivation that the majority finds.

the defendants in the trial court, and on appeal in this court. In addition, the majority has cobbled together, from disparate parts of the plaintiffs' claims, a constitutional theory that is wholly without support in the text, history and purpose of the constitutional provisions at issue in this case, or in the facts as found by the trial court. In order to appreciate these criticisms of the majority opinion, it is necessary to summarize the plaintiffs' claims regarding a deprivation of an equal educational opportunity, as disclosed by this record rather than as expounded by the majority, and then to compare the majority's analysis to the record. Only then is it possible to subject the facts found by the trial court and the constitutional provisions at issue to a reasoned and dispassionate analysis.

The plaintiffs presented three constitutional claims to the trial court: (1) the plaintiffs have been denied their constitutional right to an equal educational opportunity by virtue of their racial and ethnic concentration, and by the concentration of poverty in the Hartford school district, *coupled with certain disparities in educational resources and outcomes as compared to the suburban districts*; (2) the racial and ethnic concentration of the plaintiffs in the Hartford school district constitutes a per se violation of the education and equal protection clauses of the constitution, based solely on the undisputed demographic facts of that concentration; and (3) the inadequacy of certain educational resources in the Hartford school system constitute a denial to the plaintiffs of their constitutional right to a minimally adequate education.[8]

It is the plaintiffs' first claim—that of a deprivation of an equal educational opportunity—that concerns us

[8] For ease of reference throughout this opinion, the claims are listed in the order in which they were presented in the plaintiffs' appeal to this court, which is not the same as the order in which they appeared in the complaint. Substantively, however, there is no difference between the two sets of claims.

here, because that is the claim that the majority sustains on the basis of the undisputed demographic facts. It is indisputable, however, that the plaintiffs' claim of a deprivation of an equal educational opportunity was based, not solely on the demographic facts of racial and ethnic isolation and concentration of poverty, but on those facts *coupled with* other facts claimed by the plaintiffs to demonstrate disparities, in terms of educational resources and outcomes, between the Hartford and suburban districts. The plaintiffs' claim of the deprivation of an equal educational opportunity was premised on a factual showing that, *because of—in a cause and effect sense—their racial and ethnic isolation, the concentration of poverty in which they live, and the disparities between the educational resources available in the Hartford schools and those available in the suburban schools, the quality of their education, as measured by educational outcomes, is significantly less than that of their suburban neighbors.* Put another way, the plaintiffs undertook to persuade the trial court that, as a factual matter, all three of these factors—racial and ethnic isolation, concentration of poverty, and disparities in educational resources—*have caused* the quality of their education, as measured by the standards articulated by this court in *Horton I,* to be inferior to that of the surrounding suburban districts.

Thus, it was critical to the plaintiffs' equal educational opportunity claim that they prove the following facts: (1) they are racially and ethnically concentrated—an undisputed fact; (2) they suffer from the effects of a concentration of poverty—also undisputed; (3) the educational resources of the Hartford district are less than those of the surrounding districts[9]—a disputed fact;

[9] It is difficult for me to square the plaintiffs' claim that the Hartford school district suffers from a deprivation of educational resources, relative to those of the surrounding districts, with the plaintiffs' simultaneous and consistent insistence that this is not a school funding case, as was *Horton I.* Because resources are directly tied to funding, it is obvious to me that,

and (4) the combination of the first three cause lesser educational outcomes in Hartford when compared to the suburban districts—also a disputed fact. One cannot read this record—both the trial court record and the appellate record—any other way.

Thus, at a minimum, proof of lesser educational outcomes as a result of racial and ethnic isolation was essential to the plaintiffs' case, because their constitutional theory of deprivation of an equal educational opportunity is based on the provisions of article first, § 20, of the state constitution, regarding race and ethnicity. In other words, without either race or ethnicity, or both, as a causative factor in lesser educational outcomes, the plaintiffs' case under article first, § 20, would fall, because those are the two protected categories under that article that the plaintiffs invoke as the basis of their constitutional theory.[10] Thus, it was essential for the plaintiffs to establish in the trial court that their racial and ethnic isolation, either alone or in combination with the concentration of poverty, caused diminished educational outcomes relative to those of the surrounding communities.

It is also clear that the plaintiffs, the defendants and the trial court considered these issues as questions of fact to be established by evidence—both documentary and by way of experts' opinions—and not questions of

at least to the extent that their constitutional claim rests on a disparity in resources, it comes squarely within the rubric of *Horton I* and, therefore, would also be subject to the same requirements of proof as are required under that rubric, namely, that the quality of education is diminished because of the diminished resources made available. See *Horton I*, supra, 172 Conn. 637–38. Nonetheless, I am satisfied that my difficulty is resolved because the trial court found as a matter of fact that the disparities in educational resources claimed by the plaintiffs do not exist, and that finding is supported by the evidence.

[10] The plaintiffs have never claimed, either in the trial court or this court, that economic status—their concentration of poverty—alone entitles them to relief in this case.

law. It is equally clear that these *are* questions of fact and not of law. Moreover, the plaintiffs, the defendants and the trial court all understood that the plaintiffs were required to prove the existence of a diminished educational opportunity caused by the plaintiffs' racial and ethnic isolation, in addition to the more generalized benefits of an integrated educational system and burdens imposed by a racially and ethnically isolated system.

In other words, the plaintiffs never claimed that the general social benefits of racial and ethnic integration and the burdens of racial and ethnic concentration were sufficient to establish the factual foundation of their equal educational opportunity claim. The plaintiffs, the defendants and the trial court all understood that the plaintiffs were required, in order to come within the reasoning of *Horton I,* to establish the specific facts of diminished educational outcomes, relative to the suburban districts, as a result of their racial and ethnic and concentration. To corroborate this summary of the plaintiffs' claims, I now turn to a discussion of the factual background of this appeal.[11]

A

The Plaintiffs' Claims as Presented to the Trial Court

The plaintiffs had presented their claims in a tripartite structure.[12] Before presenting their evidence, the plain-

---

[11] I regret that my discussion of the trial court record is as lengthy and detailed as it is. It is because, however, the majority has so dramatically altered the nature of the claims presented to the trial court and to this court, and in doing so has so plainly ignored the voluminous trial court proceedings to the contrary, that the length and detail is necessary.

[12] The plaintiffs had brought this action in May, 1989. After the defendants had unsuccessfully challenged by motion certain aspects of the plaintiffs' claims, the case was tried for approximately eleven weeks in late 1992 and early 1993. Thereafter, in November, 1994, the plaintiffs filed their revised complaint, upon which the case was to be decided by the trial court.

In April, 1995, the trial court issued its memorandum of decision, the gravamen of which was that the plaintiffs had not established the requisite

tiffs made an opening oral argument to the court explaining their claims and relating those claims to the specific counts of their complaint. The plaintiffs specifically drew a sharp distinction between the first and second counts of their complaint. As they explained their case to the trial court, the first count depended solely on the legal claim that the term "segregation" in article first, § 20, of the state constitution encompassed de facto as well as de jure segregation, and that no evidence or facts regarding the effects of that segregation was necessary to prove the allegations of that count.[13] They explained that the second count was,

state action as the cause of the conditions of which they complained. Accordingly, the court rendered judgment for the defendants. The plaintiffs promptly appealed. Before any briefs were filed in this court, we held a special session in order to ensure that the record would contain all the factual findings necessary to a full consideration and determination of the appeal. Thereafter, on May 11, 1995, we remanded the case to the trial court for supplemental findings of fact, based on the understandings that (1) there were considerable areas of factual agreement between the parties, and (2) there were also considerable areas of factual disagreement that had been litigated during the eleven weeks of trial. Thus, we ordered that: (1) to the extent that the parties agreed on certain facts, they present those facts by way of stipulation to the trial court for its approval; (2) to the extent that they disagreed on facts, each side present to the trial court a proposed finding of facts that it claimed to have proven; and (3) the trial court issue its finding of facts to resolve the disputed facts as disclosed by the parties' proposed findings of fact. As indicated later in this dissent, the parties and the trial court complied with our remand.

[13] The plaintiffs stated: "Article First, Section 20, which was adopted in 1965 . . . expressly prohibits both segregation as well as discrimination. And notice the Constitution does not say 'de jure segregation.' It says 'segregation.' This is a de facto segregation case . . . and de facto segregation is a form of segregation. . . ."

"The complaint . . . has four counts. The first count basically says that de facto segregation is inherently unequal. And this draws on *Brown* v. *Board of Education*, [374 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)], that separate but equal is inherently unequal.

"Now . . . we tend to forget, when we're just thinking about this first count, that slavery, even in Connecticut, was not completely abolished until the end of the Civil War. And I'm saying Connecticut, not the South. In Connecticut it was legal until that time. So, to perpetuate—and for the state to say there's nothing wrong with a virtually all minority school system simply perpetuates this badge of inferiority, and it does so in two ways.

unlike the first count, based on a combination of facts: racial isolation; concentration of poverty; and inadequate educational resources; all combining to cause a quality of education inferior to that of the surrounding suburban districts.[14]

In the posttrial proceedings—both by way of their briefs and their oral arguments—the plaintiffs reiter-

"First of all, poor minorities have no opportunity to interact with the white population. And the other side is, the white population has no opportunity to interact with them, and so it just means more racial stereotypes and economic stereotypes on both sides.

"More fundamentally . . . because the Equal Protection Clause expressly prohibits segregation, what difference does it make what the evidence shows about its effects? It's illegal, regardless of what the effects of integration are. Integration is required as a matter of principle by the Connecticut Constitution, and that should be the end of that.

"So, Your Honor, as we present evidence over the next few weeks, on the second through the fourth counts of the complaint about the ill effects of segregation, Your Honor should not lose sight of the first count, for the first count requires no evidence other than the fact of segregation . . . ."

It is true that, as this transcript indicates, the plaintiffs initially analogize the first count to the concept of inherent inequality derived from the principle of "separate but equal" that the United States Supreme Court condemned in *Brown* v. *Board of Education*, supra, 347 U.S. 495. It cannot be tenably maintained, however, that these few oral statements, taken in their immediate context and in the context of all of the subsequent instances in which the plaintiffs articulated their claims to the trial court and this court, support the reading of the plaintiffs' claim of equal educational opportunity created by the majority. Indeed, I do not read even the majority opinion to rest on the extravagant claim—wholly unsupported by any evidence in this record—that the feelings of inferiority inflicted on the schoolchildren in *Brown* by the state mandated separation of the races is present in any of these plaintiffs as a result of demographic factors over which the state has no control. As I discuss later in this dissent, moreover, *Brown* is not pertinent here generally; and even the badge of inferiority rightfully condemned in *Brown* rested on evidence in and findings of the *Brown* trial court, both of which are significantly absent from this record.

Moreover, and "more fundamentally," as the plaintiffs put it to the trial court, their claim under the first count rested, not on any such considerations, but on the meaning of "segregation" in article first, § 20. I also discuss the merits of that claim later in this dissent.

[14] The plaintiffs stated: "[T]he second count has to do with whether or not segregation is unequal as a matter of fact, whether racial and economic isolation is unequal as a matter of fact. Now . . . our proof . . . [will show]

ated that their claim of a deprivation of an equal educational opportunity was premised on a factual inquiry into the actual quality of the education provided to them, relative to that provided to the students of the suburban districts. They repeatedly emphasized that they had proven that their racial and ethnic isolation, coupled with their inadequate educational resources and their concentration of poverty, caused the quality of their education to be inferior to that provided to their suburban counterparts.[15] In those proceedings, moreover, they repeatedly contrasted their equal educa-

the facts of racial isolation, [combined] with high concentration of poverty, combined with inadequate resources."

[15] The plaintiffs claim that "the extreme levels of racial and economic segregation in Hartford, *along with well-documented deficiencies and disparities in educational resources and outcomes,* violate plaintiffs' fundamental right to equal educational opportunity." (Emphasis added.) In discussing this claim, the plaintiffs referred to the testimony of many witnesses to buttress their position that they were not receiving an equal educational opportunity. They argued that the racial and ethnic isolation in the Hartford schools, combined with the inadequate and unequal educational conditions, deprived them of an equal educational opportunity. They stated: "*In light of the severe educational inequities* imposed on a student population already suffering serious harms from extreme levels of racial and economic isolation, it cannot be claimed that plaintiffs and other Hartford students are receiving equal educational opportunity." (Emphasis added.) In their posttrial reply brief, the plaintiffs identified "[t]he central issue before this court [as] whether the most racially and economically isolated children in the state *who are performing the worst academically with the least amount of resources* are entitled to judicial protection to ensure that their constitutional right to [an] equal educational opportunity is realized." (Emphasis added.)

In their closing oral arguments to the trial court, the plaintiffs again made clear the factual basis of their equal educational opportunity claim. They argued that the effect of three factors, taken together—racial isolation, concentration of poverty and inadequate resources—deprives them of an equal educational opportunity. Later, they quoted from their posttrial brief: "The facts are that Hartford children go to school in poverty-concentrated and racially isolated schools *without resources.* Even for high-achieving students, the system's racial isolation *and the inadequate resources have harmful effects* . . . . Plaintiffs presented *evidence on the long term effects of poverty concentration, racial segregation, and inadequate levels of resources, as well as the educational inequities separating Hartford and its neighboring districts.*" (Emphasis added.)

tional opportunity claim with their claim that de facto segregation was per se unconstitutional, making clear that the per se segregation claim was not an equal educational opportunity claim.[16]

## B

### The Remand Proceedings in the Trial Court

Upon our remand, the parties entered into a stipulation of 256 facts. Each side also presented to the trial court those disputed facts that it claimed to have proven. From the plaintiffs' proposed factual findings, it is clear that they sought to persuade the court to find facts that supported their claim that the quality of the education provided the Hartford schoolchildren was inferior to that of the suburban districts, and that this inferiority was caused by their racial and ethnic isolation combined with the concentration of poverty in the district.[17] The defendants' proposed findings, by con-

[16] The plaintiffs claim that "the extreme levels of racial segregation in the Hartford area constitute a per se violation of Article I and Article VIII." They did not phrase this claim in terms of a deprivation of an equal educational opportunity. They claimed that the insertion of the term "segregation" in article first, § 20, provided an "independent basis" upon which they should prevail.

In their closing oral arguments, the plaintiffs again distinguished their equal educational opportunity claim from their per se segregation claim. Their counsel stated: "I spent a lot of time on the term segregation and discrimination in article first, § 20, and I just want to make it clear that our primary argument is under *Horton* v. *Meskill* [and the] equal protection clause in its traditional sense, plus article eight, § 1, namely every student in the state is entitled to an equal educational opportunity." Later, they reiterated that their per se segregation claim differed from their equal educational opportunity claim: "Under our first count, the racial segregation itself violates article first, § 20 of the Connecticut constitution in the exercise of the fundamental right to education."

[17] Our May 11, 1995 order directed the parties to "identify, by appropriate headings, those legal claims presented to the trial court . . . ." The plaintiffs listed 121 disputed facts that they claimed to have proven in the trial court, under the heading, "Does the Racial, Ethnic and Economic Isolation and Poverty Concentration Coupled with Disparities in Resources and Outcomes Violate Plaintiff's Right to Equal Educational Opportunities Under Article Eighth, Section 1 and Article First, Sections 1 and 20?" Those 121 claimed

trast, reflected their view that the evidence proved that it was the plaintiffs' poverty, and not their racial and ethnic concentration, that caused the educational deficiencies of which the plaintiffs complained.

## C

### The Findings of Fact Regarding Equal Educational Opportunity

Thereafter, the trial court issued its "Finding," which constituted its factual determinations "on the disputed facts disclosed in the proposed findings of fact submitted by the parties . . . ." These findings indicate that the trial court was persuaded by the defendants' factual claims, and not by the those of the plaintiffs.

Many of the trial court's findings of fact are directly pertinent to the plaintiffs' claim of a deprivation of an equal educational opportunity. The trial court found as follows. Historically, racial or ethnic minority group membership has been associated with being educationally disadvantaged because members of those groups have failed to succeed in schools at the same levels as most members of the majority group. The generally poorer academic performance of black and Hispanic youngsters is explained for the most part by the social and economic conditions under which they and their families live.[18]

facts are grouped under subheadings that involve matters such as: the socioeconomic status of the Hartford metropolitan area students; the links between racial and economic isolation; the effects of integration; the disparities in educational resources between the Hartford and suburban districts, including staffing and curriculum, instructional services, supplies, library resources, equipment, and plants and facilities; and the disparities between the Hartford and suburban districts in educational outcomes, including mastery test scores, credits earned, scholastic aptitude test scores, graduation and drop-out rates, and patterns of postsecondary activities. These are the facts that the plaintiffs sought to have the trial court find in support of their constitutional claim that they have been deprived of an equal educational opportunity.

[18] The court also found that two other factors that generally explain any poorer performance of minority students, namely, the failure of a school

74

The court found further as follows: "It is poverty and not race that is a principal causal factor in lower educational achievement." The problems of the Hartford schools are compounded by the fact that minorities in the inner cities are disproportionately poor, and the "real correlation with academic achievement is socioeconomic class rather than race . . . ." The fact that the students come from poor families "in and of itself is a significant problem in the schools. . . . The reason that children who live in poverty do not do well in statewide academic testing is because they are poor and disadvantaged and not because they are an ethnic or racial minority, because poor minority children exhibit the same patterns as those of their poor white counterparts, and poverty is the strongest predictor of poor academic achievement." Moreover, the concentration of poverty may adversely affect academic achievement over and above the effect of family poverty. The socioeconomic status of schoolchildren dictates their academic performance. Thus, the improvement in the socioeconomic status of blacks explains the reduction by almost one half of the achievement gap between black and white students nationally between 1970 and 1990. The trial court also specifically found that "[v]irtually all of the differences in performance between Hartford students and those in other towns, as well as differences in college attendance, can be explained by differences in socioeconomic status and the background factors that socioeconomic status represents."

The trial court also found that a higher concentration of students "at risk" may affect the achievement level of students in a particular school district. Thus, given two groups of students equal in all respects except the incidence of students with "at risk" factors such as low

system to offer culturally sensitive programs and patterns of institutional discrimination reflecting discrimination in society as a whole, are not present in and do not apply to the Hartford public schools.

birth weight and mothers on drugs at birth, the group with the higher incidence of those "at risk" factors will perform more poorly in school than the other group.

The trial court further found that the level of achievement that should be attained by the students in a particular district cannot be assessed without considering the conditions that exist in the district that hinder academic achievement. Examples of those conditions are: the "mobility" of the students, namely, the frequency of their moving from school to school during a school year or from one year to the next; limited English proficiency of certain students; and the students' socioeconomic status. The court found that, in order to understand the quality or effectiveness of a particular educational program, it is necessary to separate the disadvantages that students bring to school with them from the effects of the program itself. Moreover, it is necessary to separate the effects of poverty from the effects of racial isolation. Based on expert testimony, the court found that there are ways in which the separate effects of racial isolation and poverty can be measured statistically. The plaintiffs' experts did not employ these statistical techniques.

The trial court also made certain findings regarding the state mastery test scores. The court found that the scores serve two purposes: (1) to inform districts so that they can improve their programs, correct deficiencies and plan for the future; and (2) to provide a basis for funding to districts that perform below remedial standards. This testing program was not designed for interdistrict comparison, but to provide information about individual students and programs within particular districts, and to trigger remedial services to students in need of them. Moreover, the trial court found, it would be an abuse of the purposes of the testing program to use the scores as the basis for comparing the quality of the education between schools or school sys-

tems. The test results should not be seen as primarily caused by racial isolation in the schools because the results could be related to many other factors. Thus, it is inappropriate to use the mastery test data as a basis for drawing conclusions about the quality of education in Hartford without taking into account the effects of other important variables, such as socioeconomic status, early environmental deprivations, and diminished motivation to succeed academically. Other variables that contribute to depressed test scores of Hartford schoolchildren that must be considered are the number of students with limited English proficiency and the extraordinary mobility of the student population.

The trial court also found that Hartford students and those in the surrounding towns are scoring at the level to be expected if the dramatic differences between them in poverty levels are taken into account. The disparity in test scores does not indicate that Hartford is doing an inadequate job of educating its students or that its schools are failing, because the test scores, based on the relevant socioeconomic factors, are at the approximate projected level when adjustments are made for those factors. Teachers and administrators have no control over where their students live or the conditions under which they live. They are not in a position to remedy the disadvantages that their students bring with them when they enter the educational system. Thus, the court found that there are no educational strategies or initiatives that can fully deal with the complex social issues that produce inequality of performance and undermine education, because hunger, parental neglect, crowded and substandard housing, and inadequate employment opportunities disproportionately attack minority children in our state and divert them from educational opportunity.

This, then, is the factual record upon which this case was presented to and decided by the trial court, and

upon which the appeal came to this court. I turn, next, to this appeal as presented to us by the plaintiffs.

## D

### The Plaintiffs' Case as Presented to This Court on Appeal

In their initial and reply briefs in this court, the plaintiffs made crystal clear that the three constitutional claims that they were presenting to us for our adjudication coincided perfectly with the three claims that they had presented to the trial court. For ease of reference, and more importantly for fidelity to the plaintiffs' own understanding and characterization of their claims, I refer to the three claims as: (1) an equal educational opportunity; (2) per se segregation; and (3) a minimally adequate education. The plaintiffs' briefs make equally clear that the first and third of these claims, namely, an equal educational opportunity and a minimally adequate education, are based on *factual* claims regarding, not only the undisputed facts of the degree of racial and ethnic concentration in the Hartford schools but, critically and essentially, the plaintiffs' version of the disputed facts regarding the differences in educational outcomes and achievements in the Hartford schools relative to the surrounding suburban school districts, and the causes of those differences. Thus, the plaintiffs' equal educational opportunity claim is squarely based on a *combination* of factual matrixes: the facts that demonstrate the racial and ethnic isolation of the Hartford schools, *combined with* what the plaintiffs claim to have established in the trial court as the *educational deficiencies* that are *caused by that isolation.*[19]

---

[19] In contrast, the second claim, that of per se segregation, is a purely legal claim, resting solely on the meaning of the term "segregation" in article first, § 20, as applied to the right to a free public education guaranteed by article eighth, § 1, of the state constitution. This claim, unlike the claims of a lack of an equal educational opportunity and a lack of a minimally adequate education, rests solely on the undisputed facts of racial and ethnic concentra-

The plaintiffs set out the nature of their claims definitively at the very beginning of their appellate brief: "Hartford children attend schools that are the most racially, ethnically, and economically isolated in the state. *These schools have the least educational resources and suffer from the worst academic performance. The cumulative effects of these inequities deprive Hartford's children of the preparation necessary to join the mainstream of society.*"[20] (Emphasis added.)

With this introduction in mind, I turn now to the plaintiffs' own more detailed explication of their claim of a deprivation of an equal educational opportunity[21]

tion. Under this claim, and only under this claim, the plaintiffs argue that the term "segregation" as applied to education includes de facto racial and ethnic concentration to the degree present in the Hartford schools. Moreover, the plaintiffs' briefs make clear that this legal claim is separate and distinct from the claims of a deprivation of an equal educational opportunity and of a deprivation of a minimally adequate education, and has nothing to do with such deprivations.

[20] The plaintiffs follow this introduction with an explanatory footnote so that we would have no trouble understanding their argument, relating the counts of their complaint specifically to their issues raised on appeal. They state as follows in page 1, footnote 1, of their appellate brief: "The Complaint is in [three] counts: first, that because Hartford metropolitan area schools are segregated on the basis of race, ethnic background, and socioeconomic status, *and because the Hartford schools are educationally deficient when compared to the suburban schools*, defendants have failed to provide plaintiffs *an equal opportunity to a free public education* as required by Article First, §§ 1 and 20 and Article Eighth, § 1 of the Connecticut Constitution, (Issue II on appeal); second, that the sharp segregation on the basis of race and ethnic background in Hartford metropolitan area public schools, *by itself*, violates Article First, §§ 1 and 20 and Article Eighth, § 1 of the Connecticut Constitution, (Issue III on appeal); third, that the Hartford public schools *are educationally deficient and fail to provide a majority of Hartford schoolchildren with a minimally adequate education*, measured by the state's own standards, and this violates Article First, §§ 1 and 20 and Article Eighth, § 1, (now Issue IV) . . . ." (Emphasis added.)

[21] Because the majority did not address the plaintiffs' claim of a deprivation of a minimally adequate education, I do not address that claim in this part of this dissent, and do so later in my consideration of the plaintiffs' claims as they are properly before us.

as presented in their two briefs in this court. This explication is derived directly from, and is identical to, that claim as ultimately presented to the trial court for adjudication. The plaintiffs correctly point out that the right to an equal educational opportunity was recognized by this court in *Horton I*. The plaintiffs then accurately pose the question under this claim: "As a legal matter, this case falls squarely under [*Horton I*],[22] and the question before this Court is whether the undisputed condition of racial and economic isolation of the public schools, *coupled with the undisputed and extreme disparities in educational resources afforded Hartford's schoolchildren,* violate plaintiffs' constitutional right to an equal educational opportunity." (Emphasis added.)

The plaintiffs then explain precisely why they maintain that their right to such an opportunity has been violated. Under the heading, "The Segregated, Economically Isolated *and Unequal Conditions in Hartford Metropolitan Area Public Schools* Violate Plaintiffs' Right to an Equal Educational Opportunity"; (emphasis added); the plaintiffs, quoting from *Horton I*, state: "Equality of educational opportunity is ascertained by comparing the quality of education provided in the school districts. In *Horton I*, this court identified criteria for measuring the quality of education, including: '(a) size of classes; (b) training, experience and background of teaching staff; (c) materials, books and supplies; (d) school philosophy and objectives; (e) type of local control; (f) test scores as measured against ability; (g) degree of motivation and application of the students; (h) course offerings and extracurricular activities.' *Horton I*, [supra, 172 Conn. 634]."

---

[22] In light of the plaintiffs' repeated insistence that this is not a school funding case, however, this reference to *Horton I* can only be understood as an argument that the reasoning of *Horton I*, transplanted from the realm of financing inequities to the realm of racial and ethnic concentration, applies to this case. The plaintiffs' subsequent discussion bears out this understanding.

With this legal, and appropriate, standard in place for the evaluation of a claim of a deprivation of an equal educational opportunity, the plaintiffs then attempt to persuade us that, as demonstrated by the evidence presented in the trial court, they should prevail on this claim. They attempt to do so, however, not by relying on the general harms associated with a racially and ethnically isolated school system or on the general benefits of an integrated school system, but by arguing that the trial court's adverse factual findings were clearly erroneous.[23]

In their reply brief in this court, the plaintiffs reinforce this understanding of the basis of their equal educational opportunity claim.[24] The plaintiffs then, in order

---

[23] The plaintiffs assert: "The court below erroneously found that students in the Hartford metropolitan area are provided equal educational opportunities." In support of this assertion, the plaintiffs contend that the trial court "committed error by completely bypassing analysis of disparities in the provision of materials, books and supplies and course offerings, *by similarly neglecting the wide disparity in test scores, and by disregarding the impact of racial and ethnic isolation and the concentration of poverty* in reaching [its] conclusion." (Emphasis added.) Indeed, in the trial court the plaintiffs had presented expert testimony regarding the educational impact of racial and ethnic isolation, and the plaintiffs complain in this court that the trial court was required to find accordingly because, in the plaintiffs' view, there was "no evidence in the record to show that all of the plaintiffs' experts were unworthy of belief."

In the same vein, the plaintiffs continue their attack on the trial court's findings regarding the quality of the education provided to the plaintiffs by referring back to a detailed summary of their evidence in the trial court. At pages 7 through 24 of their appellate brief, under the heading "Unequal and Inadequate Education," the plaintiffs present a detailed summary of their trial court evidence that, they maintain, demonstrates as a factual matter that they are being deprived of an equal educational opportunity as a result of their racial and ethnic isolation. This factual recitation further demonstrates that the plaintiffs' claim regarding an equal educational opportunity rests on a factual matrix that combines the racial and ethnic isolation of the Hartford district, the claimed economic plight of the district and the educational deficiencies claimed to result from that isolation and plight.

[24] In their reply brief, the plaintiffs state: "The trial court . . . succumbed to [an] error of law by failing to consider the totality of circumstances facing Hartford schoolchildren and how *racial segregation, the concentration of*

that we not be confused about their claims, reiterated the three claims that they had presented in this case, and the doctrinal differences between them. "First, plaintiffs claim that the extreme levels of racial segregation and the concentration of poor children in the Hartford schools, along with well-documented deficiencies and disparities in educational resources and reflected by the vast gulf in outcomes, violates plaintiffs' fundamental right to an equal educational opportunity. Second, plaintiffs claim that the extreme levels of racial segregation in the Hartford area constitute a per se violation of Connecticut's constitution. Third, plaintiffs claim that the conditions in the Hartford schools violate plaintiffs' right to a minimally adequate education, pursuant to Article Eighth, § 1 and plaintiffs' due process rights."

To summarize: the plaintiffs' first claim is their claim of a deprivation of equal educational opportunity as articulated in *Horton I*. As a factual matter, this claim rests on a complex factual matrix: the undisputed facts regarding the racial and ethnic concentration, and the concentration of poverty, in the Hartford district; the disputed facts regarding the claimed inadequate educational resources in the Hartford district; and the disputed causal effect of that combination of factors on the educational outcomes claimed to be prevalent in the Hartford district.

The plaintiffs' second claim is based entirely on the legal theory that the term "segregation" in article first,

---

*poor children in the schools, and disparities in educational resources, including facilities and equipment, among other things, deprive children of substantially equal educational opportunities.* Notwithstanding defendants' portrayal, this case is not simply about the extreme racial isolation of the Hartford schools, although that, too, is a ground for relief. Neither is the case solely about the deficiencies in educational resources or the vast differences in educational outcomes. *The plaintiffs' claim of denial of equal educational opportunity is about all of these harms together, just as they are experienced every day in the classroom."* (Emphasis added.)

§ 20, means de facto segregation. As a factual matter, this claim rests on only the undisputed facts regarding the racial and ethnic concentration in the Hartford schools, to the exclusion of the disputed facts regarding the claimed disparities between the educational resources and outcomes of the Hartford school district, on one hand, and the resources and outcomes of the suburban school districts, on the other hand.

The plaintiffs' third claim is their claim of a deprivation of a minimally adequate education under article eighth, § 1, of the state constitution as articulated in *Horton I*. This claim rests on disputed facts regarding certain claimed inadequacies in the Hartford school district.

Having summarized the plaintiffs' claims as disclosed by this voluminous record, I will next analyze the majority opinion in light of the record in this case. I turn, therefore, to that task.

### III

### THE FUNDAMENTAL FLAWS IN THE MAJORITY OPINION

### A

#### The Majority's Adjudicative Process

The first flaw in the majority opinion involves the adjudicative process by which the opinion was created. As the record demonstrates, the constitutional theory conceived by the majority bears only a passing resemblance to the claims of the plaintiffs as disclosed by the record. The majority's theory is a combination of the legal theories presented in the plaintiffs' first and second claims, completely shorn of the facts that the trial court found after six years of litigation. The theory upon which the majority opinion is based, therefore, is brand new and was never advocated by the plaintiffs.

The majority asserts, nonetheless, that "[t]he constitutional implications raised by these allegations were fully argued before the trial court, and were fully briefed by the parties before this court."[25] This is like saying that water is the same thing as hydrogen and oxygen because water is the result when the two gases are combined in a certain proportion.

The majority's theory of a lack of an equal educational opportunity is a hybrid of two disparate parts of the plaintiffs' case, as argued to and litigated in the trial court and as argued and briefed in this court. One part of the hybrid is the legal theory of the plaintiffs' first claim, namely, that under *Horton I*, they have been deprived of an equal educational opportunity, but *without* the factual matrix that the plaintiffs themselves presented to support that theory. The second part of the hybrid is the theory of the plaintiffs' second claim, namely, that "segregation" in article first, § 20, means de facto as well as de jure segregation when applied to education. That theory, however, does *not* constitute an equal educational opportunity claim, as understood and presented by the plaintiffs throughout this case, as

---

[25] I can find nothing in this voluminous record to support this assertion of the majority, insofar as it purports to refer to the claim of equal educational opportunity. Indeed, the majority does not, because it cannot, quote or summarize any part of this record that supports the assertion. Moreover, the assertion is curious, to say the least, because the majority does not state that the theory of equal educational opportunity that it has created *was* briefed in the trial court or this court. Rather, the majority asserts that "[t]he constitutional implications" of that theory were addressed. I do not know what that means.

It may refer to the fact that the parties fully briefed and argued the question of the meaning of "segregation" in article first, § 20. The parties addressed that issue, however, as part of the plaintiffs' per se segregation claim, which the plaintiffs themselves had separated from their equal educational opportunity claim. To the extent that this legal issue is in the case under that rubric, however, I acknowledge that it has been fully addressed by the parties. In my view, that does not substitute for giving the parties an opportunity to address its consequences for a claim, based on *Horton I*, that the plaintiffs have been deprived of an equal educational opportunity.

understood and responded to by the defendants throughout this case, and as briefed and argued in this court.

Moreover, I confess that, having read the briefs carefully and having participated in the oral argument with great concentration, the majority's theory of a deprivation of an equal educational opportunity was a complete surprise to me. I can only wonder about the reaction of the defendants, who for the past six years have been defending this case on the basis that the record demonstrates, rather than the basis on which the majority has decided the case. In fact, I suspect that even the plaintiffs are surprised that they have prevailed on a theory of a deprivation of an equal educational opportunity that they did not present, and that renders wholly immaterial the entire factual matrix that they did present, appropriately albeit unsuccessfully, under that doctrine as articulated in *Horton I.*

The newness of the majority's constitutional theory is not only demonstrated by comparing the record to the majority opinion, it is demonstrated by certain language in the majority opinion itself. When the majority asks, at the beginning of its analysis, whether "the plaintiffs' complaint encompass[es] [the constituent elements of the affirmative constitutional mandate to provide all public schoolchildren with a substantially equal educational opportunity]", it asks a question that no one else has ever asked us to answer, namely, whether the plaintiffs' complaint is legally sufficient.[26] In elaborating on that question, moreover, the majority's language is curiously but revealingly qualified: it refers to the plaintiffs' claim "as we have defined it." This question and qualification are necessitated solely by

---

[26] The majority also asks whether the plaintiffs' pleadings "fairly can be read to encompass such a challenge." It concludes that "the plaintiffs can succeed if any of their claims falls within the constitutional right *as we have defined it.*" (Emphasis added.)

the fact that the majority's, rather than the plaintiffs', theory of the equal educational opportunity claim has now become dispositive, and that this theory was never in this case until the majority issued its opinion.

Although prior to trial the defendants challenged the legal sufficiency of the plaintiffs' complaint, they lost that challenge and, except for the arguments regarding justiciability and state action, did not renew it on appeal. Moreover, at no time in this appeal was the question raised of whether the plaintiffs' pleadings stated a cognizable claim. At no time in this appeal was the question raised whether the plaintiffs' pleadings could be read to support their constitutional challenge. The sole reason that these questions and these qualifications became necessary is that the majority has recast the essential nature of the plaintiffs' complaint, as presented by the plaintiffs at trial and on appeal, in order to fit the majority's predetermined outcome.

This method of adjudication is fundamentally flawed for several reasons that call into question the integrity of the majority decision. First, it is egregiously unfair to the defendants. Having defended this case for six years in the trial court, and having responded to the plaintiffs' appeal on the legal and factual bases presented by the plaintiffs, the defendants have not had the opportunity to respond to the new theory of equal educational opportunity fashioned by the majority either by evidence or argument in the trial court, or by briefs and oral argument in this court. Indeed, we will all have to wonder what evidence or arguments the defendants would have produced in the trial court and this court had they known that this hybrid theory was the basis of the equal educational opportunity claim to which they were required to respond.[27]

[27] The majority asserts simply that "as a pleading matter, [the plaintiffs'] claims were stated in two counts rather than in one." On the contrary, the majority has taken two separate and independent claims, chopped them up

Second, the majority's treatment of the plaintiffs' pleadings in this case turns our traditional treatment of pleadings on its head, and adds to the unfairness to the defendants. It is true that, under our modern jurisprudence, we read pleadings "broadly and realistically, rather than narrowly and technically. . . . *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 587–88, 542 A.2d 1124 (1988); *Fuessenich* v. *DiNardo*, 195 Conn. 144, 150–51, 487 A.2d 514 (1985). As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 496, 646 A.2d 1289 (1994).

The application of that principle cannot, however, save what the majority has done here. That principle generally applies before trial to the construction of a complaint when it is challenged for legal sufficiency; see, e.g., *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 220–21, 520 A.2d 217 (1987); during trial, to a determination of whether certain evidence should be admitted as within, or excluded as beyond, the fair boundaries of the complaint; see, e.g., *Farrell* v. *St. Vincent's Hospital*, 203 Conn. 554, 557–58, 525 A.2d 954 (1987); and posttrial, where the parties have in fact litigated the case in a posture that includes the challenged theory, and there has been no prejudice or surprise. See, e.g., *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 230 Conn. 497–98. The principle does not apply in this case, however, where the majority has, after the trial and after appellate briefs and arguments, altered the theory of the complaint on which all of the parties

and recombined them into a third, and different, claim that no one—not even the plaintiffs—had ever made.

have relied, and then, without notice to anyone, has determined that the complaint supports the altered theory. That process violates the fundamental principle that "the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party . . . ." Id., 496.

The third flaw in the process by which the majority reached its decision is that, having decided to consider a new theory of the case, the court has not afforded the parties the opportunity to file supplemental briefs or to present further oral argument. In recent years, we have engaged in the practice of requesting supplemental briefs when, after oral argument, we have determined that the parties have not sufficiently addressed an issue or potentially dispositive theory of the case that surfaced either in the oral argument or in the process of our deliberations. See, e.g., *State* v. *Troupe*, 237 Conn. 284, 286–87 n.4, 677 A.2d 917 (1996) (continued viability of constancy of accusation doctrine); *Williams* v. *Best Cleaners, Inc.*, 235 Conn. 778, 784, 670 A.2d 294 (1996) (definition of disability under General Statutes § 31-349), superseded, 237 Conn. 490, 677 A.2d 1356 (1996); *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 130, 629 A.2d 413 (1993) (appropriate standard in habeas proceeding by which to determine effect of prior failure to raise constitutional claim); *State* v. *Oquendo*, 223 Conn. 635, 657, 613 A.2d 1300 (1992) (whether denial of motion to suppress can be sustained under abandonment doctrine). Indeed, we have reversed the Appellate Court for disposing of an appeal on the basis of a plain error analysis that neither party had raised, without first giving the parties the opportunity to brief the perceived plain error claim. See, e.g., *Lynch* v. *Granby Holdings, Inc.*, 230 Conn. 95, 98–99, 644 A.2d 325 (1994).

There are two reasons for this postargument appellate procedure: (1) fairness to the parties suggests that they be confronted with a potentially dispositive theory

that they had not had the prior opportunity to discuss; and (2) we are more likely to be correct in our judgments if they follow adequate briefing. I acknowledge that we have not uniformly followed this procedure, and that there is no rule that requires that we do so. Indeed, there are cases in which, for various reasons, it is appropriate that we not do so.

This case, however, is the paradigm of when supplemental briefing and argument would have been appropriate. This case may be the most significant ruling of this court in this century. I can think of no other case decided by this court that will have more impact on the daily lives of our citizenry than this case. Having ordered supplemental briefing and argument in cases involving issues of the continued viability of an evidentiary doctrine, the proper construction of second injury fund terminology, preservation of an issue for habeas review and the relevance of abandonment to the reasonable expectation of privacy, we should have done so in this case, the enormous public importance of which demands the highest degree of both fairness to the parties and confidence in the correctness of the outcome.

The use of that prudent appellate procedure would have been particularly appropriate in this case. In a case in which we exercise the judicial power to interpret a statute or explicate the common law, if we are incorrect, the General Assembly is free to enact legislation correcting our error. In a case such as this, however, in which this court incorrectly interprets our constitution, the only remedy of the people is the painful process of constitutional amendment.

Although, in my view, these flaws in the majority's process of decision-making seriously undermine the integrity of its opinion, the more fundamental question is whether, nonetheless, the reasoning of the majority

opinion is sound. It is not. I turn next, therefore, to the substantive flaws in the majority opinion.

## B

## The Misapplication of *Horton I*

The first substantive flaw in the majority opinion is that it misapplies the principal precedent upon which the plaintiffs' equal educational opportunity claim is based, namely, *Horton I*. It does so by disregarding the factual underpinning of *Horton I*, thereby rendering irrelevant the critical factual differences between this case and *Horton I*. Thus, the majority demonstrates its lack of fidelity to *Horton I* by severing the plaintiffs' claim from its jurisprudential roots and by shedding its essential factual underpinnings.

In *Horton I*, this court held that the education clause; article eighth, § 1; and the equal protection clauses; article first, §§ 1 and 20; require "that the state provide a substantially equal educational opportunity to its youth in its free public elementary and secondary schools." *Horton I*, supra, 172 Conn. 649; see also *Horton* v. *Meskill*, 195 Conn. 24, 34–35, 486 A.2d 1099 (1985) (*Horton III*) (characterizing *Horton I* as resting on article eighth, § 1, and article first, §§ 1 and 20). We also held that the system of funding public education then prevailing, under which each town raised its own funds for education via property taxes, supplemented by a flat grant from the state according to the average daily number of students attending school in the town; *Horton I*, supra, 628; violated that requirement. Id., 648–49.

These conclusions rested on two sets of factual findings of the trial court in that case, which we determined were supported by the evidence. Id., 649. The first set of findings was that the existing system of school financing resulted in significant disparities between the amounts spent on education by property-rich towns and the

amounts spent by property-poor towns. Id., 633. The court stated: "[T]he present system of financing education in Connecticut ensures that, regardless of the educational needs or wants of children, more educational dollars will be allotted to children who live in property-rich towns than to children who live in property-poor towns." Id.

The second set of findings concerned the effect of these financial disparities on the children. That set of findings established that the per pupil spending disparities resulted in a lower quality of education in the property-poor towns than in the property-rich towns. Id. The court stated: "The criteria for evaluating the 'quality of education' in a town include the following: (a) size of classes; (b) training, experience and background of teaching staff; (c) materials, books and supplies; (d) school philosophy and objectives; (e) type of local control; (f) test scores as measured against ability; (g) degree of motivation and application of the students; (h) course offerings and extracurricular activities. In most cases, the optimal version of these criteria is achieved by higher per pupil operating expenditures, and because many of the elements of a quality education require higher per pupil operating expenditures, there is a direct relationship between per pupil school expenditures and the breadth and quality of educational programs." Id., 634–35.[28] All of these factual assertions by this court were based on the factual findings of the trial

[28] In numerous other passages, the court in *Horton I* emphasized the factual, causal connection between per pupil expenditure and quality of education. See *Horton I*, supra, 172 Conn. 638 ("that variations in money available to different towns produce variations in quality of instruction; that the financing system discriminates against pupils in Canton because the breadth and quality of the education they receive is to a substantial degree narrower and lower than that which pupils receive in comparable towns with larger tax bases and a greater ability to finance education"); id., 645 ("The wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is

court in *Horton I*, findings that had been vigorously contested by the state.[29]

The critical difference between *Horton I* and this case involves that second set of factual findings. In

relative rather than absolute. Further, the children living in towns with relatively low assessable property values are afforded public education but, as the trial court found, the education they receive is to a substantial degree narrower and lower in quality than that which pupils receive in comparable towns with a larger tax base and greater ability to finance education. True, the state has mandated local provision for a basic educational program with local option for a program of higher quality but, as the trial court's finding indicates, that option to a town which lacks the resources to implement the higher quality educational program which it desires and which is available to property-richer towns is highly illusory."); id., 648 ("The present-day problem arises from the circumstance that over the years there has arisen a great disparity in the ability of local communities to finance local education, which has given rise to a consequent significant disparity in the quality of education available to the youth of the state. It was well stated in the memorandum of decision of the trial court, which noted that the 'present method [of financing education in the state] is the result of legislation in which the state delegates to municipalities of disparate financial capability the state's duty of raising funds for operating public schools within that municipality. That legislation gives no consideration to the financial capability of the municipality to raise funds sufficient to discharge another duty delegated to the municipality by the state, that of educating the children within that municipality. The evidence in this case is that, as a result of this duty-delegating to Canton without regard to Canton's financial capabilities, pupils in Canton receive an education that is in a substantial degree lower in both breadth and quality than that received by pupils in municipalities with a greater financial capability, even though there is no difference between the constitutional duty of the state to the children in Canton and the constitutional duty of the state to the children in other towns.' "); id., 652 ("Obviously, absolute equality or precisely equal advantages are not required and cannot be attained except in the most relative sense. Logically, the state may recognize differences in educational costs based on relevant economic and educational factors and on course offerings of special interest in diverse communities. None of the basic alternative plans to equalize the ability of various towns to finance education requires that all towns spend the same amount for the education of each pupil. The very uncertainty of the extent of the nexus between dollar input and quality of educational opportunity requires allowance for variances as do individual and group disadvantages and local conditions.").

[29] In *Horton I*, supra 172 Conn. 621–22, the defendants unsuccessfully challenged "the trial court's findings concerning the quality of education in Canton and the relation between expenditures and the quality of education."

*Horton I*, the trial court found that, because of—in a cause and effect sense—the disparities in educational funding between the property-poor towns and the property-rich towns, the quality of the educational opportunity available to students in the property-poor towns was not substantially equal to the quality of the educational opportunity available to students in the property-rich towns. Id., 637–38. In *Horton I*, the plaintiffs undertook to prove that factual assertion, the trial court found that they had proven it, and this court sustained the trial court's finding as supported by the evidence. Id., 648–49. Based on that finding, we concluded that the state's flat grant system of funding education violated the plaintiffs' constitutional right to a substantially equal educational opportunity. Id., 649–50.

In this case, the plaintiffs' equal educational opportunity claim precisely parallels the plaintiffs' claim in *Horton I*. In this case, the plaintiffs claim that, because of—in a cause and effect sense—their racial and ethnic isolation, coupled with the concentration of poverty and lack of material resources in Hartford, the quality of the educational opportunity available to them, measured by the same standards articulated by this court in *Horton I*, was not substantially equal to the quality of educational opportunity available to their suburban counterparts.[30] Put another way, the plaintiffs claim that

[30] In this connection, I note that this case also differs markedly from *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). I do so only because the majority, although not relying directly on *Brown*, invokes some of its language regarding the importance of education, with which all involved in this case agree. Although *Brown* involved intentionally segregated schools, which this case does not, and therefore differs in its legal posture, it also differs from this case in a significant factual respect.

In *Brown*, the decision rested in significant part on the trial court's finding that state-sponsored segregation inflicts feelings of inferiority and stigmatization on the African-American students. Id., 494. This was an important part of the foundation for the Supreme Court's holding that separate schools are inherently unequal. Id., 495.

There is no such finding in the present case. Were there such a finding, this might well be a very different case before us on appeal.

their racial and ethnic isolation and the concentration of poverty in the city *causes* the quality of their education to be inferior, as measured by the *Horton I* standards, than that provided in the suburbs. As in *Horton I*, the plaintiffs undertook to prove that factual assertion in the trial court. Unlike *Horton I*, however, in this case, the plaintiffs failed to persuade the trial court of that factual assertion.

In this case, the trial court found that, contrary to the factual assertions of the plaintiffs, it is poverty, and not race or ethnicity, that accounts for any discrepancies between the quality of education provided to the plaintiffs and the quality of education provided to their suburban counterparts. In addition, the trial court found that the principal standard of measure that the plaintiffs sought to use to demonstrate that difference in quality of education, the statewide mastery test scores, is not a valid tool for measuring interdistrict differences in the quality of education. As I indicate later in this dissent, the trial court's factual findings are fully supported by the evidence. Thus, the analogues in this case to the factual underpinnings that supported our conclusion in *Horton I* are not only missing here; the factual analogues in this case are squarely contrary to the conclusion reached by the majority.[31]

Consequently, the majority's reliance on *Horton I* is unfounded. In *Horton I*, we did not conclude that the plaintiffs had been deprived of an equal educational opportunity solely because of the disparities in educational funding between property-poor and property-rich

---

[31] The plaintiffs recognize this essential factual underpinning of *Horton I*. They sought to persuade the trial court of their claimed factual analogues to that underpinning, and they seek to persuade us that the trial court's contrary findings are clearly erroneous. The defendants also recognize the critical nature of those factual underpinnings. Only the majority invokes *Horton I* while simultaneously discarding as irrelevant that essential factual basis.

towns, unconnected to the educational effects of those disparities. The majority concludes, however, that the plaintiffs have been so deprived solely because of their racial and ethnic isolation. The majority reaches that conclusion, however, not only unconnected to but squarely contrary to those factual findings. Thus, the majority's analysis is contrary to the analysis that we employed in *Horton I*.

Indeed, the only attempt by the majority to link the facts of this case to *Horton I* occurs when the majority states: "As we observed, however, in *Horton I*, supra, 172 Conn. 645, educational equalization cases are in significant aspects sui generis and not subject to analysis by accepted conventional tests or the application of mechanical standards. The wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is relative rather than absolute. See also *Horton III*, supra, 195 Conn. 35. Nothing in the description of the relevant legal landscape in any of our cases suggests that the constitutional right that we articulated in *Horton I* was limited to school financing."[32] (Internal quotation marks omitted.)

The first part of this brief analysis is nothing more than a truism. The second part merely sets up the proverbial straw man.

No one disputes that educational equalization cases, whether based on claims of funding or race, are sui

---

[32] Thus, when the majority asserts that the state's constitutional obligation includes the "duty to remedy *the educational impairment that results from* [de facto] *segregation*"; (emphasis added); the majority ignores the facts of this case. Those facts are that the "injuries" of which the plaintiffs complain, namely, the diminished educational opportunities claimed to result from a combination of racial and ethnic concentration and concentration of poverty, do not result therefrom but result solely from poverty. Consequently, the majority is forced to resort to the general effects on education of racial

generis. That truism is, however, the beginning of the inquiry, not the end.

Although the constitutional right articulated in *Horton I* may not have been limited to school financing, there was a factual basis in that case that is lacking here. Moreover, the argument that *Horton I* is limited to school financing is but one of several arguments offered by the defendants.[33] They also argue that, assuming that *Horton I* is appropriately extended to race and ethnicity, the plaintiffs have failed to prove that they are deprived of an equal educational opportunity by reason of race or ethnicity because the factual findings of the trial court are to the contrary and are supported by the evidence. By pretending that the defendants' only response to the extension of *Horton I* to race and ethnicity is that *Horton I* is confined to financing, the majority dismantles the straw man, answering the easy question posed by this appeal and ignoring the difficult ones.

C

The Meaning of "Segregation" in Article First, § 20

The next substantive flaw in the majority opinion is the meaning that the majority attributes to the term "segregation" in article first, § 20. The majority somehow concludes that "segregation" means de facto, as well as de jure, segregation, on the basis of the text of article first, § 20, and the history in the 1965 constitutional convention of the adoption of article eighth, § 1,

and ethnic concentration, and to elevate those effects to the level of a constitutional mandate.

[33] Even if this were the defendants' only argument on appeal, moreover, its weakness would not be a sufficient ground on which the plaintiffs should prevail. An appellant must establish more than that the appellee's argument is weak; the appellant must first establish that its own arguments are persuasive.

and article first, § 20.[34] The text provides no support for the majority's conclusion, and the history of the 1965 convention squarely contradicts it.

1

The Text of Article First, § 20

The constitution of Connecticut, article first, § 20, as amended by articles fifth and twenty-first of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."[35] It is axiomatic that we are limited in constitutional adjudication by the text of the particular constitutional provision at issue. *Moore* v. *Ganim*, 233 Conn. 557, 581, 660 A.2d 742 (1995); *State* v. *Miller*, 227 Conn. 363, 380–81, 630 A.2d 1315 (1993); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 77–78, 469 A.2d 1201 (1984). That text does not support the majority's reading of it.

Critical to the majority's analysis is its conclusion that the phrase "because of" and the term "segregation" do not require a showing of an intent by the state to segregate or discriminate when those terms are applied to the right to public education guaranteed under article eighth, § 1. Thus, the major, albeit unstated, premise of the majority opinion is that, although "because of" and "segregation" may require a showing of an intent by the state to segregate when applied to all other "civil

---

[34] Article first, § 20, was adopted by the convention on October 14, 1965. 2 Proceedings of the Connecticut Constitutional Convention of 1965, pp. 754–55. Article eighth, § 1, was adopted by the convention five days later, on October 19, 1965. 3 Proceedings, supra, p. 1041.

[35] When first adopted in 1965, article first, § 20, was limited to the protection of the categories of religion, race, color, ancestry and national origin. Sex and physical or mental disability were added by subsequent constitutional amendments. Conn. Const., amends. V and XXI.

or political rights" covered by article first, § 20, that same language does not require such an intent when applied to public education under article eighth, § 1.

It is true that the majority does not explicitly say that the terms, "segregation" and "because of," do require a state intent to segregate when applied to other rights guaranteed by article first, § 20. Instead, the majority states: "Whatever this language may portend in other contexts, we are persuaded that, in the context of public education, in which the state has an affirmative obligation to monitor and equalize educational opportunity, the state's awareness of existing and increasing severe racial and ethnic isolation imposes upon the state the responsibility to remedy 'segregation . . . because of race [or] . . . ancestry . . . .' "

Despite the majority's futile attempt to avoid the necessary implications of its rationale, it is clear that one such necessary implication is that the language at issue either does or does not require a segregative intent when applied in other contexts. Thus, I can read this passage from the majority opinion in only two possible ways: (1) "because of" and "segregation" do not require a state intent to segregate, irrespective of the particular legal context; or (2) "because of" and "segregation" do require a state intent to segregate when applied to other legal contexts, but not when applied to public education.

The majority cannot mean that these terms do not require such an intent irrespective of the legal context. That would necessarily mean that, with respect to the exercise of all civil and political rights, the state would be required to take affirmative steps to assure that these rights are not exercised by racially or ethnically concentrated groups, regardless of any state intent to segregate. This would mean, in turn, that any electoral district that is religiously, racially or ethnically concentrated is

unconstitutional and has been such since 1965, and that such was the intent of the delegates to that convention. It would also mean that presently existing public housing projects in Hartford and other cities whose tenants are racially or ethnically concentrated, not by design but as a result of demographic and economic factors over which the state has no control, are unconstitutional and have been such because the 1965 convention delegates meant them to be. It is not hyperbole to say that the delegates would be astonished to have such an intent attributed to them. Nor is it hyperbole to say that such an interpretation would be so bizarre and unworkable as to be ludicrous.

Although I disagree with the majority, I am not willing to attribute that meaning to it. It must be, therefore, that the majority means to say that, although segregative intent is required when "because of" and "segregation" are applied to other civil and political rights, it is not required when applied to public education. This, of course also necessarily means that the same language has opposite meanings when applied to different rights—an interpretation that, in my view, is also utterly implausible. Under the majority's view, therefore, the phrase "because of" and the term "segregation" have one meaning when applied to public elementary and secondary education, namely, that racial concentration need not be intentional on the part of the state, and the opposite meaning when applied to all other political and civil rights, namely, that racial concentration must be intentional.

This tortures the text of article first, § 20, and turns the process of constitutional adjudication upside down. I acknowledge that it is an accepted, necessary and appropriate part of the judicial process to stretch the meaning of language in order to render a statutory scheme constitutional. See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 805, 640 A.2d 986 (1994); *Ambroise* v. *Wil-*

*liam Raveis Real Estate, Inc.*, 226 Conn. 757, 764, 628 A.2d 1303 (1993); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 705, 553 A.2d 596 (1989). That does not justify, however, as the majority would have it, breaking constitutional language in two so that the same words in the same sentence have two opposite meanings when applied to different sets of rights, in order to render a statutory scheme unconstitutional.

In my view, this position is untenable. First, there is nothing in the language, history or purpose of article first, § 20, to support such a bizarre interpretation. We do not ordinarily read the same word or phrase in the same sentence to have opposite meanings depending on the subject matter to which the word or phrase is applied. See *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 343, 612 A.2d 1203 (1992); *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 116, 584 A.2d 1172 (1991). There is no reason to do so here. Article first, § 20, was not drafted or approved by Lewis Carroll, whose character in Through the Looking-Glass, Humpty Dumpty, said, "when I use a word . . . it means just what I choose it to mean—neither more nor less." L. Carroll, Through the Looking-Glass (Messner Ed. 1982) p. 198. If the phrase "because of" and the term "segregation" mean that there is no intent requirement in the context of public education, but that there is such a requirement in the context of all other political and civil rights, it is only because the majority, like Humpty Dumpty, says so.

Second, the majority's rationale for saying so in this instance, namely, that the state has an obligation to monitor and equalize educational opportunity, both assumes the answer to the question posed by this case and proves too much. It assumes the answer because the question is *whether* the obligation to "equalize" extends to racial and ethnic concentration not intended

by the state. It proves too much because the state also has a constitutional obligation to monitor and equalize the electoral districts of the General Assembly. See Conn. Const., art. III, §§ 5 and 6.[36] Certainly, the right to vote, and to have one's vote given its appropriate constitutional weight, is at least as fundamental under our constitution as the right to a public education. See Conn. Const., art. VI, § 1. Therefore, because the right to vote is, like the right to attend a free public elementary and secondary school, a fundamental right that the state has a continuing obligation to monitor and equalize, under the majority's rationale every general assembly district that is not racially, ethnically and religiously integrated is now unconstitutional. It is impossible rationally to conclude that the language adopted in

[36] The constitution of Connecticut, article third, § 5, as amended by article sixteen of the amendments, provides: "The establishment of congressional districts and of districts in the general assembly shall be consistent with federal constitutional standards."

The constitution of Connecticut, article third, § 6, as amended by articles twelfth, sixteenth and twenty-sixth of the amendments, provides in relevant part: "a. The assembly and senatorial districts and congressional districts as now established by law shall continue until the regular session of the general assembly next after the completion of the taking of the next census of the United States. On or before the fifteenth day of February next following the year in which the decennial census of the United States is taken, the general assembly shall appoint a reapportionment committee . . . . Upon the filing of a report of such committee with the clerk of the house of representatives and the clerk of the senate, the speaker of the house of representatives and the president pro tempore of the senate shall, if the general assembly is not in regular session, convene the general assembly in special session for the sole purpose of adopting a plan of districting. . . . Such general assembly shall, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary to preserve a proper apportionment of representation in accordance with the principles recited in this article. Thereafter the general assembly shall decennially at its next regular session or special session called for the purpose of adopting a plan of districting following the completion of the taking of the census of the United States, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary in accordance with the provisions of this article. . . ."

the 1965 convention was intended to have this result. In short, the language of article first, § 20, simply cannot be cabined as the majority seeks to do.

Moreover, the term "segregation" cannot, the suggestion of the majority to the contrary notwithstanding,[37] be read to mean something different from "discrimination" in the context of article first, § 20. The nouns in this one sentence provision should not be read as having meanings that are mutually exclusive of, and unrelated to, the meanings of the other nouns that surround them. Consequently, the majority's reliance on the general interpretive guideline that ordinarily no word or phrase is to be regarded as superfluous is misplaced in this context. This broad, constitutional equal protection provision was not intended to be interpreted as if it were the Uniform Commercial Code, with each term having a neatly compartmentalized definition. Within the bounds of the language used, the terms are to be read as taking their meaning from and sharing their meaning with each other, under the doctrine of noscitur a sociis.

This approach to article first, § 20, is consistent with our precedents, which have generally treated both article first, § 1, and article first, § 20, as expressing the same principle, namely, equal protection of the law. See, e.g., *Broadley* v. *Board of Education*, 229 Conn. 1, 8–10, 639 A.2d 502 (1994); *Mario* v. *Fairfield*, 217 Conn. 164, 173–77, 585 A.2d 87 (1991); *Zapata* v. *Burns*, 207 Conn. 496, 504–505, 542 A.2d 700 (1988); *Carofano* v. *Bridgeport*, 196 Conn. 623, 638–39, 495 A.2d 1011 (1985); *Lyman* v. *Adorno*, 133 Conn. 511, 515, 52 A.2d

---

[37] The majority also argues that, because article first, § 20, uses both "equal protection" language and the term "segregation," that term must be given independent meaning, namely, de facto as well as de jure segregation. This analysis also must mean, therefore, that "segregation" has some meaning independent of "discrimination," because: (1) they are different words; and (2) during the convention, the word "segregation" was reinserted into the text, which already contained the word "discrimination."

702 (1947); *New Haven Metal & Heating Supply Co.* v. *Danaher,* 128 Conn. 213, 219, 21 A.2d 383 (1941). The majority's interpretive method of insisting that "segregation" must include de facto segregation because otherwise it would be superfluous, is inconsistent with the general approach of these precedents. By that reasoning, article first, § 1, and article first, § 20, themselves must also have meanings independent of each other, otherwise one would be superfluous. We have never read these constitutional provisions in that fashion, and there is no justification for doing so now.

Thus, the reference in article first, § 20, to both "equal protection of the law" and "segregation" does not suggest that "segregation" has some broader meaning than "equal protection of the law." They both express the same principle, as does the word "discrimination," and the fact that the framers of this provision used, and the electorate approved, the term "segregation" does not support the conclusion that it was intended to include de facto, as opposed to de jure, racial and ethnic isolation. When interpreting a constitution, " 'the intent to be arrived at is that of the people [who ratified it], and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' " *Cologne* v. *Westfarms Associates,* supra, 192 Conn. 78.

Similarly, the reference to "the exercise or enjoyment of his or her civil or political rights" further indicates that article first, § 20, is not meant to be read with the kind of categorical nicety that the majority employs. This phrase refers to a generally broad, inclusive category of rights, the particulars of which will have to be explicated on a case-by-case basis. The textual point is that there is no obvious, sharp distinction that leaps to

mind when considering whether rights are "civil" or "political" or both.

The appropriateness of this textual approach is further demonstrated by the references to "religion, race, color, ancestry, national origin, sex or physical or mental disability." Although arguably the reference to "religion" can be read to mean something different from the other listed categories, it cannot be disputed that the categories of race, color, ancestry and national origin blend into one another.[38]

Moreover, the use of the phrase "because of," followed by the list of protected categories, strongly suggests a requirement of state intent to segregate or discriminate, or intentionally to maintain such segregation. This reading of the phrase would be consistent with our precedents that, except where our text clearly departs from that of the federal equal protection clause, the two clauses have the same meaning and limitations. See, e.g., *State* v. *Leary*, 217 Conn. 404, 409, 587 A.2d 85 (1991); *Ecker* v. *West Hartford*, 205 Conn. 219, 237, 530 A.2d 1056 (1987); *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 577, 512 A.2d 893 (1986).

Under federal precedent, only state created or intentionally maintained racial segregation is unconstitutional, and the state is not constitutionally obligated to remedy interdistrict racial division that is caused

---

[38] This case demonstrates the point. The majority refers to the plaintiffs as "African-American," "Latino" and "white." The plaintiffs, in their complaint, refer to themselves as "black," "Hispanic," "Puerto Rican" and "white." Do "black," "white" and "African-American" refer to the plaintiffs' race, their color or their national origin? Do "Hispanic," "Puerto Rican" and "Latino" refer to the plaintiffs' ancestry or their national origin?

The same can be said for the subsequent reference to physical or mental disability. Many "physical" disabilities carry serious emotional consequences with them that may be more disabling than the physical aspects of the condition. Similarly, many "mental" or emotional disabilities have physical origins. For example, is schizophrenia that is determined to be chemical in origin and treatable by drugs a "physical" or a "mental" disability?

primarily by economic and geographical factors. *Keyes* v. *School District No. 1*, 413 U.S. 189, 198, 93 S. Ct. 2686, 37 L. Ed. 2d 548 (1973); *Columbus Board of Education* v. *Penick*, 443 U.S. 449, 464, 99 S. Ct. 2941, 61 L. Ed. 2d 666 (1979); *Milliken* v. *Bradley*, 418 U.S. 717, 744–45, 94 S. Ct. 3112, 41 L. Ed. 2d 1069 (1974). Indeed, the majority's analysis implicitly concedes that "because of" carries a requirement of intentionality when applied to all civil and political rights except the right to free public elementary and secondary schools.

Furthermore, that "segregation," as used in article first, § 20, does not include de facto racial and ethnic concentration is demonstrated by simply reading the text as the simple sentence that it is, shorn of the majority's fiction that the words have opposite meanings when applied to public education and all other rights. This constitutional provision is not an education provision. It does not mention education specifically at all. This provision relates to education because the right to attend a public school comes within the phrase "in the exercise or enjoyment of his or her civil or political rights."[39]

If, as the majority concludes, "segregation" includes racial and ethnic concentration resulting, not from intentional state conduct but from demographic factors over which the state has no control, and if we are not willing to indulge in the fiction that the same words, used in the same sentence, nonetheless have opposite meanings when applied to different rights, then other areas of public life that are covered by the phrase "in the exercise of . . . political or civil rights" must also be subject to the same proscription. Thus, for example, a local electoral district that, by virtue of the religious,

---

[39] This is precisely the plaintiffs' argument under the first count of their complaint. They stated in the trial court: "Under our first count, the racial segregation itself violates article first, § 20 of the Connecticut constitution *in the exercise of the fundamental right to education*." (Emphasis added.)

racial or ethnic make-up of its constituents, is heavily Roman Catholic, African-American, Puerto Rican or Polish-American, is "segregated" under the majority's understanding of that term, and all voters within that district are being "segregat[ed] or discriminat[ed] in the exercise or enjoyment of [their] civil or political rights because of religion, race, color, ancestry or national origin," in violation of article first, § 20. In short, under the majority's reading of "segregation," the 1965 constitutional amendments rendered all such electoral districts unconstitutional. It is not only implausible that this is what the language used in 1965 was intended to mean, it is impossible rationally to reach such a conclusion.

2

The Record of the 1965 Constitutional Convention

The history of the term "segregation" in article first, § 20, in the 1965 convention makes even clearer than its text that the members of the convention did not intend it to mean de facto racial or ethnic concentration. It is inconceivable—except that the majority conceives it—and it is untenable to hold—except that the majority holds it—that the delegates to the 1965 constitutional convention intended the term "segregation" in that article to include de facto racial and ethnic concentration in the public schools irrespective of any state intent to bring about or to perpetuate such concentration. This question is not even close.

I begin this part of my analysis with another factual finding of the trial court that the majority ignores. The trial court found that "the 1965 constitutional convention was a very conservative body that made only those changes that had to be made in order to comply with the legislative reapportionment mandates of the federal courts and it was extremely reluctant to change any-

thing that did not have to be changed."[40] Thus, the 1965 convention was not called for the purpose of a general overhaul of the 1818 constitution. It was called primarily for the purpose of bringing the Connecticut constitution into compliance with the then recently decided cases of *Lucas* v. *Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 84 S. Ct. 1472, 12 L. Ed. 2d 632 (1964), *Reynolds* v. *Sims*, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), *Wesberry* v. *Sanders*, 376 U.S. 1, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964), and *Gray* v. *Sanders*, 372 U.S. 368, 83 S. Ct. 801, 9 L. Ed. 2d 821 (1963), and the delegates acted accordingly. The principal agenda of a constitutional convention is a useful tool in construing its actions. See E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 586 (1986) ("courts must look to the agenda of the constitution as a whole in the context of the historical and sociological issues that occupied center stage at the time of ratification").

One cannot square this unchallenged characterization of the 1965 convention with the notion that, when in the course of accomplishing its principal objective of legislative apportionment it also adopted article first, § 20, this "very conservative" convention also intended to accomplish results that would at that time have rendered unconstitutional—or, at the very least, would have called into serious constitutional question—many school districts and general assembly districts in the state. Yet, despite what the majority may say, these are the necessary implications of its decision and rationale.

In attempting to divine the intent of the framers of article first, § 20, we are not faced with the difficult task of peering back through the mists of more than a

---

[40] This finding, which the plaintiffs do not challenge on appeal, was based on the testimony of their own expert witness on Connecticut history, Christopher Collier, professor of history at the University of Connecticut and the officially designated state historian for the state of Connecticut.

century to a sparse historical record, in order to determine the intent of persons of whom we have limited knowledge, as is often the case when we attempt to interpret the language used in the 1818 state constitution. The 1965 convention took place but thirty-one years ago. The names and careers of the delegates are well known to anyone reasonably cognizant of Connecticut government and politics and there is a complete printed record.

Among the delegates were former and future governors of this state,[41] former and future United States Senators and Representatives,[42] former and future state legislators,[43] former members of this court, including two former chief justices,[44] and many other delegates with distinguished pedigrees in government and politics. These were men and women with long and distinguished careers in public life, who had practiced the arts of government and politics and who, presumably, knew the limits of both. They also knew that their effort would be placed before the electorate in order for the constitution to be amended. They knew, furthermore, that throughout Connecticut there were local, intradistrict neighborhood school boundaries and schools that were, because of the housing patterns then prevalent, heavily concentrated by religion, race and ethnic background. They knew, moreover, that, because of housing patterns, there would be local general assembly districts throughout Connecticut, created by the General Assembly in accordance with the constitutionally required reapportionment provisions that they were

---

[41] Raymond E. Baldwin, Ella T. Grasso, John D. Lodge, Thomas J. Meskill and C. Wilbert Snow.

[42] Raymond E. Baldwin, Lawrence J. DeNardis, Ella T. Grasso, John D. Lodge, Edwin H. May, Jr., Thomas J. Meskill, Horace Seeley-Brown, Jr., and Chase Going Woodhouse.

[43] Nicholas B. Eddy, Florence D. Finney, James J. Kennelly and J. Tyler Patterson, Jr.

[44] Raymond E. Baldwin, Abraham S. Bordon and Patrick B. O'Sullivan.

fashioning, that would also be heavily concentrated by the same factors.

It is simply inconceivable that the convention delegates, with that knowledge, intended by the language they used in article first, § 20, to render unconstitutional or to call into serious constitutional question, every one of those school boundaries, schools and electoral districts. In order to reach such a conclusion, one must posit the following line of hypothetical reasoning, or something similar, to the delegates regarding the meaning of "segregation": (1) "because of" and "segregation" mean intentional or de jure, rather than de facto, segregation, because otherwise the General Assembly would be prevented from drawing mathematically equal but religiously, racially or ethnically concentrated districts; and, although districts must now be substantially equal in population, it would be a radical change also to require them to be integrated on the basis of religion, race and ethnicity, a change far beyond the principal charge in this convention;[45] (2) in fact, intentional segregation is probably what the United States Supreme Court was addressing in *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), when it outlawed the "separate but equal" doctrine, although that is not absolutely clear from the available federal decisions to date; (3) nonetheless, when the words "because of" and "segregation" come to be applied to interdistrict, but maybe not intradistrict, elementary and secondary school lines under the right to a free public education—which, by the way, will not be adopted until five days from now and, of course, has never been interpreted—those words mean the oppo-

---

[45] That practice in drawing electoral lines persists today. Indeed, we recently held that it was a constitutionally permissible factor for the General Assembly to employ in fulfilling its decennial obligation to reapportion itself. See *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 610 A.2d 153 (1992).

site, namely, de facto segregation; and (4) we entertain this dual intent without (a) clearly—or even unclearly—suggesting it by the language we use, and (b) disclosing it on the record of this convention or to the voters who will have to ratify our work. This scenario, I suggest, does no more than dramatize the reasoning behind the majority's tortuous and selective reading of the record of the 1965 convention. In my view, to attribute such a thought process to the delegates is not only implausible, it would have been irresponsible on the part of the delegates to have engaged in such a process sub rosa, and it is untenable to suggest that they did.

My view of the intent of the convention delegates is buttressed by the fact that, as even the plaintiffs emphasized in their posttrial brief to the trial court and in their appellate brief to this court, "[t]he documentation of racial and economic isolation in Connecticut schools in the 1960s was thorough and comprehensive. In addition to the state's own official annual documentation, the University of Connecticut Institute of Urban Research and the University's Educational Resources and Development Center conducted a series of highly detailed reports on school segregation in Connecticut's major cities." In constitutionalizing the right of Connecticut's children to a free public education, however, the politically seasoned delegates to the 1965 convention uttered not one word even suggesting that this well documented problem would be addressed by the constitutional amendments that they had gathered to draft. In fact, the idea that the new education clause would create any sort of fundamental change in the state's education system was squarely rejected by Simon Bernstein, a delegate whom the majority ironically cites in support of its result. In reference to the proposed education clause, Bernstein stated, "[T]his again is not anything revolutionary, it is something

which we have . . . ." 3 Proceedings of the Connecticut Constitutional Convention of 1965, p. 1039.

Moreover, just one year before the convention, the New Haven board of education had adopted a junior high school pairing plan for the purpose of reducing unintended racial imbalance in its school system and in the interest of promoting equality of educational opportunity. That plan, which generated considerable public controversy, was the subject of several public hearings at which it was vigorously defended and assailed, and resulted in an action for an injunction against the plan.[46] On July 8, 1965, while the convention was in session, the Superior Court decided in favor of the board. See *Guida* v. *Board of Education*, 26 Conn. Sup. 121, 213 A.2d 843 (1965).

There can be little doubt that, if the delegates intended the word "segregation" in article first, § 20, to mean de facto segregation when applied to public education, the statutory authority that the Superior Court concluded the board had in *Guida* would have been transformed into a constitutional obligation. It is fair to presume that the delegates who came from the

---

[46] One school served a predominantly white area, and the other served a predominantly black area. The plan exchanged, by busing, the students in the seventh grade of one school for the students in the eighth grade in the other, thus reducing somewhat the racial imbalance in the area served by the two schools. The plaintiffs claimed that the plan violated General Statutes § 10-15, which provided that all schools shall be "open" to all children without regard to race or color.

In *Guida* v. *Board of Education*, 26 Conn. Sup. 121, 123, 213 A.2d 843 (1965), the court upheld the validity of the plan. It held that the plan, which was also aimed at improving the quality of education apart from the racial imbalance factor, was within the board's general statutory powers over education. Id., 124. It held further that, although the desire to reduce racial imbalance was a substantial factor in the formulation of the plan, "a determination by the board which is otherwise lawful and reasonable does not become unlawful merely because the factor of racial imbalance is accorded relevance." Id.

New Haven area,[47] men and women cognizant of the public affairs of their district, were aware of this controversial case, which was decided only two months earlier. Indeed, one of those delegates, former Chief Justice Patrick B. O'Sullivan, was one of the drafters of article first, and the chairman of the convention that adopted it, and another, Mary B. Griswold, spoke in favor of it. I cannot believe that, if it were the intent of the convention in adopting the word "segregation" to constitutionalize the New Haven board's plan, not one of the fourteen delegates from the district that included New Haven would have even mentioned its potential effect on the New Haven case. The record of the convention, however, is bereft of any such mention.

That record, moreover, affirmatively demonstrates that the delegates did not intend "segregation," as used in article first, § 20, to include de facto segregation. To the contrary, the history of the article and the debate over the term "segregation" in the 1965 convention compel the conclusion that the delegates intended the term specifically to preclude, under our state constitution, the doctrine of state-created "separate but equal" educational and other public facilities that the United States Supreme Court had expressly overruled, as a matter of fourteenth amendment jurisprudence, in *Brown* v. *Board of Education*, supra, 347 U.S. 483.

In February, 1950, the commission on state government organization issued its report to the General Assembly and to then Governor Chester Bowles. Among

[47] The delegates to the convention were elected from the two major parties and the state's six congressional districts. Thus, there were fourteen delegates—seven Democrats and seven Republicans—from each of the six districts. The fourteen delegates from the district embracing the New Haven area were: Frederick K. Biebel, Jr., George Cahill, Edith Cook, Daniel O. Cosgrove, Lawrence J. DeNardis, Warren A. Field, James P. Geelan, Mary B. Griswold, William T. Holleran, John A. Maresca, Eugene McCabe, Patrick B. O'Sullivan, Arline Ryan and George F. Wright.

its recommendations was a revision of the constitution, which included a new article first, our Declaration of Rights, including the following proposed article first, § 20: "No person shall be denied the enjoyment of, nor be discriminated against in, nor be segregated in, any right or employment, nor be so treated in the militia, or in the public schools or in any public place, because of religious principles, race, color, ancestry or national origin." The commission's recommendation to revise the constitution was not acted upon.

During the 1965 convention, on July 28, 1965, Chase Going Woodhouse introduced Resolution No. 168, which contained several recommendations for changes in our Declaration of Rights, article first. Among these were two proposals that are relevant to this case. First, the resolution proposed that article first, § 1,[48] be amended to add the provision that all men are "entitled to the equal protection of the laws." Second, it proposed that article first, § 20,[49] be amended exactly as had been proposed by the commission to the General Assembly and the governor in 1950.[50] This resolution was referred to the Committee on Resolutions.

Ultimately, the committee reported to the floor of the convention its Rules Committee Substitute for Constitutional Convention Resolution No. 168 (committee resolution 168). This resolution proposed a number of changes in the provisions of article first. Included within committee resolution 168 was the proposal that both article first, § 1, and then article first, § 20; see footnote

[48] The constitution of Connecticut, article first, § 1, was the same then as it is now.

[49] The constitution of Connecticut, article first, § 20, then provided: ".No hereditary emoluments, privileges or honors shall ever be granted, or conferred in this state." This language is now found in article first, § 18.

[50] The stated purpose of original Resolution No. 168 was to "amend the Declaration of Rights in accordance with the Report to the General Assembly and the Governor of the Commission on State Government Organization, dated February, 1950."

49; remain unchanged, and that there be a new article first, § 22,[51] providing as follows: "No person shall be denied the equal protection of the law, nor the enjoyment of his civil or political rights, nor be discriminated against in the exercise thereof because of religion, race, color, ancestry or national origin." This draft of article first, § 22, therefore, incorporated the explicit references to equal protection of the law and discrimination that had been in original Resolution No. 168, but omitted the specific references to segregation, employment, the militia and the public schools that had also been in the original resolution.

This proposal prompted a letter to the convention by the Connecticut Council of Churches that committee resolution 168 was not specific enough. The council stated that " 'segregation constitutes such a core area of discrimination as it affects the pattern of relationship among persons and groups and needs thereby to be specifically guarded against through constitutional provision.' " J. Zaiman, "Anti-Separation Clause Urged for Bill of Rights," The Hartford Courant, Oct. 14, 1965, pp. 1 and 11. The council also expressed the thoughts that, because " 'civil or political rights' " was not defined in the proposal, that language was " 'so broad as to be specifically excepted against in any controversial test of rights,' " and that " '[o]ur history seems to show that platitudinous phrases have not helped many of our citizens to enjoy specific rights that could not be pointed to implicitly in constitutional authority.' " Id., p. 11.

In addition, according to a contemporary account in The Hartford Courant, certain civil rights groups also thought that the proposal was not specific enough, and suggested reinserting the "antisegregation" clause. Id., p. 1. This prompted caucuses by both the Democrats

---

[51] Subsequently, what was article first, § 22, in committee resolution 168 became, as later amended on the floor of the convention, article first, § 20.

and Republicans, as a result of which there was bipartisan agreement on reinserting language referring to segregation.

Accordingly, on October 14, Woodhouse brought to the floor an amendment reinserting the reference to "segregation," which resulted in the following language that ultimately became article first, § 20: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

In proposing this amendment, Woodhouse reminded the convention that the word segregation had appeared in the original resolution, and that the only question was one of the appropriate wording to be used.[52] 2 Proceedings, supra, pp. 690–91. Former Chief Justice Baldwin, one of the drafters of committee resolution 168 that was being amended, and another delegate, James J. Kennelly, both rose to stress the symbolic, as opposed to substantive, nature of the amendment.[53] Id., pp. 691–92.

[52] "I should like to point out . . . that the word segregation was in the original resolution which I introduced. It was a favorable report of the subcommittee, it was in the favorable report of the full committee. *It was not in the substitute bill* [committee resolution 168] *as brought in by the rules committee, so I think the general idea was there. The only question that has arisen is the idea of general language or more specific language.* It would seem that this language as offered in the amendment is sufficiently general so that it would not be interpreted as an exclusion or limit rights. . . . On the other hand, we have to realize that today *the philosophy of segregation* is something that is in the minds of all of us. It would be regrettable if it should be in any way suggested that this Constitution did not unequivocally oppose the *philosophy and the practice of segregation.* So I move this amendment as reading very definitely that it in no way limits the rights of anyone. It would not be so interpreted by the courts and it strengthens the wording that we have before us in the file." (Emphasis added.) 2 Proceedings, supra, pp. 690–91, remarks of Chase Going Woodhouse.

[53] "We have spent a lot of time on this particular provision and I want to say that I have no objection. I am perfectly agreeable to having this changed.

The only reference to education in the entire debate over committee resolution 168 was by Bernstein, and that reference was made in the context of his delineating more specifically the "civil and political rights" to which the proposal referred. Bernstein stated: "I just want to comment that in this section which states that there will be enjoyment of civil and political rights, for the record, perhaps we might spell out a few of them so that courts and historians in the future may not fail to understand what we are talking about. *These are rights which we have always assumed we have had anyway and these rights include rights of freedom from discrimination in travel, rights of freedom in education, public accommodations, and employment and housing.*" (Emphasis added.) Id., p. 694.

O'Sullivan put the amendment to a voice vote, and ruled it adopted. O'Sullivan then ruled "*that this*

---

*As a matter of fact we discussed this very thing in the committee and we thought that segregation was unnecessary to put in there, but if it will please people, then I am perfectly agreeable to having it there as a member of this convention.*" (Emphasis added.) 2 Proceedings, supra, pp. 691–92, remarks of Raymond Baldwin.

"This section would protect political rights such as registration, the voting right to hold public office, the right to assemble and petition as well as the traditional rights that we have always protected. It is further a broad statement of principle that is all inclusive and would provide a complete umbrella for the total protection against discrimination and the word subjugation *against segregation, which is sound symbolic language.*" (Emphasis added.) Id., p. 692, remarks of James J. Kennelly.

Baldwin later added, "[i]n preparing this particular clause to this bill of rights, the subcommittee of the committee made a study of the existing legislation in Connecticut protecting political and civil rights, and I just want to note for the benefit of the record, that there is no state in the entire union that has more comprehensive and more liberal legislation with reference to the exercise of political and civil rights, than does the little sovereign State of Connecticut. I am proud to make that statement because this legislation has been the work of successive legislators through several different administrations. I think it should be noted here that *if every state in the union had followed Connecticut's lead in dealing with this problem, we would not be having the trouble that we are having in some places today.*" (Emphasis added.) Id., pp. 695–96.

*amendment is not a substantive change and therefore we can act upon the entire bill today."* (Emphasis added.) Id., p. 696.

Reading this record in an objective, dispassionate manner leads inescapably to the conclusions that the use of the term "segregation" in what ultimately became article first, § 20: (1) was intended to emphasize that the entire section prohibited intentional segregation in the "separate but equal" sense; (2) was not intended to add substance to the provision, but was intended only to make the general principles more specific; (3) was not intended to affect rights to education in a way different from other civil and political rights; and (4) cannot be read to mean one thing when applied to all such rights except education, but the opposite when applied to the right to public education under article eighth, § 1. Several reasons compel these conclusions.

First, the historical source of the term was the 1950 recommendation to the General Assembly and governor for a constitutional provision. In 1950, the term "segregation," in the constitutional sense, referred to the widespread system of laws in other parts of the nation, mandating the separation of the races, the constitutionality of which was then maintained under the infamous "separate but equal" doctrine. There is no evidence, either in this case or historically in general, to suggest that in 1950 this term was understood to mean racial or ethnic concentration that was not the product of state intent. Moreover, this historical source was specifically noted as the source of original Resolution No. 168, introduced to the 1965 convention by Woodhouse.

Second, after committee resolution 168 was reported out without the term "segregation," the principal motive to reinsert it was to respond to the concern of civil rights groups and the Council of Churches, which was, not that the new resolution was not broad enough, but

that it was not specific enough. Certainly, in 1965, eleven years after *Brown* and while the civil rights movement was taking hold in the land and extending the principle of *Brown* to all areas of public life, the Council's reference to segregation as a "core area of discrimination" could only have referred to segregation in its constitutional sense of legally mandated or sanctioned segregation, and cannot be plausibly read as referring to what we later have come to describe as de facto segregation.[54]

Third, Woodhouse's remarks when she introduced the amendment reinforced the conclusion that the substance of what she sought to have enacted was already embodied in the provision, and that the reinsertion of the term was only to make the equal protection principle more specific, not to add something of substance that was not already included therein. See footnote 52. Read in the context of 1965, her reference to the "philosophy and the practice of segregation" could only have meant that philosophy and practice as a legal concept. See 2 Proceedings, supra, p. 691. Indeed, one wonders what the reference to "philosophy" could have meant in the context of racial and ethnic concentration that occurs as a result of demographic factors without any planning, intent, idea or doctrine behind it. Woodhouse's final remarks, namely, that the amendment "in no way limits the rights of anyone," and that it "strengthens the wording" of committee resolution 168; id.; were an assurance to the Council of Churches and others that their concern for specificity was being met. Her assurance that the

---

[54] This conclusion is buttressed by the council's reference to " '[o]ur history,' " which in the council's view showed that " 'platitudinous phrases have not helped many of our citizens to enjoy specific rights that could not be pointed to implicitly in constitutional authority.' " J. Zaiman, Hartford Courant, supra, p. 11. The reference to " '[o]ur history' " was obviously, not to Connecticut's history in particular, but to our nation's history in general and the south in particular, where under the separate but equal doctrine "many of our citizens [could not] enjoy" true equality. See id.

insertion of "segregation" makes the general more specific cannot be read, as the majority reads it, however, to make the general something else.

Fourth, the drafters of committee resolution 168, Baldwin, O'Sullivan and Bordon,[55] three former members of this court, including two former Chief Justices, chose to exclude the term. One of them, Baldwin, acknowledged that they had discussed in the Committee on Resolutions the question of whether to include the term "segregation," and had concluded that "it was unnecessary to put in there." Id., p. 692. Baldwin, and presumably O'Sullivan and Bordon, the other distinguished members of the drafting subcommittee, was nonetheless agreeable to the amendment "if it will please people." Id.

In addition, Baldwin disclosed that the subcommittee had canvassed the state's legislation "protecting political and civil rights," and had found that our state led the nation in that respect. Id., pp. 695–96. He expressed his pride in that legislative record, and noted that, if other states had legislation like ours, "we would not be having the trouble that we are having in some places today." Id., p, 696. Among that legislation was General Statutes § 10-15c, which requires that public schools be open to all children without discrimination on account of race, creed or color, and which had been in effect since 1868.[56] The most plausible inference from this

---

[55] These former justices were described to the convention as "three of the most distinguished minds not only in this convention, but in the State of Connecticut." 2 Proceedings, supra, p. 693, remarks of H. Meade Alcorn.

[56] Undoubtedly, Baldwin was also referring to other long-standing civil rights legislation in this state. As the trial court found in this case, some examples of this include: legislation outlawing racial discrimination in hotels, restaurants, transportation facilities and places of public amusements, which had been in place since 1905, and had been significantly expanded in 1953 and 1961; legislation outlawing discrimination in public employment, which had been in place since 1936, and had been expanded to private employment in 1947, and to public housing in 1949; and legislation creating the nation's first civil rights commission in 1943.

statement is that he was referring, in part at least, to the still extant resistance, in other parts of the nation, to elimination of the separate but equal doctrine, in education as well as other areas.

Had there been any intent in reinserting the term "segregation" that it have one meaning when applied to education and an opposite meaning when applied to all the other political and civil rights, the drafting subcommittee, who obviously commanded the respect of their colleagues, would have said so and would not have misled the delegates by assuring them that there was no change in substance intended by reinsertion. This is particularly true because if, as the majority posits, there *are* dual and opposite meanings lurking in the language, (1) that duality is certainly not apparent on the face of article first, § 20, (2) it is inconceivable that the draftsmen of the article would have left that duality unexpressed, and (3) this unexpressed duality would have opened the entire article to an even more bizarre interpretation, namely, that intention does not apply to, and is not required to constitute a violation of, any of the civil or political rights encompassed by the article. In sum, the majority's interpretation of article first, § 20, cannot rationally or responsibly be attributed to the people who drafted it or to their colleagues with whom they discussed and adopted it.

Fifth, with one exception discussed immediately below, the debate on article first, § 20, is bereft of references to education. Thus, the majority's attempt to link the two, and to establish that the reference to "segregation" in the section was intended to mean de facto segregation, but solely when applied to article eighth, § 1, has no support in this record. Indeed, it is impossible to imagine how the debate over "segregation" could indicate such an intent, because when the debate took place, consideration of article eighth, § 1, the education clause, was five days in the future.

The only reference to the subject of education in the entire debate on the amendment occurred in remarks by Bernstein. 2 Proceedings, supra, p. 694. Those remarks are significant for several reasons that have more to do with what they do not establish than what they do establish. As noted, Bernstein made his remarks five days before the convention considered the resolution that ultimately became the education provision, article eighth, § 1. Thus, they could have had no conceivable relevance to the interpretation of that provision. In addition, his reference to education was intended to do nothing more than to indicate that education was one of those "civil and political rights," along with, in his view, travel, public accommodations, employment and housing, that would be covered by article first, § 20. Id. As discussed previously, when Bernstein did specifically address the reach of the education clause five days after the adoption of the segregation clause, he made clear that the education clause was intended only to constitutionalize the then existing system of free public education—a municipality based system that included well documented instances of racial isolation. 3 Proceedings, supra, p. 1039.

Thus, when the majority asserts that "[t]he delegates' expectation that the proposed amendments to the constitution would secure interrelated constitutional rights was underscored by Bernstein's remark that article first, § 20, was intended to be applied in the context of the 'rights of freedom in education,' " the majority merely states the obvious. Of course article first, § 20, was intended to apply to education, as one of the "civil or political rights" referred to in that article. To the extent, however, that the majority suggests that Bernstein's remarks imply some connection between that obvious application and a specific and different meaning of "segregation" in that article when applied to article eighth, § 1, the suggestion is utterly without basis.

Sixth, O'Sullivan, another member of the drafting subcommittee, presiding as the chairman of the convention ruled the amendment to be technical and not substantive. 2 Proceedings, supra, p. 696. Such a ruling cannot be squared with the notion that the amendment had the intended effect of transforming the resolution from a straightforward equal protection provision, which specifically incorporated into our constitution principles that had already been held to be there by the established interpretations of article first, § 1, into a provision that maintained those principles generally, but altered them radically with respect only to public education. If such a transformation is anything, it is certainly substantive and not technical, and O'Sullivan would have called that fact to his colleagues' attention.

Seventh, although we have on occasion interpreted article first, § 20, to have a broader meaning than its federal counterpart, based on differing language between the two; see, e.g., *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993) (protecting from discrimination those with physical and mental disabilities based on explicit language of article first, § 20); the record in this case demonstrates that the linguistic difference, namely, the specific reference to "segregation," was not intended to have a meaning different from that of the federal equal protection clause. Contrary to the assertion of the majority, this record demonstrates that it was intended only to constitute a more specific application of the same principle of equal protection of the laws.

Eighth, even if one somehow were able to read the record as not clearly establishing the meaning of "segregation" to require intent, at the least it cannot be disputed that the record does not clearly indicate that "segregation" has no requirement of intent. Moreover, it cannot be disputed that reading the record as the majority reads it works a radical change in our constitu-

tional equal protection jurisprudence. We do not read our constitutional text to make radical changes without clear evidence of an intent to do so. *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 172–73, 610 A.2d 153 (1992). The majority's approach violates this sound principle of constitutional interpretation.

Thus, there is no basis for the suggestion by the majority of relevance to the issues in this case that when both article eighth, § 1, and article first, § 20, were debated by the convention delegates, "they recognized and endorsed the landmark decision in *Brown* . . . declaring the unconstitutionality of 'separate but equal' public school education." First, there is no mention whatsoever of *Brown*, or of the question of segregation of schools, in the debate over article eighth, § 1. The entire debate concerned the fact that Connecticut was one of few states that did not mention education in its constitution, and the desirability of doing so.[57] 3 Proceedings, supra, pp. 1038–41. If anything, the fact that the delegates obviously were aware of *Brown* contradicts the inference that the majority seeks to draw. The debate over article first, § 20, referred to the separate but equal doctrine declared invalid in *Brown*. That was a doctrine of state intended segregation, and there is no suggestion in this debate that the framers intended the references to segregation to include the notion of de facto concentration of races or ethnic groups.[58]

---

[57] Indeed, Bernstein, who introduced the resolution for article eighth, § 1, and who was one of two speakers on the question, did not mention either *Brown* or article first, § 20.

[58] Contrary to the majority's suggestion, moreover, to the extent that the reach of *Brown* was unclear in 1965, the weight of the available authority, which was confirmed by the United States Supreme Court in 1971; *Swann* v. *Board of Education*, 402 U.S. 1, 6, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971); was clearly to the effect that, despite the ruling in *Brown*, there is no affirmative state duty " 'to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils.' " *Bell* v. *School City of Gary, Indiana*, 324 F.2d 209, 213 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.

Finally, the available historical evidence does not end with the printed record of the convention. There are postconvention documents that shed light on the question involved in this case, principally by the absence of any suggestion that comports with the majority's analysis. These documents are: (1) a resume by the secretary of the state of the proposals passed by the convention; (2) an annotated copy of the proposed revised constitution, with marginal notes, published by the convention itself "as a guide to the people of the state"; and (3) an account published in The Hartford Courant, December 5, 1965, p. 36, of an interview with Baldwin in which he explained the work of the convention. Each of these discusses article first, § 20, in brief and summary fashion. None of them, however, even suggests that it could have opposite meanings when applied to education and other rights. If the majority's startling textual and historical conclusions are correct, it is curious that no one at the time understood what the convention had done, not even the delegates themselves.[59]

Ct. 1223, 12 L. Ed. 2d 216 (1964); see also *Springfield School Committee* v. *Barksdale*, 348 F.2d 261, 264 (1st Cir. 1965); *Downs* v. *Board of Education*, 336 F.2d 988, 998 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S. Ct. 898, 13 L. Ed. 2d 800 (1965); *Blocker* v. *Board of Education*, 226 F. Sup. 208, 230 (E.D.N.Y. 1964). The two cases that the majority cites for such speculative reliance by the convention delegates do not support it. *Booker* v. *Board of Education*, 45 N.J. 161, 177–78, 212 A.2d 1 (1965), holds that the New Jersey commissioner of education has authority to reduce de facto segregation on the basis of state law and policy. *Jenkins* v. *Township of Morris School District*, 58 N.J. 483, 497–98, 279 A.2d 619 (1971), while holding the same, collects cases from 1966, not 1965.

[59] I recognize that my comments in this respect are premised on the notion that the majority's interpretation of article first, § 20, constitutes a significant change from preexisting interpretations of that article, even in the educational context, and even giving due regard to the difference in language between the federal equal protection provision and this article. This premise is valid, nonetheless, particularly because the majority's analysis rests on the concurrent proposition that "because of" and "segregation" have dual meanings: one when applied to education under article eighth, § 1; and an opposite one when applied to all other civil and political rights. Given this

## D

## Remedy

The final fundamental flaw in the majority opinion involves its discussion of a remedy for the constitutional violation that it has found. In what must surely be one of the great understatements in this court's history, the majority recognizes "that the fashioning of appropriate declaratory or injunctive relief requires careful consideration in order to weigh the benefits and costs of various remedial measures." The majority considers *remanding the case to the trial court for the fashioning of a remedy* because, in its view of the record, "the parties have not had the opportunity to present evidence directed to the remedial consequences that follow from our decision on the merits of the plaintiffs' complaint," and because in this court the plaintiffs "have not focused their attention on the remedial consequences of a substantive decision in their behalf." The majority eschews this course of action, as well as the notion of inviting further briefing in this court, however, in favor of "the methodology used in *Horton I*," namely, staying further judicial intervention to afford the General Assembly an opportunity to take appropriate action. In what must surely be one of the most ironic statements in this court's history, given the majority's judicial overreaching in this case, the majority offers as its rationale for this methodology "[p]rudence and sensitivity to the constitutional authority of coordinate branches of government . . . ."

This flaw has two parts. First, it misrepresents the record in this case. Second, it imposes on the General Assembly a mandate to enact a remedial regime without an articulation of principle to guide it in its endeavors.

premise, one would have expected some comment explicating the startling linguistic and jurisprudential path by which the majority has read the two provisions together.

1

## The Record Regarding Remedy

The majority's assertion that "the parties have not had the opportunity to present evidence directed to the remedial consequences that follow from our decision on the merits of the plaintiffs' complaint" is contrary to the record. The question of a potential remedy was extensively litigated and briefed in the trial court, which specifically noted that "this is not a bifurcated hearing." The parties presented several witnesses on the subject of a remedy.[60] In their posttrial brief, the plaintiffs spent twelve pages discussing the question of a remedy, and the defendants responded in kind, devoting thirty pages to the question.

In addition, on remand the trial court made numerous findings regarding a potential remedy. The plaintiffs do

---

[60] For example, the plaintiffs presented William Gordon as an expert in, among other things, "desegregation planning, desegregation techniques and equity analysis." He testified that he had never "seen an interdistrict remedy that was put into effect that didn't have some type of Court order." He also testified regarding the need for a planning process to develop an integration plan, the relative merits of different types of such plans, such as controlled choice, magnet schools and educational parks.

The plaintiffs also offered Gary Oldfield as "an expert in the analysis of desegregation remedies, and the relationships between segregation and desegregation and opportunity." He testified about the conditions under which implementation of a desegregation plan can succeed, the role of teacher involvement in desegregation plans, the role of transportation plans, the use of a housing component, and the role of the court in such remedies.

The plaintiffs also introduced the depositions of two other witnesses that covered the question of remedies. John Mannix' deposition testimony covered the question of busing, scattered housing in the suburbs and magnet schools. Gerald Tirozzi's deposition testimony dealt with past efforts to remedy racial isolation and concentrations of poverty, and the relative merits of various approaches to integration plans.

The defendants presented Christine Rossell as their primary witness on the question of remedy. She testified regarding: a comparison of the effectiveness of mandatory, as opposed to voluntary, desegregation plans; the merits of controlled choice plans; and the factors necessary to consider in bringing about stable integration.

not challenge these findings in this appeal. The court found that no state in the country has a racial imbalance law that requires interdistrict balancing. Under the heading, "The Nature and Scope of the Remedy," the court made seventeen additional specific findings. Among those findings were the following. The plaintiffs seek to have the court direct the Hartford school districts and the twenty-one suburban districts to address the claimed inequities jointly, to reconfigure district lines, and to take other steps sufficient to eliminate those inequities. The court also found that the "present racial, ethnic and socioeconomic concentration and isolation of the schoolchildren in the Hartford public school system on the basis of their residence is principally the result of social and demographic patterns of change that have occurred over the past thirty years in the Hartford metropolitan area."

The trial court found further that the relief sought by the plaintiffs includes the integration of the public schools in the region for the purpose of eliminating economic, as well as racial and ethnic, isolation. The court noted that, although William Gordon, an expert witness for the plaintiffs, was of the opinion that the federal courts' method of eliminating de jure segregation could be effectively applied to this case, the remedial planning in this case would be more complicated because the remedy sought by the plaintiffs includes interdistrict economic integration. The court also noted the plaintiffs' expert witnesses' opinions that problems of poverty can be appropriately addressed by the public schools. The court rejected these opinions, however, as inconsistent with the "general agreement that conventional educational approaches are inadequate to address the special problems of the urban poor," and with the "unanimous and apparently undisputed finding of the governor's commission on quality and integrated education that there [are] no educational strategies or

initiatives that could fully deal with the larger issues of poverty, unemployment, housing, health, substance abuse, hunger, parental neglect, and crowded and substandard housing" that are associated with the concentration of poverty.

The trial court specifically found that there "are no existing standards or guidelines that educators, social scientists or desegregation planners can offer or recommend to achieve the proper racial, ethnic and socioeconomic balance in the school districts of the Hartford metropolitan area." The court further found that "[m]andatory student reassignment plans to achieve racial balance, whether intradistrict or interdistrict, are ineffective methods of achieving integration, whether they are mandated by racial imbalance laws or by court order." In this connection, the court also found that "[p]roposed solutions to the problems of racial, ethnic and economic isolation which rely on coercion and which fail to offer choices and options either do not work or have unacceptable consequences." Finally, the court found that "[i]ntegration in its fullest and most meaningful sense can only be achieved by building affordable housing in suburban areas in order to break up the inner city ghettos, and by making urban schools more attractive for those who live outside the city."

These facts, like the facts regarding the educational effects of poverty rather than of race or ethnicity, were drawn from the testimony of the witnesses whom the parties had presented at trial. The competing factual claims were vigorously litigated at trial and briefed in the trial court, and both sides had a full and fair opportunity to brief them in this court. If, as the majority suggests, that opportunity was not adequately afforded here, it can only be attributed to the fact that the majority precludes it by sending the case directly to the General Assembly and the executive branch. This brings

me to the task that the majority has thrust upon those branches of government by its opinion.

2

The Lack of a Recognizable Principle or Standard

I confess that, if I were a member of either the executive or legislative branch of our government, I would have but the slightest glimmering of what kind of legislation would comport with the majority's mandate, because the opinion articulates no principle or standard upon which to base such legislation. Confining my discussion here to the Hartford metropolitan area, I can find no principle or standard in the majority opinion by which to measure the level of racial and ethnic integration of the African-American and Hispanic schoolchildren that will be constitutional.

The closest thing to such a principle are three statements by the majority. The first is that "the existence of *extreme racial and ethnic isolation*" in the public schools violates the constitution. (Emphasis added.) The second is that if "*significant* racial and ethnic isolation continues to occur," no intent to bring about or maintain that isolation is required in order to establish a constitutional violation. (Emphasis added.) The third is that a "significant component of [a] substantially equal educational opportunity is access to a public school education that is not substantially impaired by racial and ethnic isolation."

Assuming that these elliptical references constitute the majority's guidance to the General Assembly, is the lack of significant isolation, or the presence of substantial impairment, the same as "substantial equality?" Does significant isolation or "substantially impaired" mean that, with respect to the Hartford metropolitan area, the legislature must start with the last census figures, and redraw the district lines so that each munic-

ipality has a substantially equal percentage of African-American and Hispanic schoolchildren? Or does the reference to "extreme racial and ethnic isolation" mean that, so long as the concentration is not massive—something less than the current 92 or 95 percent figure,[61] for example—the constitution will not be violated? Or is the measure a statewide, rather than a district-wide figure? That is, must each municipality have a percentage of African-American and Hispanic schoolchildren substantially equal to the percentage of such children in the state? Education is, after all, a state responsibility that has only been delegated to the municipalities.

Further, why is the municipality the appropriate measuring unit, rather than the individual school? After all, if a student's constitutional right to an integrated education is violated by being required to be educated in a racially or ethnically concentrated setting, thereby, according to the majority, missing out on the social benefits of an integrated education and incurring the social burdens of a segregated education upon which the majority's analysis rests, then is it not appropriate that we look at the actual setting in which each child's education takes place? After all, a student who attends a racially and ethnically concentrated school, albeit in a racially and ethnically integrated school district, will not have those benefits and will carry those burdens. If so, then it seems that each school must, constitutionally, have the appropriate racial and ethnic makeup.

---

[61] Indeed, these figures constitute a combination of the percentages of African-American and Hispanic students in the Hartford schools. Thus, underlying the majority's entire thesis of the constitutional need to remedy racial and ethnic isolation in the schools of our state is the unfounded assumption that, for purposes of measuring diversity in those schools, these two groups constitute a monolithic cultural entity. In my view, such an assumption is insulting to both groups. In fact, viewed through a somewhat different prism—viewing these two groups not as culturally monolithic but as culturally different—a school system like Hartford's can be seen as more culturally diverse than an all white school system.

These are just some of the questions that are raised, but not addressed, by the majority opinion.

The task of the state will be complicated, moreover, by the findings of the trial court in this case regarding remedy. The majority does not address these findings, but my examination of the record discloses that they are based on sufficient evidence to withstand appellate scrutiny. Among those findings are the following.

The trial court found that there are no educational strategies or initiatives that could fully deal with the larger issues of poverty, unemployment, housing, health, substance abuse, parental neglect, and crowded and substandard housing that are associated with the concentration of poverty under which the plaintiffs suffer. Thus, it is these factors, not the plaintiffs' racial and ethnic concentration, that account for the educational deficiencies of which the plaintiffs complain. Furthermore, the court found that there are no existing standards or guidelines that educators, social scientists or desegregation planners can offer or recommend to achieve the proper racial, ethnic and socioeconomic basis in the school districts of the Hartford metropolitan area. The majority's mandate, therefore, will require the state to devise a strategy to compel integration that, the trial court found after six years of litigation, will not significantly ameliorate the underlying educational deficiencies of which the plaintiffs complain, and with respect to which educators, social scientists and desegregation planners could not offer standards or guidance. Thus, the majority thrusts on our state government the truly awesome task of devising a remedy for educational deficiencies in Hartford—a remedy that will necessarily require drastic statewide changes—without an intelligible guiding principle, and with no indication that the true source of Hartford's educational deficiencies will be addressed thereby.

In this respect, also, this case differs markedly from *Horton I*. In that case, like this case, the question of the availability of an appropriate remedy or remedies had been litigated. In that case, however, unlike this case, the trial court had found, and we affirmed based on that finding, that there were feasible remedies available to achieve the substantial equality of educational opportunity that was not being afforded by the flat grant funding system. *Horton I*, supra, 172 Conn. 635–36. Furthermore, in that case, unlike this case, there were successful methods in use in many other states for remedying the inequality of educational opportunity resulting from financial inequities. Id., 651. According to the trial court's findings here, by contrast, there are no strategies available, or in successful use elsewhere, for remedying differences in educational opportunities that result from concentrations of poverty. In sum, whereas the remedy in *Horton I* involved moving dollars around and thereby ameliorating educational differences and deficiencies, the remedy here will involve moving schoolchildren around without ameliorating such differences or deficiencies.

IV

THE NECESSARY IMPLICATIONS OF THE
MAJORITY OPINION

Despite the effort of the majority to cabin its conclusions, it is clear to me that the effort must fail and that, when the General Assembly attempts to enact legislation in order to meet the mandate of this case, there are several necessary—not possible, not probable but, in my view, necessary—implications of the majority opinion that it will be required to confront. I have already discussed what seems to me to be the most obvious implication, namely, that the majority's rationale applies, not just to interdistrict racial and ethnic concentrations, but to intradistrict and interschool con-

centrations as well. There are, however, other less obvious but equally necessary implications.

These implications are compelled in part by the identity of the plaintiffs. Six of the eighteen plaintiffs are white students—four who reside in Hartford, and two who reside in West Hartford. Moreover, there is no showing that the two who live in West Hartford are burdened by a concentration of poverty. The majority opinion vindicates these white students' constitutional right to attend unsegregated schools, as well as the constitutional right of the African-American and Hispanic plaintiffs. Furthermore, the racial and ethnic concentration involved in the Hartford school district is more ethnic than racial. That is, a greater percentage of the students in Hartford are Hispanic than are African-American, and Hispanics are the fastest growing segment of the school population. Thus, in terms of article first, § 20, this case is more about "ancestry" and "national origin" than it is about "race" or "color."[62]

---

[62] A second significant factor that compels the drastic implications of the majority's opinion is its definition of "segregation" as used in article first, § 20, when applied to education under article eighth, § 1. This definition does not require any state intent to bring about racial or ethnic concentration, and it appears to require that there be no significant disparities in the racial and ethnic makeup of various school districts.

A third such factor is the majority's rationale for that definition. That rationale is based on the recognition of the general social benefits of a racially and ethnically integrated educational setting and of the general social burdens of a racially and ethnically concentrated educational setting. It deems irrelevant, however, the specific factual findings in this case, which are that the educational deficiencies of the Hartford school district of which the plaintiffs in this case complain arise from the concentration of poverty in Hartford, and not from the racial and ethnic concentration in the schools.

A fourth factor is the language of article first, § 20, itself. That language prohibits discrimination or segregation, not only because of race or ethnicity, but also because of religion. There is nothing in the language or history of article first, § 20, to suggest that it embodies a hierarchy of protected classes. Indeed, it would be Orwellian, and antithetical to the entire equal protection premise of article first, § 20, to read it as embodying a principle that some classes are more equal than others. It follows, therefore, that religious concentration in public schools, not resulting from a state intent, must be treated the same as racial and ethnic concentration.

The first of the necessary implications of the majority opinion is that every school district in the state that is primarily white and that does not have an appropriate percentage of African-American and Hispanic students, is in violation of article first, § 20.[63] This conclusion, it seems clear to me, flows inexorably from the facts that (1) in this case, it is not only the constitutional rights to an unsegregated education of the African-American and Hispanic students, taken together, that are being violated, but the same rights of the white plaintiffs who live in Hartford and West Hartford, and (2) this violation is based on the general social benefits attributable to an integrated education, and the general social burdens attendant upon a racially and ethnically concentrated education. Certainly, every predominantly white school district lacks the general social benefits of an integrated education, and suffers from the general social burdens of a segregated education. Just as certainly, the constitutional rights of white students in other parts of the state cannot be less than those in the Hartford metropolitan area, and a student's constitutional right to attend school in an unsegregated public school district, or to attend an unsegregated school within such a district, cannot depend on where the student happens to live.

Indeed, the majority comes very close to making explicit this necessary implication of its decision. It states that the right of "Connecticut schoolchildren" to a substantially equal educational opportunity requires "access to a public school education that is not substantially impaired by racial and ethnic isolation." Thus, every rural and suburban school district, from Litchfield to Pomfret and from Greenwich to Granby, is now either clearly or probably unconstitutional; its boundaries, or

---

[63] I do not address the implications of the majority opinion for other racial and ethnic groups, such as Asian-Americans, Polish-Americans and Italian-Americans, not because I do not think there are such implications, but because attempting to figure them out at this point is beyond my capability.

the racial and ethnic makeup of its school population, or both, will have to be changed in order to remedy that unconstitutionality. This means the end of the traditional system of municipality based school districts.[64]

Second, because ethnicity is a specifically protected class under article first, § 20, and because the facts of this case rest more on ethnicity than on race, not only must every school district in this state have an appropriate percentage of African-American and Hispanic students, taken together, but also an appropriate ethnic makeup, irrespective of race. Furthermore, I cannot see how such a makeup can be properly confined to counting Hispanic students. Certainly, other ethnic groups have no lesser status than Hispanic students. Just as certainly, moreover, the general benefits of an integrated education and the general burdens of a segregated education apply to ethnic, as well as racial, segregation. Therefore, if ethnicity is a protected class under article first, § 20, if "segregation" does not require intent, and if segregation prohibits ethnic as well as racial segregation, then in order for a school district to be nonsegregated it will have to contain an appropriate percentage of the various major ethnic groups in the state.

Third, because "segregation" in article first, § 20, does not have an intentionality requirement, and because that article protects religion on a par with race and ethnicity, every school district, and probably every neighborhood school, that is heavily concentrated with students of one religion is segregated. Consequently, all of the students in that district or school are being subjected to segregation "because of religion." There-

[64] In fact, there are vast areas of the state, such as Litchfield, Tolland and Windham counties, where it will be difficult if not impossible to find sufficient minority students to comply with the majority's mandate. In these areas, even broadly drawn regional school districts will be constitutionally deficient.

fore, the legislature will be required to address this necessary implication of the majority's mandate, so that each district, or school, will have an appropriate percentage of Protestant, Roman Catholic and Jewish students.[65]

As a result of these implications, the legislature, if it is to take seriously its responsibilities under the majority's mandate, will have few options, if any, other than a statewide realignment of school districts, accompanied by a statewide transportation system.[66] Such a system will be necessary to ensure that the constitutional rights of every schoolchild in the state are protected.[67]

---

[65] I have only mentioned what I assume are, in terms of our population, the three major religions in the state. It may be that other religions, such as Islam, will also have to be taken into account.

[66] Indeed, that is precisely the remedy that the plaintiffs sought in the trial court on an interdistrict basis. Moreover, the trial court also found that students who live in an environment of concentrated poverty bring with them to school the array of social disadvantages associated with poverty that seriously hinder academic achievement, and that it is those disadvantages, rather than racial and ethnic isolation, that are the primary causes of educational difficulties. These findings are supported by the evidence in this case. Furthermore, although the majority has deemed these findings to be irrelevant to its constitutional analysis, I do not read the majority opinion to reject them as unfounded. Thus, after the legislature has undertaken the process of realigning school district lines and transporting students so as to achieve the constitutionally mandated degree of racial, ethnic and religious integration, under the findings in this case the poverty stricken students of our urban areas will carry their educational disadvantages with them.

[67] I recognize that these implications do not take into account the fact that the majority's conclusions rest in part on the fact that the plaintiffs' racial and ethnic isolation is also accompanied by a concentration of poverty. I nonetheless think that the implications are present and are necessary, because the constitutional underpinnings of the majority's conclusion that the existing district lines must be changed are that: (1) a racially and ethnically integrated educational system carries benefits that a concentrated system does not, and is free of burdens that a segregated system imposes; and (2) "segregation" under article first, § 20, means de facto racial and ethnic separation. Neither of these notions has anything to do with poverty or its effects. Indeed, the majority has deemed irrelevant to its constitutional analysis the findings in this case that all of the educational deficiencies that the plaintiffs attribute to the Hartford school system are attributable to the environment of poverty in which the families of the students live, and not

V

## THE PLAINTIFFS' CLAIMS AS PRESENTED TO THIS COURT

This discussion brings me, finally, to a consideration of the plaintiffs' claims as they *were actually* presented to us for adjudication, not as reconstructed by the majority. The plaintiffs make three claims that, in my view of the case, must be addressed.[68] These are, in general terms, that: (1) the defendants violated article first, §§ 1 and 20, and article eighth, § 1, by failing to provide public schoolchildren in the Hartford metropolitan area an equal educational opportunity; (2) the defendants violated article first, §§ 1 and 20, by providing education in the Hartford metropolitan area that is segregated on the basis of race and ethnicity; and (3) the defendants violated article eighth, § 1, by failing to provide Hartford schoolchildren a minimally adequate education. Although much of my prior discussion disposes of most of these claims, some further discussion is appropriate. None of these claims is persuasive, moreover, because none is supported by the record. I would, therefore, affirm the judgment of the trial court.[69]

A

### Equal Educational Opportunity

As I indicated previously, the plaintiffs' equal educational opportunity claim is based on *Horton I,* and is

to their racial and ethnic isolation. Thus, under the majority's analysis, at the end of the day, the fact of the plaintiffs' concentration of poverty is constitutionally irrelevant.

[68] There is a fourth claim, namely, that the defendants have failed "to remedy the racial, ethnic and economic isolation and lack of educational resources despite their long-standing knowledge of the harmful effects of these conditions." Because this claim presupposes that the plaintiffs have established a constitutional violation that requires the defendants to have remedied, and because I conclude that the plaintiffs have not done so, it is not necessary to address this claim.

[69] Although I disagree with the trial court's conclusion that there is no state action involved, the facts found by the trial court and the applicable

premised on the factual assertion that the racial and ethnic concentration in the district, coupled with their concentration of poverty and their lesser educational resources, as compared to the resources of the suburban districts, has caused educational outcomes in the Hartford school district that are inferior to those in the suburban districts. The claim also depends in significant part on the premise that, with respect to the relative educational outcomes of Hartford and the suburbs, the state mastery test scores are a valid tool for measuring differences in educational outcomes between Hartford and the suburbs. Consequently, they argue, just as in *Horton I*, in which unequal funding caused an inferior quality of education in the property-poor towns and violated the constitution, in this case the combination of factors listed earlier has caused the quality of education in the Hartford district to be inferior to that provided in the surrounding suburban districts and violates the constitution. Similarly, the plaintiffs argue that the relative quality of educational opportunities must be measured by the same or similar factors that this court deemed relevant in *Horton I*, supra, 172 Conn. 634, namely: educational outcomes, as reflected by the state mastery test scores, state remedial goals, scholastic aptitude test (SAT) scores and college attendance rates; plants and facilities; equipment, supplies, textbooks and libraries; course offerings and curriculum; teaching and professional staff; bilingual education programs; and special needs programs.

As I indicated previously, although this claim might well be persuasive if its factual underpinnings were sound, it founders on the factual findings of the trial court. It is not necessary to recount all of those findings in this regard. It is sufficient to repeat here several that are fatal to the plaintiffs' claim.

legal principles compel a judgment for the defendants on the merits of this case.

The trial court's findings are squarely contrary to the plaintiffs' claim that Hartford suffers from diminished educational resources compared to its suburban neighbors. The court found that, since 1979, the state's method for financing public schools has taken into account the needs of urban school districts by including in the aid formula the number of children from low income families and, since 1989, a weighting factor that takes into account the number of students who score below the remedial standard on the state's mastery test scores. The court also found that the 1986 Educational Enhancement Act addressed cities' financial needs by raising teachers' salaries dramatically, so that Hartford, New Haven and Bridgeport have been able to recruit and retain teachers at salaries comparable to, if not higher than, the salary levels offered in the suburbs, and that this has permitted urban class sizes to be reduced. The court found, in addition, that the priority school district program provides that the poorer communities, like Hartford, receive the greatest financial benefit, that the state factors the mastery test scores into the aid formula as a measurement of a school district's need, and that where students do not meet remedial standards additional funds are made available.

The trial court found, moreover, that Hartford's teachers are as qualified as their suburban counterparts, and that they are very committed and dedicated to providing a quality education for their students. Hartford's teacher training program is based on the "effective schools" concept, which is specifically directed to the needs of urban and minority children. Finally, the court found that Hartford is not a negative educational setting, that there is "outstanding education going on in its schools," that some "of the best special education classes in the state can be found" there, and that the "Hartford public schools offer academic programs that are sufficient to meet the basic educational needs of

all its students and also provide other programs that are required to meet the special needs of its economically disadvantaged students."

As I indicated in great detail earlier, the trial court's findings are also squarely contrary to the plaintiffs' claim that there is a causal connection between their racial and ethnic concentration—whether considered alone or in conjunction with the concentration of poverty—and any educational deficiencies of which the plaintiffs complain. The gist of the trial court's findings in this regard is that it is not the racial and ethnic isolation of the plaintiffs, but their socioeconomic status—their poverty, its concentration, and all of the social pathologies that are closely associated with poverty and its concentration—that is the causative factor of those deficiencies.[70] These "disadvantaging characteristics" of poverty, which "poor children bring with them" from home and neighborhood to school, include "unemploy-

[70] Some of these specific findings are as follows. The generally poorer academic performance of African-American and Hispanic students is explained for the most part, not by their racial and ethnic isolation, but by the social and economic conditions under which their families live. Thus, it "is poverty and not race that is a principal causal factor in lower educational achievement." The problems of the Hartford school district arise from the fact that the minorities in it are primarily poor, and the "real correlation with academic achievement is socioeconomic class rather than race . . . ." Children who live in poverty do not do well in statewide academic testing because they carry with them the social disadvantages of their poverty, and not because they are racially or ethnically isolated. This is demonstrated further by the fact that poor white children exhibit the same educational patterns as poor minority children, because poverty, and the concentration thereof, is the strongest predictor of diminished academic achievement.

Thus, the court specifically found that virtually "all of the differences in performance between Hartford students and those in other towns, as well as differences in college attendance, can be explained by differences in socioeconomic status and the background factors that socioeconomic status represents." Among these background factors are the heightened "mobility" of the Hartford students, and the limited English proficiency of many of them. In this connection, the court also found that it is possible statistically to separate the educational effects of poverty from those of racial isolation, which the plaintiffs' experts had not done.

ment . . . substance abuse, hunger, parental neglect . . . crowded and substandard housing," and such "at risk" factors as low birth weight and mothers on drugs at birth.

Finally, the trial court's findings are squarely contrary to the plaintiffs' claim that they have established valid differences in the educational outcomes between the Hartford school district and the suburban districts. To the extent that the plaintiffs rely on the state mastery scores to measure these differences, which as I read their brief is a considerable extent, the trial court found that such scores are not a valid means for measuring interdistrict achievements. Moreover, despite the plaintiffs' assertion to the contrary, the court's findings on this subject are not confined to the state mastery test scores.[71]

The plaintiffs contend, nonetheless, that the trial court's findings are clearly erroneous, that many of the facts upon which they rely were undisputed in the trial court, and that the court was required to accept certain of the experts' opinions. Suffice it to say that neither the record nor the law bears out that contention. The court's findings are fully supported by the evidence. None of the facts in question was undisputed; on the contrary, they were hotly disputed in the trial court,

[71] Specifically, the trial court found that the scores serve purposes that are not related to measuring interdistrict performance, and that it would be an abuse of their purposes to use them for such a measurement. Moreover, the court found that the scores should not be caused by racial and ethnic isolation, because the results could be related to other factors that have not been considered in that context. The test scores cannot serve as a basis for interdistrict comparisons because they do not take into account other significant factors, such as socioeconomic status, environmental deprivations at home, diminished motivation to succeed, the number of students with limited English proficiency, and the extraordinary mobility of the Hartford student population. The court also found that, because school officials have no control over where their students live or the conditions under which they live, the officials are not in a position to remedy the severe disadvantages that their students bring with them to school.

originally and on our remand. Finally, it is axiomatic that a trial court is not required to accept an expert's opinion; *Drabik* v. *East Lyme*, 234 Conn. 390, 396, 662 A.2d 118 (1995); and that is particularly true in this case, where the court indicated that some of the plaintiffs' experts' opinions were flawed methodologically, and where there were contrary expert opinions that the trial court did credit.

## B

### Per Se Segregation Under Article Eighth, § 1, and Article First, § 20

This claim of the plaintiffs bears little additional discussion. As I indicated previously, it rests entirely on the proposition that "segregation" as used in article first, § 20, and applied to education under article eighth, § 1, means de facto racial and ethnic concentration, without a requirement of state intention. As I also indicated previously, this claim is simply untenable, and such a conclusion cannot rationally be drawn from the language or history of those constitutional provisions.

## C

### A Minimally Adequate Education

The plaintiffs' final claim is that they have established that they are being deprived of their right, under article eighth, § 1, to a minimally adequate education. This claim requires some additional discussion, because the majority did not discuss it and, therefore, it was not involved in my analysis of the majority opinion. I conclude, nonetheless, that the plaintiffs cannot prevail on this claim.

The plaintiffs argue, first, that, under both the majority opinion in *Horton I*, supra, 172 Conn. 649 (referring to state's "constitutional duty to educate its children"), and the dissenting opinion therein; id., 659 (*Loiselle, J.,*

dissenting) ("[w]hen the constitution says free education it must be interpreted in a reasonable way. A town may not herd children in an open field to hear lectures by illiterates."); article eighth, § 1, embodies a requirement of a minimally adequate education that the judiciary is empowered to enforce. The plaintiffs also point to precedents from other jurisdictions that, in their view, have held accordingly. They next contend that the trial court employed an improper standard in defining a minimally adequate education and that, under the proper standard, the evidence established a violation thereof as a matter of law.

The defendants respond, first, that article eighth, § 1, does not embody any particular substantive level of education that the judiciary has power to enforce. They contend that, although they agree that the constitutional provision includes the right to an "adequate education"; id., 659; it "does not authorize the judiciary to establish specific educational programs and goals or levels of educational achievement as a constitutional requirement." The defendants next argue that, assuming we do consider the issue, the trial court cannot be faulted for using a standard that the plaintiffs themselves proposed, that the standard now proposed by the plaintiffs is improper, and that, under any appropriate standard, the plaintiffs' rights have not been violated.

In my view, it is not necessary in this case to decide whether article eighth, § 1, embodies a requirement that the state provide a minimally adequate education or, if it does, the extent to which such a requirement is subject to judicial review. Nor is it necessary to define the specific contours of such an education. Assuming that there is such a requirement that is subject to judicial review, I conclude that the standard proposed by the plaintiffs is improper and that, gauged by any appropriate standard, the plaintiffs have not been deprived of such a right.

Although it is difficult to ascertain precisely the standard that the plaintiffs propose, it appears to be geared in significant part to student achievement, as measured by certain performance goals set by the state, namely, the state mastery tests.[72] Thus, they assert that the trial court improperly rejected as irrelevant to this claim their "evidence relating to whether Hartford children were succeeding in the goals set by the state . . . ." They contend that this standard is not met in Hartford, which in their view is a "school system whose children cannot read or write, even if provided with significant resources," and that Hartford has not provided a minimally adequate education because it is not a system "that succeeds in teaching children to at least achieve a minimal level of reading, writing and arithmetic . . . ." As the defendants correctly point out, the plaintiffs base these characterizations of the Hartford school district on the state mastery test scores for Hartford.

I reject, as did the trial court, the plaintiffs' proposed standard for a constitutionally required minimally adequate education. Performance or achievement of the student population, taken generally, cannot in my view be the principle upon which any such requirement is based. There is nothing in either the language or the history of article eighth, § 1, to support such a standard.

Not only the trial court's findings in this case, but also common sense tells me that any appropriate standard by which to measure the state's assumed obligation to provide a minimally adequate education must be based generally, not on what level of achievement students reach, but on what the state reasonably attempts to make available to them, taking into account any special needs of a particular local school system.

---

[72] In this connection, the plaintiffs also refer to "other measures of achievement such as drop-out rate, graduation rate, SAT scores and college attendance." Although these do not involve any goals or standards set by the state, the plaintiffs link them with the mastery test scores.

Although schools are important socializing institutions in our democratic society, they cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder the academic achievement of those students. Thus, as the trial court found, achievement levels as measured by such tools as the state mastery tests are an inappropriate measurement of the quality of education. Those test scores do not take into account important variables that erect difficult barriers to achievement, such as socioeconomic status, early environmental deprivations, low birth weight, mothers on drugs at birth, diminished motivation to succeed academically, extraordinary mobility, limited English proficiency, and all of the other dismal factors associated with the concentration of poverty in the Hartford school district.

This is not to say that, as part of its assumed constitutional obligation to provide a minimally adequate education, the state has no obligation to attempt, by reasonable means, to ameliorate these problems. It may well have such an obligation. It is to say, however, that this record fully establishes that the state has, through the programs, policies and funding mechanisms already described, met that obligation.

## VI

## CONCLUSION

It is a bedrock principle of our system of government that the legislative branch is the source of the fundamental public policy of the state, and that the courts may invalidate such a policy only where it is established beyond a reasonable doubt that it violates a constitutional right. *Morascini* v. *Commissioner of Public Safety*, 236 Conn. 781, 789, 236 A.2d 1340 (1996). Not only does the majority fail even to give lip service to this principle, the majority violates it.

With no justification other than its own view of the wiser course for the state to follow, the majority strikes down a legislative public policy determination—in effect since 1909, more than half a century prior to the 1965 constitutional convention—in favor of municipality based public school districts, and substitutes its own policy choice for that legislative determination. With the same absence of legitimate justification, the majority strikes down the legislative policy determination that more can be accomplished toward the goal of diversity in our public school systems by voluntary and incremental means, supplemented by state funding and incentives, than by a mandate that requires the abandonment of municipality based school districts and the institution of a statewide system of transportation of schoolchildren. Instead, the majority substitutes its policy choice and opts for a mandate that will require such a statewide system of transportation based solely on racial, ethnic and religious factors.

Although the majority may disagree with the legislature's choices and initiatives, it cannot be maintained that reasonable people may not differ regarding the best way to reach the goal of diversity in our public schools. Indeed, in states and communities across the nation people of goodwill of all races and ethnic groups are struggling to find acceptable and feasible ways to reach and maintain that goal and, at the same time, to reach the twin goal of improving the quality of their children's education. This case, in which there are such disagreements and in which the defendants are engaged in a good faith effort to reach those goals, is the quintessential case for deference to the policy choice of the legislative branch.

The majority concludes its opinion with a rhetorical invocation of its oath of office as a justification for its decision. That same oath of office, however, embraces the concept of judicial respect for the legitimate policy

choices of the legislative branch, even when judges disagree with those choices.

Only twelve years ago, we stated: "This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy uninhibited by the history which attended the adoption of the particular phraseology at issue and the intentions of its authors. The faith which democratic societies repose in the written document as a shield against the arbitrary exercise of governmental power would be illusory if those vested with the responsibility for construing and applying disputed provisions were free to stray from the purposes of the originators." *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 62. In this case, that snow has now fallen, and the shield against the arbitrary exercise of power has been shattered.